UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

COMPLAINT AND JURY
DEMAND

WARREN A. OVALLE,

               Plaintiff,

Docket No.:

-against-

SUFFOLK COUNTY, SUFFOLK COUNTY
SHERIFF'S DEPARTMENT, SUFFOLK
COUNTY SHERIFF'S DEPARTMENT CORRECTIONS OFFICERS
JOHN DOE #1-10, INDVIDUALLY & AS SHERIFF'S
DEPARTMENT CORRECTIONS OFFICERS IN THEIR
OFFICIAL CAPACITY, DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION
(herein after referred to as "DOCCS"), DOCCS ACTING
COMMISIONER ANTHONY ANNUCCI, INDIVIDUALLY
& AS DOCCS ACTING COMMISIONER IN HIS
OFFICIAL CAPACITY; DOCCS PAROLE OFFICER
SABRINA HAMLETTE, INDIVIDUALLY & AS DOCCS
PAROLE OFFICER IN HER OFFICAL CAPACITY; DOCCS
PAROLE OFFICER LOREN OWENS-SKRODANCE,
INDIVIDUALLY & AS DOCCS PAROLE OFFICER IN
HER OFFICAL CAPACITY, DOCCS PAROLE OFFICER
PEDRO TORRES, INDIVIDUALLY & AS DOCCS
PAROLE OFFICER IN HIS OFFICAL CAPACITY, DOCCS
PAROLE OFFICER ROSS BOTWINICK, INDIVIDUALLY
& AS DOCCS PAROLE OFFICER IN HIS OFFICAL
CAPACITY, DOCCS SENIOR PAROLE OFFICER GARRY
JUSTE, INDIVIDUALLY & AS DOCCS SENIOR PAROLE
OFFICER IN HIS OFFICAL CAPACITY, DOCCS SENIOR
PAROLE OFFICER SCOTT HNIS, INDIVIDUALLY & AS
DOCCS SENIOR PAROLE OFFICER IN HIS OFFICAL
CAPACITY, OFFICE OF SPECIAL INVESTIGATION,
OFFICE OF SPECIAL INVESTIGATION INVESTIGATOR
CATHERINE MENCARELLI, INDIVIDUALLY & AS
OFFICE OF SPECIAL INVESTIGATION INVESTIGATOR
IN HER OFFICIAL CAPACITY, DOCCS PAROLE
VIOLATIONS CHIEF EDWARD DELRIO,
INDIVIDUALLY & AS DOCCS PAROLE VIOLATIONS
CHIEF IN HIS OFFICIAL CAPACITY, DOCCS REGIONAL
DIRECTOR IRWIN DAVIS, INDIVIDUALLY & AS
DOCCS REGIONAL DIRECTOR IN HIS OFFICIAL
CAPACITY, BUREAU CHIEF OF SUFFOLK COUNTY

PAROLE JARVIS JENKINS, INDIVIDUALLY & AS
BUREAU CHIEF OF SUFFOLK COUNTY PAROLE IN HIS
OFFICAL CAPACITY, NEW YORK STATE
ATTORNEY GENERAL OFFICE, NEW YORK
STATE ATTORNEY GENERAL OFFICE and ASSISTANT
ATTORNEY GENERAL LAURIE PACK, INDIVIDUALLY
AND AS ASSISTANT ATTORNEY GENERAL IN HER
OFFICIAL CAPACITY,

                              Defendants.
_____

Plaintiff, WARREN A. OVALLE, by his attorneys, Ferro, Kuba, Mangano, P.C. for his Complaint

alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiff seeks relief for the violation of his

rights secured by 42 U.S.C. §1981 §1983, §1985, §1988, the Fourth and Fourteenth Amendments to

the United States Constitution.

2.      This claim arises from Plaintiff's wrongful confinement and/or imprisonment in

Suffolk County and New York State Correctional facilities at various times during the period of

September 18, 2017 through October 11, 2019, by all defendants who acted under the color of state

law and their intentional, deliberate, malicious, reckless, grossly negligent, negligent, careless

actions and/or with no reasonable basis to violate Plaintiff's conditions of parole, due process and

civil rights as set forth in detail below.

3.      Plaintiff seeks monetary damages (special, compensatory, and punitive) against

Defendants, as well as an award of costs and attorney's fees, and such other and further relief as this

Court deems just and proper.

## JURISDICTION

4.      This action is brought pursuant to 28 USC §1331, 42 USC §1981 §1983, §1985,

§1988, the Fourth and Fourteenth Amendments to the United States Constitution. This Court has original jurisdiction pursuant to 28 USC §1251 as a federal question is present pursuant to 42 USC §1981, §1983, §1985, §1988 and 28 USC §1343.

5.     The amount in controversy exceeds $75,000 excluding interest and costs.

## VENUE

6.     Venue is laid within the United States District Court for the Eastern District of New York in that all Defendants' Agencies and/or Offices, are located within, and a substantial part of the events giving rise to the claim which occurred within the boundaries of the Eastern District of New York. Hence the Eastern District of New York is the appropriate venue pursuant to 28 USC §1291(b).

## PARTIES

7.     Plaintiff, Warren A. Ovalle, is a legal resident of the United States and is presently residing in Suffolk County, City and State of New York.

8.     Upon information and belief, defendants, Suffolk County is a municipal corporation organized and existing under the laws of the State of New York, with a principal place of business in the County of Suffolk, State of New York.

9.     Upon information and belief, defendant, Suffolk County Sheriff's Office is a municipal corporation organized and existing under the laws of the State of New York, with a principal place of business in the County of Suffolk, State of New York.

10.     Upon information and belief, defendant, Department of Corrections and Community Supervision, is a New York State corporation organized and existing under the laws of the State of New York, with a principal place of business in the County of Albany, State of New York.

11.     Upon information and belief, defendant, Commissioner Anthony Annucci was

employed by the Department of Corrections and Community Supervision and maintains an office in the County of Albany, State of New York.

12.     Upon information and belief, defendant, Parole Officer Sabrina Hamlette was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

13.     Upon information and belief, defendant, Parole Officer Loren Owens-Skrodance, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

14.     Upon information and belief, defendant, Parole Officer Pedro Torres, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

15.     Upon information and belief, defendant, Parole Officer Ross Botwinick, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

16.     Upon information and belief, defendant, Senior Parole Officer, Garry Juste, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

17.     Upon information and belief, defendant, Senior Parole Officer, Scott Hnis, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

18.     Upon information and belief, defendant, the Office of Special Investigation, is an agency of the Department of Corrections and Community Supervision and maintains an office in the County of Albany, State of New York.

19.     Upon information and belief, defendant, Investigator Catherine Mencarelli, was Employed by the Office of Special Investigation, and maintains an office in the County of Albany, State of New York.

20.     Upon information and belief, defendant, Parole Violations Chief, Edward Delrio, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of New York, State of New York.

21.     Upon information and belief, defendant, Regional Director, Irwin Davis, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Queens, State of New York.

22.     Upon information and belief, defendant, Bureau Chief of Suffolk County Parole, Jarvis Jenkins, was employed by the Department of Corrections and Community Supervision and maintains an office in the County of Suffolk, State of New York.

23.     Upon information and belief, defendant, New York State Attorney General's Office, is a New York State agency, and maintains an office located in the County of New York, State of New York.

24.     Upon information and belief, defendant, Assistant Attorney General Laurie Pack, Esq. was employed by the New York State Attorney General's Office, and maintains an office located in the County of Suffolk, State of New York.

25.     At all times relevant hereto, Defendant, Suffolk County, acting through the Sheriff's Office, was responsible for the policy, practice, supervision, implementation, and conduct of all Sheriff's Office's matters, including the operation of its correctional facilities, and/or county jails and was responsible for the appointment, training, supervision, discipline and retention and conduct of all Sheriff's Office personnel. In addition, at all times here relevant, Defendant, Suffolk County

was responsible for enforcing the rules of the Sheriff's Office, and for ensuring that the Sheriff's office personnel obey the laws, statutes, rules, regulations, codes and mandates of the United States and the State of New York.

26.     All other defendants, including John Doe #1-10, individuals whose names are currently unknown to plaintiff are employees of the Suffolk County Sheriff's Office and are sued in their individual capacities.

27.     At all times relevant hereto, Defendant, Department of Corrections and Community Supervision (hereinafter referred to as "DOCCS"), and its related agencies, divisions and departments, including Office of Special Investigations, were responsible for the policy, practice, supervision, implementation, and conduct of all Commissioners, Regional Directors, Parole Violations Chiefs, Senior Parole Officers, Parole Officers, and Department of Corrections and Community Supervision and/or Division of Parole matters, and were responsible for the appointment, training, supervision, discipline and retention and conduct of all DOCCS personnel. In addition, at all times here relevant, Defendant, DOCCS, was responsible for enforcing the rules of its agencies and/or divisions and/or departments, and for ensuring that the DOCCS's personnel obey the laws, statutes, rules, regulations, codes and mandates of the United States and the State of New York.

28.     All other defendants, including, Commissioner Anthony Annucci, Regional Director Irwin Davis, Parole Violations Chief Edward Delrio, Bureau Chief of Suffolk County Parole Jarvis Jenkins, Parole Officer Sabrina Hamlette, Parole Officer Loren Owens-Skrodance, Parole Officer Pedro Torres, Parole Officer Ross Botwinick, Senior Parole Officer Garry Juste, Senior Parole Officer Scott Hnis, OSI Investigator Catherine Mencarelli, are employees of the State of New York and New York State DOCCS and are sued in their individual capacities.

29.     At all times relevant hereto, Defendant, New York State Attorney General's Office, was responsible for the policy, practice, supervision, implementation, and conduct of all New York State Attorney General matters, and was responsible for the appointment, training, supervision, discipline and retention and conduct of all Assistant Attorney General personnel. In addition, at all times here relevant, Defendant, New York State Attorney General's Office was responsible for enforcing the rules of its Office, and for ensuring that its Assistant Attorney Generals, obey the laws, statutes, rules, regulations, codes and mandates of the United States and the State of New York.

30.     All other defendants, Assistant Attorney General Laurie Pack, is an employee of the New York State Attorney General's Office and is sued in her individual capacity.

31.     At all times relevant hereto, all Defendants were acting under color of state law, to wit, under the color of the statutes, ordinances, regulations, codes, policies, customs and usages of the County of Suffolk and State of New York.

## FACTUAL ALLEGATIONS

32.     On January 7, 2010, Plaintiff was convicted of assault in the second degree and sentenced to a six-year incarceration followed by five years post-release supervision.

33.     On or about March 17, 2015, Plaintiff completed the incarceration portion of his sentence and was released to the Department of Corrections and Community Service (hereinafter referred to as "DOCCS") to serve his post-release supervision, with a maximum expiration date for his five years of post-release supervision to be on March 19, 2020. A special condition of Plaintiff's parole supervision included that he was not permitted to fraternize with his co-defendant, Robert Akre. Plaintiff's Parole Officer, P.O. Sabrina Hamlette, never properly reviewed the Special Conditions of Release document with Plaintiff, nor were the required

signatures secured to activate imposition of said Special Conditions and were therefore unenforceable, could not sustain a parole violation detainer warrant and therefore said warrant was not valid on its face. Defendant's use of the invalid parole detainer warrant resulted in the wrongful arrest and confinement of Plaintiff and violated his state and federal due process rights. Annexed hereto as Exhibit "1" and "2" are copies of the Certificate of Release to Post-Release Supervision dated March 17, 2015 and Special Conditions to Parole Supervision dated November 2, 2016.

34.     On or about September 18, 2017, Plaintiff was violated on a parole violation detainer warrant, (warrant #0762538), which cited a delinquency date of May 26, 2017 and Plaintiff was subsequently incarcerated. The violation detainer warrant alleged, the Plaintiff violated conditions of his post release supervision and declared him delinquent with a filing of a declaration of delinquency on May 26, 2017, more specifically that Plaintiff violated a special condition of his parole by meeting with his co-defendant, Robert Akre. As such, pursuant to New York State Penal Law §70.40(3)(b) and §70.45(5)(d)(i)and(ii), Plaintiff's post-release supervision was interrupted on May 26, 2017 and the interruption continued until such time Plaintiff would be restored to post release supervision (which did not occur here). The DOCCS, specifically the Division of Parole, lacked jurisdiction to issue said parole violation detainer warrant while Plaintiff was under the custody and supervision of Suffolk County Correctional facility and not the Division of Parole. Therefore, the DOCCS did not have the jurisdiction to issue the parole warrant. Annexed hereto as Exhibit "3" is a copy of parole violation warrant #0762538.

35.     On September 18, 2017, the DOCCS, and specifically Regional Director Irwin Davis, Bureau Chief of Suffolk County Parole Jarvis Jenkins, Senior Parole Officers Garry Juste

and Scott Hnis, Parole Officers Sabrina Hamlette, Loren Owens-Skrodance, Pedro Torres, Ross Botwinick and Office of Special Investigation Catherine Mencarelli, were all present and involved in the arrest of Plaintiff at his mother's residence. The DOCCS and the above-named defendants did not have a warrant and illegally searched plaintiff's mother's entire residence without permission or consent and illegally seized items, some of which have not been returned to Plaintiff's mother, in violation of Plaintiff's Fourth Amendment rights.

36. On September 25, 2017, a preliminary parole violation hearing for parole detainer warrant #0762538 was held at the Suffolk County Correctional Facility in Riverhead, New York. At the preliminary hearing, the Division of Parole attempted to establish probable cause that Plaintiff violated Charge #3 (Rule 7) and Charge #10 (Rule 13) as contained in the parole violation detainer warrant, having contact with his co-defendant, Robert Akre, a special condition of his release to parole supervision. At the conclusion of this hearing, the Administrative Law Judge found no probable cause as to charge #3 but found probable cause as to charge #10. As a result of this probable cause finding, Plaintiff remained wrongfully incarcerated pending a final parole revocation hearing and he was not returned to parole supervision. Plaintiff's Parole Officer, P.O. Sabrina Hamlette, never properly reviewed or gave notice of the Special Conditions of Release document to Plaintiff, nor were the required signatures secured to activate imposition of said Special Conditions and were therefore unenforceable, could not sustain a parole violation at the hearing and therefore the warrant was not valid. Annexed hereto as Exhibit "4" is a copy of the Board of Parole Preliminary Violation Hearing Decision and Summary dated September 25, 2017.

37. Plaintiff filed a Writ of Habeas Corpus with the Supreme Court, Suffolk County claiming there was insufficient evidence presented at his preliminary hearing to support a finding

of probable cause as to charge #10 and requested that the Court review the legality of his detention. Furthermore, at the Writ of Habeas Corpus, it was established that Plaintiff's co-defendant, Robert Akre, was working in Hempstead, Nassau County on May 26, 2017 and therefore could have been present at Plaintiff's residence in Central Islip, Suffolk County as alleged in the parole violation detainer warrant. The DOCCS, and specifically Parole Officer Sabrina Hamlett and Office of Special Investigation Investigator Catherine Mencarelli acted in bad faith when they fabricated and filed a false charge (charge #10) against Plaintiff to violate his parole and wrongfully arrest and imprison him. To the extent the Administrative Law judge accepted said charge and parole violation detainer warrant into evidence at the preliminary hearing the DOCCS, and specifically Parole Officer Sabrina Hamlett and Office of Special Investigation Investigator Catherine Mencarelli, also committed perjury and filed a false report. In addition, Commissioner Anthony Annucci, Regional Director Irwin Davis, Bureau Chief of Suffolk County Parole Jarvis Jenkins, Senior Parole Officer Garry Juste all had knowledge of and approved the filing of the aforesaid false charge in parole violation detainer warrant #0762538. On November 29, 2017, the Honorable Justice Joseph A. Santorelli granted Plaintiff's Writ of Habeas Corpus finding that probable cause had not been established and ordered Plaintiff be released from custody and returned to parole supervision. On November 30, 2017, Justice Santorelli signed a written Order that parole violation detainer warrant #0762538 be lifted, which Plaintiff's counsel subsequently served on the Suffolk County Correctional Facility, the New York State Division of Parole and the New York State Attorney General's Office. Pursuant to New York State Penal Law §70.40(3)(b) and §70.45(5)(d)(i)and(ii), Plaintiff was not on post release supervision or parole from September 18, 2017, the date the aforementioned parole detainer warrant was issued and Plaintiff was placed into the custody of the Suffolk County Jail

on said parole violation warrant, through October 11, 2019. Plaintiff was wrongfully detained in violation of Judge Santorelli's Court Order because he was targeted as a minority and victimized by the systematic racism approved and enforced by the above-referenced Defendants. Annexed hereto as Exhibit "5", is a copy of the Honorable Justice Joseph A. Santorelli Order dated November 30, 2017.

38.    The Honorable Justice Santorelli's granting of Plaintiff's Writ of Habeas Corpus and finding that probable cause did not exist to support the parole warrant #0762538 demonstrates there was no legal justification or valid affirmative defense to Plaintiff's wrongful arrest and subsequent confinement and for the violation of his civil and due process rights as afforded by the United States and New York State Constitutions. Therefore, the DOCCS acted in bad faith in not releasing Plaintiff from custody and retuning him to community supervision. Instead of the DOCCS acting lawfully by releasing and returning Plaintiff to parole and/or community supervision they double downed on their unlawful and improper conduct and issued a subsequent false and unfounded parole violation detainer warrant that was ultimately dismissed by the Honorable Justice Schick who held "This Court having found that the violation of parole charges against Warren Ovalle (issued by the Division of Parole) were brought in bad faith and were an abuse of discretion."

39.    On November 30, 2017, while Plaintiff was awaiting release from custody pursuant to Justice Santorelli's Order, the Division of Parole issued and executed a new parole violation detainer warrant #762686, which cited a delinquency date of September 23, 2017, a time period when Plaintiff's post-release supervision was interrupted and not in effect and charging Plaintiff with the same parole violations that had been vacated by the Honorable Justice Joseph A. Santorelli on November 29, 2017, again in violation of Plaintiff's right to due process

afforded under the United States and New York State Constitutions and double-jeopardy laws. In addition, Defendants wrongfully detained Plaintiff in direct violation of the Honorable Justice Santorelli's Order dated November 30, 2017, again violating Plaintiff's civil and due process rights afforded under the United States and New York State Constitutions. Defendant, Suffolk County Sheriff's Office, and specifically the Sheriff's Department Corrections Officers John Doe #1-10, violated Honorable Justice Santorelli's Order dated November 30, 2017, by failing to release plaintiff as ordered by said Judge (even assuming the new parole violation warrant was valid, which plaintiff clearly contests, he still should have been released by Defendant, Suffolk County Sheriff's Office). Defendant, the DOCCS and New York State Attorney's General Office conspired with the Suffolk County Sheriff's Office by failing to disclose that Plaintiff was being charged with additional/supplemental parole violations during the pendency of his Writ of Habeas Corpus before Justice Santorelli despite having prior notice and being in possession of same (the alleged additional/supplemental parole violations). The DOCCS and/or Division of Parole intentionally did not disclose the alleged additional/supplemental parole violations despite having notice of them before and during the pendency of plaintiff's Writ of Habeas Corpus before the Honorable Justice Santorelli in order to wrongfully detain plaintiff if the Honorable Justice Santorelli granted the Writ of Habeas Corpus which he did. Furthermore, parole violation detainer warrant #762686 was not valid on its face and the DOCCS did not have the authority to issue the warrant because Plaintiff was not under the DOCCS supervision. Annexed hereto as Exhibit "6" and "7" are copies of parole violation warrant #762686 and page 9 of New York State – DOCCS Community Supervision Parolee Report Chrono Report dated December 3, 2018 and more specifically the entries dated October 30, 2017.

40.    The DOCCS Community Supervision Parolee Chrono Report with an entry date

of October 30, 2017, annexed hereto as Exhibit "7", memorializes relevant entries from the Division of Parole's case management system entered by Plaintiff's assigned Parole Officer, specifically P.O. Sabrina Hamlet, as they pertain to Plaintiff, Mr. Ovalle's Parole Officer, P.O. Hamlet prepared an entry dated October 30, 2017, a month prior to Mr. Ovalle's November 29, 2017 Writ of Habeas Corpus, supplemental violations of parole were submitted with 5 additional fraternizing charges that were dated for 10/6/17, 10/10/17, 10/13/17, 10/20/17 and 10/25/17 due to plaintiff, Mr. Ovalle, continuing to have contact with his co-defendant while incarcerated at Yaphank Correctional Facility. In addition, the Supervising Parole Officer, Garry Juste, reviewed and approved these alleged supplemental violations of parole charges on November 7, 2017. The DOCCS' Commissioner Anthony Annucci, Regional Director Irwin Davis and Parole Violation Chief, Edward Delrio, Bureau Chief of Suffolk County Parole, Jarvis Jenkins all had knowledge of and reviewed the additional/supplemental charges that were part of the prior parole violation detainer warrant #762538 and further approved the alleged additional/supplemental charges to improperly support a new detainer warrant #762686, despite those same charges having been dismissed by the Honorable Justice Santorelli and thus no longer valid for the sole purpose of keeping plaintiff illegally imprisoned in violation of his federal and state civil and due process rights. Based on the dates of these additional/supplemental fraternizing charges, all in October of 2017, they were clearly known to the DOCCS during the pendency of parole detainer warrant #762538 and prior to the Writ of Habeas Corpus before Honorable Justice Santorelli on November 29, 2017, and therefore were part of said prior detainer warrant (#762538). Therefore, the supplemental and/or additional fraternizing charges dated for 10/6/17, 10/10/17, 10/13/17, 10/20/17 and 10/25/17 were no longer valid when the Honorable Justice Santorelli dismissed parole detainer warrant #762538, which they had become a part of. These five

additional/supplemental fraternizing charges were deliberately and improperly not served on Plaintiff or his counsel during the pendency of the Writ of Habeas Corpus, despite being known to the DOCCS and the New York State Attorney General's Office to wrongfully keep Plaintiff detained and imprisoned in violation of his Constitutionally protected civil and due process rights. These five additional/supplemental fraternizing charges were deliberately and improperly withheld from Mr. Ovalle and his counsel by the DOCCS and the New York State Attorney General's Office so that they could improperly lodge them in the subsequent detainer warrant #762686, in case Judge Santorelli granted the Writ of Habeas Corpus which he did. In fact, the DOCCS waited until the day that Mr. Ovalle was supposed to be released to serve these alleged additional fraternizing charges against him, even though the DOCCS and the New York State Attorney General's Office was aware of these charges more than thirty (30) days prior. Clearly, the DOCCS, and specifically Commissioner Anthony Annucci, Regional Director Irwin Davis and Parole Violation Chief, Edward Delrio, Bureau Chief of Suffolk County Parole, Jarvis Jenkins, and the New York State Attorney General's Office, and specifically Ms. Laurie Pack, Esq., were acting in bad faith by not serving these additional/supplemental violation of parole charges on Plaintiff and his counsel during the pendency of his Writ of Habeas Corpus, despite being known to them. This was an improper and deliberate act to wrongfully keep Plaintiff detained and imprisoned in violation of his Constitutionally protected civil and due process rights. Furthermore, the additional fraternizing charges demonstrate Plaintiff was incarcerated at Yaphank Correctional Facility and was under the custody and control of the Suffolk County Sheriff's Office and not the DOCCS and therefore the special conditions of parole, restricting Plaintiff from meeting with Mr. Akre, were not enforceable. The DOCCS, and specifically Commissioner Anthony Annucci, Regional Director Irwin Davis and Parole Violation Chief,

Edward Delrio, Bureau Chief of Suffolk County Parole, Jarvis Jenkins, did not have the jurisdiction to lodge the parole warrant and the parole warrant was not valid on its face because it charged conduct and acts that were part of the prior warrant that was already dismissed by Judge Santorelli.

41.     On December 4, 2017, Plaintiff was ordered by Defendants' Housing Unit Officer at the Yaphank Correctional Facility to pack-up his belongings because he was being released to the public. Plaintiff believed this to be true because the Honorable Justice Santorelli had just granted his Writ of Habeas Corpus and lifted his parole violation detainer warrant. Instead of releasing Plaintiff, which the defendant, Suffolk County Sheriff's Office was legally obligated to do, the Suffolk County Sheriff's Office and Suffolk County Sheriff's Officers John Doe #1-10, in collusion with the DOCCS transported Plaintiff to Riverhead Jail with no legal basis. Plaintiff was illegally detained at the Riverhead Correctional facility and intimidated by two Suffolk County Sheriff's CERT Officers, two In House Security Sergeants, a Lieutenant and DOCCS Parole Officer Sabrina Hamlett just to serve parole violations that should have been mailed to Plaintiff's attorney on file. Plaintiff was intentionally and wrongfully detained at the Riverhead Correctional Facility for over a month and his classification was upgraded to the highest security status due to the Suffolk County Sheriff's Office and the DOCCS conspiring and colluding to fabricate that Plaintiff made a phone call to parole threatening them. Plaintiff never made this phone call to parole and there are no phone records or any physical evidence to substantiate this false allegation (despite the fact that all phone calls at the Correctional facility and Division of Parole are, upon information and belief, recorded). In addition, Plaintiff was repeatedly transported between Yaphank Correctional Facility to Riverhead Correctional Facility by the Suffolk County Sheriff's Office and Suffolk County Sheriff's Officers John Doe #1-10, more

than fifteen times for no legitimate purpose, except for possible "diesel therapy", from September of 2017 through March of 2018. During these transports, Plaintiff lost his single cell status, dormitory status, loss of property, loss of legal documents, loss of commissary and subjected to threats by the Sheriff's Correctional Officers John Does #1-10. Moreover, Plaintiff was targeted by the Defendants and DOCCS as a minority and repeatedly and systematically threatened, punished, victimized and denied his civil rights.

42. On December 13, 2017, a preliminary parole revocation hearing was held for the subsequent parole violation, detainer warrant #762686, before Preliminary Hearing Officer Sharon Burnett at the Suffolk County Correctional Facility in Riverhead, New York. At the preliminary hearing the Division of Parole attempted to establish that Plaintiff violated Charge #44, meeting with co-defendant, Robert Akre, at the Suffolk County Correctional Facility on October 10, 2017, in violation of Plaintiff's special conditions of his parole (a time period that Plaintiff's parole supervision was interrupted and not in effect). The Preliminary Hearing Officer incorrectly determined that Plaintiff was under parole supervision while detained at the Suffolk County Correctional Facility and incorrectly found that probable cause existed to substantiate the parole violation. The Division of Parole acted in bad faith by improperly charging Plaintiff with parole violations that had been previously vacated by the Honorable Justice Santorelli, during a period that Plaintiff was not on parole supervision, unlawfully depriving him of his fundamental rights to due process and liberty. Additionally, the Division of Parole failed to advise Plaintiff or his counsel that it intended to file additional alleged parole violations despite having notice of and being in possession of said additional alleged parole violations while Plaintiff's Writ of Habeas Corpus was being heard by the Honorable Justice Santorelli, Conditions or Special Conditions of parole are specifically imposed to regulate conduct while on parole in the

community and not while the parolee is in the custody of a county jail or state correctional facility. The Division of Parole does not have jurisdiction when the parolee is in the custody of a county jail or state correctional facility. The DOCCS and/or Division of Parole and Defendant, Suffolk County Sheriff's Office lacked the jurisdiction to bring this action as a parole violation, improperly detaining Plaintiff and depriving him of his federal and State civil and due process rights. In addition, the DOCCS and/or Division of Parole and Plaintiff's Parole Officer, Sabrina Hamlett or defendant, Suffolk County Sheriff's Office never put Plaintiff on notice that the special conditions of his parole remained in effect while he was detained in the Suffolk County correctional facility and/or jail. Moreover, fundamental due process rights permitted Plaintiff to present witnesses and documents at the pending parole violation hearing, including consulting with his co-defendant to prepare a defense and present him as a witness, especially since he was the subject of the alleged parole violation. Therefore, the alleged parole violation was not valid or lawful and Plaintiff remained wrongfully confined and/or detained by Defendants in violation of his civil and due process rights under the United States and New York State Constitutions. Again, Plaintiff was further targeted by the Defendants and DOCCS as a minority and repeatedly and systematically threatened, punished, victimized and denied his civil rights. Annexed hereto as Exhibit "8" is a copy of the transcript from the preliminary hearing for parole violation warrant #762686.

43.     Subsequently, Plaintiff filed a Writ for Habeas Corpus which came before the Honorable Justice James Hudson on January 31, 2018. Prior to that, three Supreme Court Justices recused themselves from hearing Plaintiff's Writ of Habeas Corpus. The handling Assistant Attorney General, defendant, Laurie Pack, Esq was untimely in her opposition and an adjournment was granted. Pursuant to New York Civil Procedure and Practice Rules 7008(a)

when the Writ of Habeas Corpus is filed and served "the return shall consist of an affidavit to be served in the same manner as an answer in a special proceeding and filed at the time and place specified in the Writ, or, where the Writ is returnable forthwith, within twenty-four hours after its service." In this case, the assigned Assistant Attorney General, Laurie Pack, intentionally did not file her response to Plaintiff's Writ of Habeas Corpus until three weeks after the Writ was filed and not twenty-four hours as mandated by the law so that she could Judge shop and ensure that Plaintiff's Writ of Habeas Corpus came before his sentencing Judge, specifically the Honorable Justice James Hudson. The Honorable Justice Hudson held that probable cause existed to sustain Plaintiff's parole violation under warrant #762686, meeting with co-defendant, Robert Akre, and denied Plaintiff's Writ of Habeas Corpus, further improperly depriving Plaintiff of his federal and State civil and due process rights and his freedom. Furthermore, the Honorable Justice James Hudson was the Plaintiff's sentencing Judge and should have recused himself, especially since Plaintiff had previously filed a complaint against him to the Commissions of Judicial Conduct for threatening him in open Court to take a plea and after Plaintiff had filed a NY CPL 440 motion to set aside the sentence only thirty (30) days prior to the Writ of Habeas Corpus before said Judge. The actions described above were also motivated by Plaintiff's race and skin color and his civil rights and equal right to due process were denied. Annexed hereto as Exhibit "9", is a copy of the transcript from the hearing before Judge Hudson denying Claimant's writ of habeas corpus.

44.    On March 1, 2018, a final parole hearing was held before Preliminary Hearing Officer Mary Ross which subsequently sustained Plaintiff's parole violation under warrant #762686. At that hearing, Plaintiff's Parole Officer failed to appear despite being served with a subpoena. This was the Parole Officer, specifically P.O. Sabrina Hamlette, that lodged the

alleged parole violations against Plaintiff. The preliminary hearing proceeded in violation of Plaintiff's due process rights. Plaintiff's right to confront and cross-examine the complaining witness (P.O. Sabrina Hamlett) was illegally and improperly denied. A proper foundation was not established to accept the parole violation into the record, as the complaining witness was not present. Evidence was introduced at this preliminary hearing that was the fruit of the poisonous tree and violated double jeopardy laws, more specifically, illegal evidence from a prior parole hearing which was reversed by Writ of Habeas Corpus (see exhibits "5" and "7"). The Administrative Law Judge did not operate in accordance with the law and continued with a hearing that was not neutral and fair, reaching a decision which violated Plaintiff's parole and deprived him of his freedom proving that the Administrative Law Judge ("ALJ") was not a neutral and fair hearing officer, and further violating Plaintiff's civil and due process rights protected by the United States and New York State Constitutions. Plaintiff's records were submitted at the hearing without proper subpoena as misrepresented by the Division of Parole. Plaintiff was sent to Downstate Correctional Facility and then transferred to Livingston Correctional Facility where he was harassed by a Correction's Officer and retaliated against as evidenced by the issuance of three misbehavior reports against Plaintiff after he filed charges against said Correction's Officer, which was Plaintiff's right. Plaintiff was then transferred to Woodbourne Correctional Facility. The actions described above were motivated by Plaintiff's race and skin color and his civil rights and equal right to due process were denied. Annexed hereto as Exhibit "10" and Exhibit "11' respectively are copies of the hearing transcript before Administrative Law Judge Ross sustaining the parole detainer warrant and page 6 of the New York State – DOCCS Community Supervision Parolee Report Chrono Report dated December 3, 2018 and specifically entries dated December 4, 2017.

45.     In August of 2019, Plaintiff filed a Writ of Habeas Corpus in Suffolk County that was transferred to Sullivan County by Suffolk County Judge Linda Kevins because she refused to have the Plaintiff produced and she was one of the Judges to have recused herself in 2018. On October 2, 2019, the Honorable Justice Stephan G. Schick granted Plaintiff's Writ of Habeas Corpus, dismissed Plaintiff's parole violations under warrant #762686, and held: "This Court having found that the violation of Parole charges against Warren Ovalle were brought in bad faith and were an abuse of discretion." During oral arguments, Honorable Justice Stephan G. Schick addressed the Division of Parole's actions, which Plaintiff presently claims deprived him of his civil and due process rights protected by the United States and New York State Constitutions and all applicable federal and state civil right statutes, including but not limited to, "judge shopping" and "having a second bite at the same apple with a different judge with a different ruling". In addition, the New York State Attorney General Office and the assigned Assistant Attorney General, Laurie Pack, Esq., committed prosecutorial misconduct by not disclosing evidence to plaintiff or his legal counsel that showed that the same parole violations charged in his original parole violation detainer warrant (#762538), which were dismissed when the Honorable Justice Santorelli granted Plaintiff's Writ of Habeas Corpus, were charged again a second time in Plaintiff's parole violation detainer warrant (#762686) by the DOCCS and the New York State Attorney General's Office and were subsequently heard by the Honorable Justice James Hudson. As set forth above, Plaintiff was wrongfully confined to County and State Correctional Facilities from September 18, 2017, through October 11, 2019, deprived of his Constitutional rights, liberty and happiness and caused to endure physical pain and suffering, emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme hardship and inconvenience, depression and anxiety with no legal basis.

Annexed hereto as Exhibits "12" and "13" are copies of the Honorable Justice Stephan G. Schick Order dated October 2, 2019, and the transcript from the hearing and/or oral argument that generated that order.

46.     At all times during the events described above, the defendants were engaged in a joint venture with New York State DOCCS and/or Division of Parole, the New York State Attorney General's Office and Suffolk County Sheriff's Office and formed an agreement to violate Plaintiff's rights. The Defendants and New York State DOCCS and/or Division of Parole and the New York State Attorney General's Office and their respective employees, agents and/or servants assisted each other in performing the various acts described above and lent their physical presence and support and the authority of their office to each other during these events in violation of Plaintiff's civil and due process rights afforded by the United State and New York State Constitutions and other applicable statutes and case law. The above-referenced defendants and their employees, agents and/or servants acted in concert to violate Plaintiff's civil and due process rights, and implemented systematic racism in further violation of Plaintiff's Constitutional rights. Alternatively, Defendants, Suffolk County and the Suffolk County's Sheriff's Office failed to intervene in the obviously illegal actions of New York State DOCCS and/or Division of Parole.

47.     During all the events described above, Defendants acted maliciously with the intent to injure Plaintiff and/or with reckless disregard of Plaintiff's safety, health, and the rights afforded Plaintiff under the United States and New York State Constitutions.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (42 USC §1981, §1983, §1985, §1988)

48.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "47" of the Complaint as if set forth at length herein.

49.     At all times relevant in this matter, all Defendants its employees, agents, and/or servants, individually, and in their official capacities, acting under color of law, deprived Plaintiff of his civil, constitutional and statutory rights, in violation of the United States Constitution, the Fourth and Fourteenth Amendments to the United States Constitution and in violation of 42 U.S.C. §1981, §1983, §1985, §1988 and 28 U.S.C. § 1343.

50.     All defendants falsely confined, detained, imprisoned, Plaintiff and failed to intervene in each other's obviously illegal actions.

51.     All defendants violated Plaintiff's civil and due process rights due to his race, color and/or national origin and for other reasons set forth in detail above, including filing false parole violations, not complying with Court Orders and abiding by the United States Constitution and all applicable federal statutes and laws.

52.     That as a sole, direct and proximate result of the foregoing, Plaintiff has been injured and sustained damages.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### (Article 1 Section 5, 6 and 12 of the New York State Constitution)

53.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "52" of the Complaint as if set forth at length herein.

54.     At all times relevant in this matter, all defendants, its employees, agents, and/or servants, individually, and in their official capacities, acting under color of law, deprived Plaintiff of his civil, constitutional and statutory rights, in violation of the New York State Constitution, Article 1 Section 5, 6 and 12 of the New York State Constitution, and all other applicable statues, laws, codes, sections.

55.     All defendants falsely confined, detained, imprisoned, Plaintiff and failed to intervene in each other's obviously illegal actions.

56.     Defendants failed to release plaintiff pursuant to the Honorable Justice Santorelli's Court Order and improperly detained him in violation of his civil rights and due process rights.

57.     All defendants violated Plaintiff's civil and due process rights due to his race, color and/or national origin and for other reasons set forth in detail above, including filing false parole violations, not complying with Court Orders and abiding by the New York State Constitution and all applicable state statutes and laws.

58.     That as a sole, direct and proximate result of the foregoing, Plaintiff has been injured and sustained damages.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### (42 USC § 1985(3) - Conspiracy)

59.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "58" of the Complaint as if set forth at length herein.

60.     At all times relevant in this matter, defendant, Suffolk County Sheriff's Office and John Does #1-10, its employees, agents, and/or servants, individually, and in their official capacities, conspired with each other and State agencies, including New York State DOCCS and Attorney General's Office, for the purpose of depriving, either directly or indirectly, Plaintiff of equal protection of the laws and/or equal protections, privileges and/or immunities under the laws, and said conspirators caused or committed acts in furtherance of the object of the conspiracy depriving Plaintiff of equal protection under the law and due process and depriving him of his civil rights or privileges as a U.S. Citizen, including, freedom and happiness.

61.     All defendants violated Plaintiff's civil and due process rights due to his race, color and/or national origin and for other reasons set forth in detail above, including filing false parole violations, not complying with Court Orders and abiding by the United States Constitution and all applicable statutes and laws.

62. That as a sole, direct and proximate result of the foregoing, Plaintiff has been injured and sustained damages.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### (Municipal and Supervisory liability)

63. Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "62" of the Complaint as if set forth at length herein.

64. At all times relevant in this matter, all defendants, their employees, agents, and/or servants, individually, and in their official capacities, intentionally and/or carelessly, recklessly, and/or negligently conducted and performed their legal duties and responsibilities and failed to follow required United States and New York State due process laws, policies and procedures, including in part, filing false parole violations, failing to release Plaintiff from a county jail as directed by the Court and Court Order, intentionally and wrongfully confining and detaining Plaintiff, transferring and detaining Plaintiff at the Riverhead Correctional Facility for over a month and upgrading his classification to the highest security status with no proper basis and with no evidence that Plaintiff committed any criminal or improper act, in threatening and intimidating Plaintiff while illegally and improperly detaining him at the Riverhead Correctional Facility, in allowing Plaintiff to have visitors at county jails and/or correctional facilities with an individual that allegedly violated the conditions of his parole, in providing personal and confidential documents at Plaintiff's parole hearings improperly and without proper subpoena as well as other violations of proper policy and procedure.

65. All defendants are liable for the damages suffered by Plaintiff as a result of the conduct of their employees, agents and/or servants, in that, after learning of their employees and other participants' violation of Plaintiff's constitutional rights, they failed to correct the wrong;

All defendants have created and allowed a policy or custom under which unconstitutional practices occurred and permitted such policies or customs to continue. And they have been grossly negligent in managing subordinates who caused the unlawful conditions or events. Defendants have been alerted to the wrongful detention and/or confinement and/or systematic racism by its employees or other agencies, but has nevertheless exhibited deliberate indifference to such wrongful detention and/or confinement; that intentional indifference caused the violation of Plaintiff's constitutional rights in this case.

66.     The aforesaid event was not an isolated incident. Defendant, Suffolk County, has been aware for some time, from Notices of Claim, lawsuits and complaints filed with agencies, Including the Internal Affairs Department of the Suffolk County Police Department and Sheriff's Office, and the DOCCS and New York Attorney General's Office have been aware for some time, from Verified Claims and lawsuits and administrative and judicial rulings, that a disturbing amount of officers use excessive force, wrongfully detain and/or confine, bring charges against inmates with no legal basis, and fail to intervene in and report the obviously illegal actions of their fellow officers. Nevertheless, Defendants have allowed policies and procedures that allow the aforementioned to persist.

67.     For example, The Justice Lab analyzed data on all people detained in New York City jails, and compared that data to consensus data on the demographic makeup of the city. Over fifty-one (51%) percent of all people under parole supervision by NYS DOCCS reside in New York City. Their analysis indicated that Black people are detained for alleged parole violations in New York City jails at a rate 12 times higher than that for white people. And that Latin people are detained for alleged parole violations at roughly 4 times the rate of white people. The impact of being on parole for people being charged with new offenses, these inequities became even larger.

Among people in New York City jails who are on parole and are also being held for a new charge, a stunning ninety-one (91%) percent were people of color. This disparity is even more pronounced for people charged with low-level crimes. Among those held for alleged misdemeanor offenses who were also on parole, ninety-nine (99%) percent were people of color. Black people are incarcerated for technical violations of parole in New York State prisons at 4.99 times the rate of white people, and Latin people are thirty (30%) percent more likely than white people to be incarcerated for a technical parole violation. As with rates of supervision, these inequities were more severe for men, Black men are 5.66 times as likely as white men to be incarcerated for a technical parole violation, and Latino men were thirty-eight (38%) percent more likely to be in New York State prison for a technical parole violation than their white counterparts. See, Racial Inequities in New York Parole Supervision by Kendra Bradner and Vincent Schiraldi of the Columbia University, Justice Lab.

68.     All defendants violated Plaintiff's civil and due process rights due to his race, color and/or national origin and for other reasons set forth in detail above, including filing false parole violations, not complying with Court Orders and not abiding by the United States Constitution and all applicable statutes and laws.

69.     Defendants are aware that all of the aforementioned has resulted in violations of parolees' constitutional rights. Despite, such notice, Defendants have failed to take corrective action. This failure and these policies caused defendants' officers and relevant employees in the present case to violate Plaintiff's civil rights, without fear of reprisal.

70.     Plaintiff has been damaged as a result of the deliberate indifference of the Defendants, to the constitutional rights of minorities.

71.     Defendants are liable for the damages suffered by Plaintiff as a result of the conduct of their employees, agents, servants, in that, after learning of their employees' violation of Plaintiff's

constitutional rights, they failed to remedy the wrong; Defendants have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing and supervising subordinates who caused the unlawful condition or event. Defendants have been alerted to the regular and systematic violations of minority parolees' civil and constitutional rights, but have nevertheless exhibited deliberate indifference to such policies and customs; the deliberate indifference caused the violation of Plaintiff's constitutional and civil rights in this case.

72.     That as a sole, direct and proximate result of the foregoing, Plaintiff has been injured and sustained damages.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### (Wrongful Confinement and/or Imprisonment)

73.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "72" of the Complaint as if set forth at length herein.

74.     At all times relevant in this matter, all Defendants, and their employees, agents, and/or servants, individually, and in their official capacities, acting under color of law, wrongfully confined, detained and/or imprisoned Plaintiff against his will and without his consent and without legal basis or valid legal process and in violation of a Court Order and deprived Plaintiff of his liberty, happiness and freedom in violation of Plaintiff's rights under the United States and New York State Constitutions.

75.     Defendants falsely confined, detained, imprisoned Plaintiff and failed to intervene in each other's obviously illegal actions.

76.     All defendants violated Plaintiff's civil and due process rights due to his race, color and/or national origin and for other reasons set forth in detail above, including filing false parole violations, not complying with Court Orders and abiding by the United States and New York State

Constitutions and all applicable statutes and laws.

77. Plaintiff was conscious and fully aware of the illegal and false confinement and/or detention.

78. That as a sole, direct and proximate result of the foregoing, Plaintiff has been injured and sustained damages.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Negligent hiring, supervision and retention)

79. Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "78" of the Complaint as if set forth at length herein.

80. All defendants owed a duty of care to plaintiff to follow the law, as well as its own proper policies, procedures and customs and prevent the loss of liberty and mental abuse sustained by Plaintiff.

81. Defendants owed a duty of care to Plaintiff because under the same or similar circumstances a reasonably prudent person should have anticipated an injury to plaintiff, including the loss of liberty, or those in a position similar to plaintiff's as a consequence of this conduct.

82. Upon information and belief, Defendants' Officers and relevant employees were incompetent and unfit for their positions.

83. Upon information and belief, Defendants knew or should have known through exercise of reasonable diligence that their Officers and relevant employees were potentially dangerous, derelict of their duties and previously failed in properly performing their duties and abiding by defendants' proper policies, procedures, and customs.

84. Defendants' negligence in hiring and retaining the Officers and relevant employees proximately caused plaintiff's damages.

85. Defendants' negligence in supervising and policing the Officers and relevant

employees proximately caused plaintiff's damages.

86.     As a result of Defendants negligent hiring, supervision and retention of the Officers and relevant employees plaintiff sustained the damages described above.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### (Negligent infliction of emotional harm and distress)

87.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "86" of the Complaint as if set forth at length herein.

88.     At all times relevant in this matter, Defendants, their employees, agents, and/or servants, individually, and in their official capacities, caused Plaintiff to sustain severe emotional and mental distress, physical harm and injury, psychological trauma, shock, horror, anxiety, depression, post-traumatic stress disorder and other mental disorders, legal expenses as a direct, sole and proximate result of their illegal, outrageous and wrongful acts as described above, including but not limited wrongful confinement and/or imprisonment.

89.     That Plaintiff's injuries and damages were caused solely by reason of the defendants' negligent and/or careless conduct, as stated herein, without any fault or negligence on the part of Plaintiff contributing thereto.

90.     By reason of the foregoing, plaintiff has been injured and sustained monetary damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS,
### (Intentional infliction of emotional harm and distress)

91.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "90" of the Complaint as if set forth at length herein.

92.     At all times relevant in this matter, Defendants, their employees, agents, and/or servants, individually, and in their official capacities, caused Plaintiff to sustain severe emotional

and mental distress, physical harm and injury, psychological trauma, shock, horror, anxiety, depression, post-traumatic stress disorder and other mental disorders, legal expenses as a direct, sole and proximate result of their illegal, outrageous and wrongful acts as described above, including but not limited wrongful confinement and/or imprisonment.

93.     That Plaintiff's injuries and damages were caused solely by reason of the defendants' extreme and outrageous conduct with the intent to cause, or disregard of a substantial probability of causing, severe emotional distress to Plaintiff.

94.     That Plaintiff's injuries and damages were caused solely by reason of the defendants' intentional and/or reckless conduct, as stated herein, without any fault on the part of Plaintiff contributing thereto.

95.     By reason of the foregoing, plaintiff has been injured and sustained monetary damages.

## AS AND FOR A NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS, (Negligence)

96.     Plaintiff repeat, reallege and incorporate by reference paragraphs "1" through "95" of the Complaint as if set forth at length herein.

97.     At all times relevant in this matter, Defendants their employees, agents, and/or servants, individually, and in their official capacities, acting under color of law, were negligent in performing its duties and responsibilities and in complying with a Court Order resulting in injury and damages to Plaintiff, including but not limited to, deprivation of freedom, severe pain and suffering, severe and permanent emotional and mental distress and other damages.

98.     That Plaintiff's injuries and damages were caused solely by reason of the defendants' negligent and/or careless conduct, as stated herein, without any fault or negligence on the part of Plaintiff contributing thereto.

99.     By reason of the foregoing, plaintiff has been injured and sustained monetary damages.

## JURY DEMAND

100.    Plaintiff demands a trial by jury.

WHEREFORE, Plaintiff demand judgment against Defendants, severally and jointly, on all causes of action as follows:

A.      In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B.      Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C.      Awarding Plaintiff attorney fees pursuant to 42 U.S.C §1988, costs and disbursements of this action; and

D.      Granting such other and further relief as this Court deems just and proper.

Dated:  Hauppauge, New York
        September 27, 2021

Yours, etc.

Ferro, Kuba, Mangano, P.C.
By: William Ferro, Esq.
Bar No.: 2172930
Attorney for Plaintiff
Warren A. Ovalle
825 Veterans Highway
Hauppauge, New York 11788
(631) 581-9494
WFerro@ferrokuba.com

**EXHIBIT 1**

# STATE OF NEW YORK
## DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (DOCCS)
### CERTIFICATE OF RELEASE TO POST-RELEASE SUPERVISION

**DETERMINATE SENTENCE – POST-RELEASE**

*DETERMINATE SENTENCE:*

NYSID: 093-7560-I DIN#10-R-0096

VALLE, Warren, now confined in Marcy CF who was convicted of Attempt 2 (D) and sentenced in the county of Suffolk at a term of the County Court, Judge Hudson presiding on the 7th day of January, 2010, for the term of 0-0-0/6-0-0 the minimum term of such sentence expires on the 19th day of March 2015, has agreed to abide by the conditions to which (he) (she) has signed (his) (her) name below; and is hereby released by virtue of the authority conferred by New York State Law.

VALLE, Warren, is additionally subject to a period of 5-0-0 years/months Post-Release Supervision, which will commence on the release date of 3/19/15 and (he) ' (she) will be under the legal jurisdiction of the Department of Corrections and Community Supervision until the Post-Release Supervision Maximum Expiration (PRSME) date of 3/19/2020.

Post-Release Supervision Period (years/months): 5-0-0

Post-Release Supervision Maximum Expiration Date: 3/19/20

| | |
|---|---|
| Approved Residence Address: 15 East Locust St. | Approved Field Office Address: Suffolk Area Office 250 Johnson Ave. |
| City/State/Zip: Central Islip, NY 11722 | City/State/Zip: Bohemia, NY 11716 (631) 218-5070 |
| Command Center Address: 314 West 40th St. New York, NY 10018 For emergencies reporting after office hours and on weekends, call (212) 239-6115, Command Center staff will assist you. | |
| City/State/Zip: | Name of Parole Officer: PO Torres / STO Murray |

Special Instructions: Within 24 hours of release report to Suffolk AO, 250 Johnson Ave, Bohemia, NY 11716. P.O. Torres.

I, VALLE, Warren voluntarily accept Post-Release supervision. I fully understand that my person, residence and property are subject to search and inspection. I understand that Post-Release Supervision is defined by these Conditions of Release and all other conditions that may be imposed upon me by the Board of Parole or its representatives. I understand that any violation of these conditions may result in the revocation of my release.

## CONDITIONS OF RELEASE

1. I will proceed directly to the area in which I have been released, and, within seventy-four hours of my release, make my arrival report to the Community Supervision Office indicated below, unless other instructions are designated on my release agreement.
2. I will make office and/or written reports as directed.
3. I will not leave the State of New York or any other state to which I am released or transferred, or any area described in writing by my Parole Officer without permission.
4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence, employment or program status when circumstances beyond my control make such discussion impossible.
5. I will reply promptly, fully and truthfully to any inquiry of or communication by my Parole Officer or other representative of the Department of Corrections and Community Supervision.
6. I will notify my Parole Officer immediately any time I am in contact with or arrested by any law enforcement agency. I understand that I have a continuing duty to notify my Parole Officer of such contact or arrest.
7. I will not be in the company of or fraternize with any person I know to have a criminal record or whom I know to have been adjudicated a Youthful Offender except for accidental encounters in public places, work, school or in any other instance with the permission of my Parole Officer.
8. I will not behave in such a manner as to violate the provisions of any law to which I am subject which provide for a penalty of imprisonment, nor will my behavior threaten the safety or well-being of myself or others.
9. I will not own, possess, or purchase any shotgun, rifle or firearm of any type without the written permission of my Parole Officer. I will not own, possess or purchase any deadly weapon as defined in the Penal Law or any dangerous knife, dirk, razor, stiletto, or imitation pistol. In addition, I will not own, possess or purchase any instrument readily capable of causing physical injury without a satisfactory explanation for ownership, possession or purchase.
10. In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to resist extradition to the State of New York from any state in the Union and from any territory or country outside the United States. This waiver shall be in full force and effect until I am discharged from Parole or Conditional Release. I fully understand that I have the right under the Constitution of the United States and under law to contest an effort to extradite me from another state and return me to New York, and I freely and knowingly waive this right as a condition of my Parole or Conditional Release.
11. I will not use or possess any drug paraphernalia or use or possess any controlled substance without proper medical authorization.
12. Special Conditions:
    Refer to continuation Form 3010PRS
13. I will fully comply with the instructions of my Parole Officer and obey such special written conditions as he or she, a Member of the Board of Parole or an authorized representative of the Department of Corrections and Community Supervision, may impose.

I hereby certify that I have read and that I understand the foregoing conditions of my release and that I have received a copy of this Certificate of Release to Post-Release Supervision.

Signed this 17th day of Mar. 20 15

Released: _____

Witness: A. Smith

[ ] COPY TO OFFENDER
[ ] COPY TO FACILITY INC.

# EXHIBIT 2

New York State - DOCCS
Community Supervision
SPECIAL CONDITIONS OF RELEASE TO PAROLE SUPERVISION

Name: OVALLE,WARREN A
Date of Release: 03/19/2015

Page: 1
NYSID: 09347560J
Supervision Maximum: 03/17/2020

I, OVALLE,WARREN A            , acknowledge that the following Special Conditions
have been imposed upon me and that these Special Conditions will remain in
affect until the termination of my legal period of supervision 03/17/2020
unless otherwise amended, in writing, by the Department of Corrections and
Community Supervision.

- I WILL NOT have contact with the following individual(s) Avre      (36)
Robert            . This means that I WILL NOT attempt
to meet in person, communicate by letter, telephone, electronic device (i.e.
computer) or though a third pary, or via other means, the above individual(s)
without knowledge and permission of my Parole Officer.

- I WILL NOT have contact with the following individual(s) Vicam      (37)
Avire    Are               . This means that I WILL NOT attempt
to meet in person, communicate by letter, telephone, electronic device (i.e.
computer) or though a third pary, or via other means, the above individual(s)
without knowledge and permission of my Parole Officer.

- I WILL NOT have contact with the following individual(s)           (38)
                            . This means that I WILL NOT attempt
to meet in person, communicate by letter, telephone, electronic device (i.e.
computer) or though a third party, or via other means, the above individual(s)
without knowledge and permission of my Parole Officer.

- I WILL remain in the geographic confines of the county(s) of Suffolk/Nassau  (49)
               . If I travel outside of the above mentioned county(s), I will
obtain a travel pass from my Parole Officer granting permission for such
travel.

- Other Conditions:                                                 (50)



- I WILL remain at my approved residence from  9pm  to  7am  , seven  (61)
days a week.  Exceptions to my curfew may be permitted with PRIOR approval from
my Parole Officer.

- I WILL cooperate fully with the implementation of the Electronic Monitoring  (63)
Program.  I WILL NOT tamper with any equipment and WILL ensure that all
equipment is returned to the Department of Correction and Community
Supervision upon completion.

- I WILL live and remain at my approved residence and have no unauthorized  (68)
visitations from others without the prior approval and knowledge of my Parole
Officer.

Releasee Initials:              Witness Initials:           Date: 11/02/2016

# EXHIBIT 3

Form 4093 (5-62)

# STATE OF NEW YORK-EXECUTIVE DEPARTMENT
## DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### VIOLATION OF RELEASE REPORT

Warrant Issued _x_ _____ No Warrant Issued _____

Name: Ovalle, Warren A.
NYSID NO: 09347560J
Institution: Marcy C.F
DIN NO: 10R0095
Date of Birth: 06/08/1977
Offense: Assault 2nd, ATT .Robbery 2nd
Sentence: 00-00/06-00, 01-00/03-00

Date Released: 06/09/2015
Max. Expiration: 03/17/2020
Date of Warrant: 09/18/2017
Warrant No: 016.2558
Date Enforced: 09/18/2017
Location: SCJ

### Delinquency Date: 5/26/2017

Since his/her release, the above named individual has violated the
Conditions of Release in the following manner:

**Charge#1:** Warren A. Ovalle violated rule # 5 of the conditions governing his
release in that he failed to reply truthful to an inquiry by his Parole
Officer on 9/18/17 at approximately 6:15am, when he denied
having a cell phone.

**Charge#2:** Warren A. Ovalle violated rule # 5 of the conditions governing his
release in that he failed to reply truthful to an inquiry by his Parole
Officer on 9/18/17 at approximately 6:15am, when he denied having
any contact with his co-defendant, Robert Akre.

**Charge#3:** Warren A. Ovalle violated rule # 7 of the conditions governing his
release in that on 9/18/17 at approximately 6:15am in the vicinity of
15 Locust Street, Central Islip N.Y, he was in the company of his co-
defendant, Robert Akre, as person known to him as having a criminal
record.

**Charge#4:** Warren A. Ovalle violated rule # 9 of the conditions governing his
release in that on 9/18/17 at approximately 6:15am in the vicinity of
15 Locust Street, Central Islip N.Y, he was found to be in possession
of a metal baiman knife.

**Charge#5:** Warren A. Ovalle violated rule # 9 of the conditions governing his
release in that on 9/18/17 at approximately 6:15am in the vicinity of 15
Locust Street, Central Islip N.Y he was found to be in possession of a
two large Rambo hunting surviver knifes.

**Charge#6:** Warren A. Ovalle violated rule # 9 of the conditions governing his
release in that on 9/18/17 at approximately 6:15am in the vicinity of
15 Locust Street, Central Islip N.Y he was found to be in possession
of two metal razor.

**Charge#7:** Warren A. Ovalle violated rule # 9 of the conditions governing his
release in that on 9/18/17 at approximately 6:15am in the vicinity of
15 Locust Street, Central Islip N.Y he was found to be in possession
of a eight metal chinese dragon attack stars.

**Charge#8:** Warren A. Ovalle violated rule # 11 of the conditions governing his
release in that on 9/18/17 at approximately 6:15am in the vicinity of
15 Locust Street, Central Islip N.Y he was found to be in possession
of a quantity controlled substances, to wit marijuana without proper
medical authorization

Name: Ovalle, Warren A.    NYSID NO: 09347560J    DIN NO: 10R0095
Warrant#: 0762538

**Charge#9:** Warren A. Ovalle violated rule # 11 of the conditions governing his release in that on 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street, Central Islip N.Y he was found to be in possession of a drug paraphenelia to wit:drug grinder without proper medical authorization.

**Charge#10:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 9/26/17 at approximately 5:23pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#11:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 6/23/17 at approximately 2:50pm in the vicinity of Lowes Shopping Center located at:2150 Nesconset Highway, Stonybrook N.Y 11790, he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#12:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 7/18/17 at approximately 6:33pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#13:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 7/19/17 at approximately 11:12am in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#14:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 7/25/17 at approximately 5:10pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#15:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 8/02/17 at approximately 5:41pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#16:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 8/02/17 at approximately 5:57pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#17:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 8/04/17 at approximately 2:35pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

State of New York - Executive Department
Department of Corrections and Community Supervision

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 1CR0095
Warrant#: 0762538

**Charge#18:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 8/28/17 at approximately 2:46pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#19:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 8/28/17 at approximately 4:04pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#20:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 8/29/17 at approximately 4:30pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#21:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 9/08/17 at approximately 10:56am in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#22:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 9/11/17 at approximately 12:48pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

**Charge#23:** Warren A. Ovalle violated rule # 13 of the conditions governing his release in that on 9/11/17 at approximately 1:04pm in the vicinity of 15 Locust Street, Central Islip N.Y he failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre.

State of New York – Executive Department
Department of Corrections and Community Supervision

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 0762530

General Adjustment to Parole Supervision/ Current Violative Behavior
On 9/18/17 at approximately 6:05am, in the vicinity of 15 Locust Street Central Islip N.Y Warren A. Ovalle violated rule# 5 of his board conditions of his release that he signed on 5/17/16 that states I ne will reply promptly, fully and truthfully to any inquiry of or communication, by my parole officer or other representative of the Department of Corrections and Community Supervision. On 9/18/17 at approximately 6:05am at 15 Locust Street Central Islip N.Y Warren A. Ovalle failed to reply truthful to an inquiry by his Parole Officer, when he was asked if he had gotten a cellphone yet. He replied by shaking his head no. On 9/18/17 at approximately 6:15am at 15 Locust Street Central Islip, N.Y, Warren A. Ovalle was found to be in possession of at least six cell phones. PO confirmed that at least one of the six cellphones belonged to Warren A. Ovalle as evidence found confirmed PO Hamlette's name and number to have been saved in the contacts of the cellphone. On 9/18/17 at approximately 6:05am, in the vicinity of 15 Locust Street Central Islip N.Y, Warren A. Ovalle failed to reply truthful to an inquiry by his Parole Officer, when he denied having any contact with his co-defendant, Robert Akre. He said that he has not had any contact with Robert Akre since being in jail. On 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street Central Islip N.Y Warren A. Ovalle's co-defendant was observed at the residence and to have fled out of the home upon PO. Hamlette's arrival. Co-defendant Robert Akre was apprehended in the backyard of the residence and was observed to be in possession of a quantity of marijuana.

On 9/18/17 at approximately 6:05am in the vicinity of 15 Locust Street Central Islip N.Y. Warren A. Ovalle violated rule # 7 of his board conditions of release that he signed on 5/17/2016 that states I will not be in company of or fraternize with any person I know to have a criminal record or whom I know to have been adjudicated a youthful offender except for accidental encounters in public places, work, school or in other instance with the permission of my parole officer. On 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street Central Islip N.Y Warren A. Ovalle's co-defendant Robert Akre was observed at the residence before he fled from the residence upon PO'; arrival. On 9/18/17 at approximately 6:15am upon doing a search at 15 Locust Street Central Islip N.Y in Warren A Ovalle's common living area, Robert Akre's wallet, birth certificate and his car insurance identification card were found in the residence. Robert Akre's car insurance identification card was observed to have Warren A. Ovalle's address: 15 Locust Street Central Islip N.Y listed as his place of residence.

On 9/18/17 at approximately 6:15am at 15 Locust Street Central Islip N.Y, Warren A. Ovalle violated rule # 9 of his board conditions of release that he signed on 5/17/2016 that state I will not own, possess, or purchase any shot gun, rifle, or firearm of any type without the written permission of my parole officer. I will not own, possess or purchase any deadly weapon as defined in the Penal Law or any dangerous knife, dirk, razor, stiletto or imitation pistol. In addition, I will not own, possessor purchase any instrument readily capable of causing physical injury without a satisfactory explanation for ownership, possession or purchase. On 9/18/17 at approximately 6:15am Warren A. Ovalle was found to be in possession of a metal batman knife at his residence located at 15 Locust Street Central Islip N.Y. The batman knife was found in his common living area in a draw with is wallet that contained his driver's license. Warren A Ovalle's mother also confirmed that the area in which the batman knife was found, to be his living area of the home. On 9/18/17 at approximately 6:15am Warren A. Ovalle was also found to be in possession of two large metal Rambo hunting knifes at his residence at 15 Locust Street Central Islip N.Y.

State of New York — Executive Department
Department of Corrections and Community Supervision

Name: Ovalle, Warren A.    NYSID NO: 03347560J    DIN NO: 10R0095
Warrant#: 0762538

## General Adjustment to Parole Supervision/ Current Violative Behavior

The two large metal Rambo hunting knifes that were also found in his common living area of which his mother confirmed to be his living area. On 9/18/17 at approximately 6:15am Warren A. Ovalle was found to be in possession of two metal razors at his residence at 15 Locust Street Central Islip N.Y. The two metal razors were found in his common living area, that his mother confirmed to be his living area in the home. On 9/18/17 at approximately 6:15am Warren A. Ovalle was found to be in possession of eight metal chinese dragon attack stars that were found in his draw with his wallet that had his driver's license, in his common living area. Warren A. Ovalle's mother also confirmed the ares in the residence, In which the eight metal chinese dragon attack stars were found, is his living area.

On 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street, Central Islip N.Y Warren A. Ovalle violated rule # 11 of his board conditions of release that he signed on 5/17/16 that state I will not use or possess any drug paraphernalia or use or possess any controlled substances without proper medical authorization. On 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street, Central Islip N.Y Warren A. Ovalle was in possession of a large quantity of marijuana. On 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street, Central Islip N.Y during a search of Warren A. Ovalle's common living area, P.O Hamlette observed two clear see through packages with a green leafy substance tightly wrapped separately that were hidden in the bottom of the closet of his common living area., that was tied and knotted in a grocery plastic bag. On 9/18/17 at approximately 6:15am in the vicinity of 15 Locust Street, Central Islip N.Y during a search of Warren A. Ovalle's common living area, P.O Hamlette observed that he was in possession drug paraphernalia , to wit a silver drug grinder that was observed to still have a green leafy substance in it and to a strong scent .

On 5/26/17 at approximately 5:23pm in the vicinity of 15 Locust Street, Central Islip N.Y Warren A. Ovalle failed to comply with written instructions given to him on 11/02/16 by his parole officer directing that he do not have contact with Robert Akre. On 5/23/17 Parole Officer Mancerelli observed Warren A. Ovalle and Robert Akre together at the residence located at: 15 Locust Street, Central Islip N.Y. On 6/23/17 at approximately 2:50pm Suffolk County Police Department, Detective Daniel Fandry observed Warren A. Ovalle to be with his co-defendant, Robert Akre in a vehicle together with the license plate # HRB2256, in the vicinity of Lowes Shopping Center located at 2150 Nescomet Highway, Stonybrook N.Y 11700.On 7/18/17 at approximately 6:33pm Parole Officer Mancerelli observed Warren A. Ovalle  with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 7/10/17 at approximately 11:12am Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y  .

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 0762538

## General Adjustment to Parole Supervision/ Current Violative Behavior

On 7/25/17 at approximately 5:10pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 8/02/17 at approximately 5:41pm Parole Officer Mencarelli observed co-defendant, Robert Akre to be standing at the gate of the Warren Ovalle's residence located at 15 Locust Street, Central Islip N.Y. On 8/02/17 at approximately 5:57pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 8/04/17 at approximately 2:35pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 8/28/17 at approximately 2:46pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 8/28/17 at approximately 4:01pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 8/29/17 at approximately 4:20pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 9/08/17 at approximately 10:56am Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre together at his residence at 15 Locust Street, Central Islip N.Y.On 9/11/17 at approximately 12:48pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre get out of a vehicle together, at the residence at 15 Locust Street, Central Islip N.Y.On 9/11/17 at approximately 1:04pm Parole Officer Mencarelli observed Warren A. Ovalle with co-defendant, Robert Akre get out of a vehicle together, at the residence at 15 Locust Street, Central Islip N.Y.

## Alternatives to Incarceration

Alternatives to Incarceration cannot be considered at this time.

## Present Status

On 9/18/17 warrant # 0762538 was issued and the subject was brought into custody. The subject is currently incarcerated at Riverhead Correctional Facility. The preliminary hearing will be 10/25/17 and the final hearing will be . There is a current stay away order of protection against the subject For the victim that will expire 1/7/2024.

Time On Parole:     Years_____     Months_____ Days_____

Time Owed:     Years_____     Months_____ Days_____

Parole Officer, (signature)     Date     Senior Parole Officer, (signature)     Date

State of New York – Executive Department
Department of Corrections and Community Supervision

Name: Ovalle, Warren A.     NYSID NO: 09J47560.J     DIN NO: 10R0095
Warrant#: 0762538

## Case Summary

Warren A. Ovalle is a 40 year old male who released to NYS DOCCS after serving part of his sentences of 00-00/08-00 and 01-00/03-00 for the convictions of Assault 2nd and Attempted Robbery 2nd. Warren A. Ovalle was sentenced on 1/07/2010 in Suffolk County Court by Honorable Judge Huson. His maximum expiration date is 03/17/2020. The subject was released to New York State Department of Corrections and Community Supervision in 2002.

### Instant Offense

In the instant offense Warren A. Ovalle in concert with the person described as the victim's brother and involved in what was described as a secret relationship by authorities, noticed a scratch on the 17 year old victim's back and accused him to be involved with a girl. The victim was handcuffed to a toilet and restrained for a period of more than 12 hours and was repeatedly whipped with a length of coaxial cable and had very little freedom. While Warren A, Ovalle and his co-defendant were asleep, the victim was able to free himself by braking the toilet bracket.

### Criminal History

Warren A. Ovalle's criminal history began 7/1/1997 at the age 20. He had 4 prior arrest yielding 1 felony conviction and 3 violations. His sanctions included probation, local jail and 1 state prison term. violent offenses include attempted robbery 2nd 9/10/01 and I/O for assault 2nd. His criminal behavior pattern is violence and /or aggressive behavior with a weapons, propensity and evidences an emerging record of unlicensed operation of a motor vehicle and drug related activity. Warren A. Ovalle criminal history includes his Instant Offense.

### Prior Parole History

The subject was released to New York State Department of Corrections and Community Supervision 6/28/02. The subject has had two prior parole violations. On 3/23/15 warrant # 0858207 was issued due to the Warren A. Ovalle failing to follow the directions of his assigned parole officer. On 9/27/16 was issued due to Warren A. Ovalle reportedly tampering with his GPS monitor devise.

### Drug/Alcohol History

The subject has a history of substance abuse usage and alcohol misuse with marijuana and alcohol being his drug of choice. While on NYS DOCCS, Warren A. Ovalle has been maintaining his sobriety. His last urine drug test was on 7/12/17 at the Suffolk County Area Office, 550 Johnson Avenue Bohemia N.Y 11716, and the results were negative. All other urine drug test administered to him, had negative test results.

EXHIBIT 4

FORM 9013CS (REV 01/13)

STATE OF NEW YORK - BOARD OF PAROLE
PRELIMINARY VIOLATION HEARING
DECISION AND SUMMARY

Adjourned Dates:

Warrant # _____

| Name | NYSID Number | Hearing Date | Place |
|------|--------------|--------------|-------|

Hearing Officer: _____    Attorney: _____

1. List witnesses in order of appearance:

   ☐ Parole Officer _____

   ☐ Releasee _____

   ☑ Witnesses _____

2. List documents introduced into evidence:

   ☑ Notice of Violation Form 9011
   dated: _____

   ☑ Violation of Release Report
   dated: _____

   ☐ Other _____

   ☐ Certificate of Release to Parole Supervision
   dated: _____

   ☐ Supplemental Violation of Release Report
   dated: _____

3. List reasons for determination and evidence relied on:

☑ I find there is probable cause that you violated the conditions of your release.

*NOTE:* ALL CHARGES MAY BE PRESENTED AT THE FINAL HEARING.

☐ I find there is not probable cause that you violated the conditions of your release.

_____          Signature _____
Date                                          Hearing Officer

**EXHIBIT 5**

SUPREME COURT, COUNTY OF SUFFOLK
RIVERHEAD, NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
THE PEOPLE OF THE STATE OF NEW YORK,                           ORDER
ex rel., WARREN A. OVALLE,

                              Petitioner           Parole Warrant #762538


        -against-


MICHAEL YRANCHI, WARDEN of the Suffolk County
Correctional Facility, ·


                           Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


     1. The legality of the above referenced parole violation detainer warrant #0762538
having been argued before this Court on November 29, 2017, and
     2. This Court having found that there was not sufficient probable cause established at
the Petitioner's preliminary parole revocation hearing to detain the Petitioner,·

     It is hereby. ORDERED, that Parole Violation Detainer Warrant # 0762538 be
immediately lifted.


DATED:     November 30, 2017
              Riverhead, New York


                                        THE HON. JOSEPH A. SANTORELLI, J.S.C.

Date _11/30/17_  Time _11:55 am_
Agency
Rank _____ Badge #
Print Name _Ira Wexler_
Signature _____

# EXHIBIT 6

Form 4022 (6/02)

## STATE OF NEW YORK-EXECUTIVE DEPARTMENT
## DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### VIOLATION OF RELEASE REPORT

Warrant Issued _x_____ No Warrant Issued _____

Name: Ovalle, Warren A.
NYSID NO: 09347560J
Institution: Marcy C.F
DIN NO: 10R0095
Date of Birth: 06/08/1977
Offense: Assault 2nd, ATT ,Robbery 2nd
Sentence: 00-00/06-00, 01-00/03-00

Date Released: 06/09/2016
Max. Expiration: 03/17/2020
Date of Warrant: 11/30/2017
Warrant No: 762686
Date Enforced: 11/30/2017
Location::SCJ

### Delinquency Date: 09/23/2017

Since his/her release, the above-named individual has violated the Conditions of
Release in the following manner:

Charge#1: On September 23, 2017 at approximately 1:35pm while at the
Suffolk County Correctional Facility located at 100 Center Drive,
South Riverhead N.Y 11901, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record
without the knowledge or consent of his Parole Officer.

Charge#2: On September 23, 2017 at approximately 1:35pm while at the Suffolk County
Correctional Facility located at 100 Center Drive South Riverhead N.Y
11901, Mr. Warren Ovalle violated rule #13, of the conditions of his
release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Charge#3: On September 23, 2017 at approximately 6:05pm while at the
Suffolk County Correctional Facility located at 100 Center Drive
South Riverhead N.Y 11901, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record
without the knowledge or consent of his Parole Officer.

Charge#4: On September 23, 2017 at approximately 6:05pm while at the Suffolk County
Correctional Facility located at 100 Center Drive South Riverhead N.Y
11901, Mr. Warren Ovalle violated rule #13, of the conditions of his
release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Charge#5: September 24, 2017 at approximately 1:20PM while at the
Suffolk County Correctional Facility located at 100 Center Drive
South Riverhead N.Y 11901, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record
without the knowledge or consent of his Parole Officer.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 762686

Charge#6:  On September 24, 2017 at approximately 1:20pm while at the Suffolk County
Correctional Facility located at 100 Center Drive South Riverhead N.Y
11901, Mr. Warren Ovalle violated rule #13, of the conditions of his
release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Charge#7:  On September 25, 2017 at approximately 12:28pm while at the
Suffolk County Correctional Facility located at 100 Center Drive
South Riverhead N.Y 11901, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record
without the knowledge or consent of his Parole Officer.

Charge#8:  On September 25, 2017 at approximately 12:28pm while at the Suffolk
County Correctional Facility located at 100 Center Drive South Riverhead N.Y
11901, Mr. Warren Ovalle violated rule #13, of the conditions of his
release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Charge#9:  On September 26, 2017 at approximately 10:38 pm while at the
Suffolk County Correctional Facility located at 100 Center Drive
South Riverhead N.Y 11901, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record
without the knowledge or consent of his Parole Officer.

Charge#10:  On September 26, 2017 at approximately 10:38pm while at the Suffolk
County Correctional Facility located at 100 Center Drive South Riverhead
N.Y 11901, Mr. Warren Ovalle violated rule #13, of the conditions of his
release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Charge#11:  On September 27, 2017 at approximately 9:42am while at the Suffolk County
Correctional Facility located at 100 Center Drive South Riverhead N.Y
11901, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge or consent
of his Parole Officer.

Charge#12:  On September 27, 2017 at approximately 9:42am while at the Suffolk County
Correctional Facility located at 100 Center Drive South Riverhead
N.Y 11901, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.        NYSID NO: 05347560J        DIN NO. 10R0095
Warrant#: 762686

**Amended**
**Charge#13:** On September 29, 2017 at approximately 9:08am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge or consent
of his Parole Officer.

**Amended**
**Charge#14:** On September 29, 2017 at approximately 9:08am while at the Suffolk
County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule #13, of the conditions of his release in that
he had contact with Mr. Robert Akre, without the knowledge or consent of
his Parole Officer and contrary to a special condition imposed on November
2, 2016.

**Amended**
**Charge#15:** On September 29, 2017 at approximately 6:45pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge or consent
of his Parole Officer.

**Amended**
**Charge#16:** On September 29, 2017 at approximately 6:45pm while at the Suffolk
County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule #13, of the conditions of his release in that
he had contact with Mr. Robert Akre, without the knowledge or consent of
his Parole Officer and contrary to a special condition imposed on November
2, 2016.

**Amended**
**Charge#17:** On September 30, 2017 at approximately 10:02am while at the Suffolk
County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule # 7, of the conditions of his release in that
he had contact with his co-defendant Mr. Robert Akre an individual known
to him to have a criminal record without the knowledge or consent of his
Parole Officer.

**Amended**
**Charge#18:** On September 30, 2017 at approximately 10:02am while at the Suffolk
County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule #13, of the conditions of his release in that
he had contact with Mr. Robert Akre, without the knowledge or consent of
his Parole Officer and contrary to a special condition imposed on November
2, 2016.

**Amended**
**Charge#19:** On September 30, 2017 at approximately 11:54 am while at the Suffolk
County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule # 7, of the conditions of his release in
that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge or consent
of his Parole Officer.

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 762688

Amended
Charge#20: On September 30, 2017 at approximately 11:54am while at the Suffolk
County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980,
Mr. Warren Ovalle violated rule #13, of the conditions of his release in
that he had contact with Mr. Robert Akre, without the knowledge or
consent of his Parole Officer and contrary to a special condition imposed
November 2, 2016.

Amended
Charge#21: On October 1, 2017 at approximately 10:49am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his
release in that he had contact with his co-defendant Mr. Robert Akre
an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#22: On October 1, 2017 at approximately 10:49am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of his
release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#23: On October 2, 2017 at approximately 12:38pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

Amended
Charge#24: On October 2, 2017 at approximately 12:38pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#25: On October 3, 2017 at approximately 9:45am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.    NYSID NO: 09347560J    DIN NO: 10R0095
Warrant#: 762696

**Amended
Charge#26**: On October 3, 2017 at approximately 9:45am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
N.Y 11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended
Charge#27**: On October 4, 2017 at approximately 9:36am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

**Amended
Charge#28**: On October 4, 2017 at approximately 9:36am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended
Charge#29**: On October 5, 2017 at approximately 11:27am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

**Amended
Charge#30**: On October 5, 2017 at approximately 11:27am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended
Charge#31**: On October 6, 2017 at approximately 9:58am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 762686

**Amended**
**Charge#32:** On October 6, 2017 at approximately 9:58am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended**
**Charge#33:** On October 7, 2017 at approximately 11:30am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

**Amended**
**Charge#34:** On October 7, 2017 at approximately 11:30am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended**
**Charge#35:** On October 8, 2017 at approximately 11:06am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

**Amended**
**Charge#36:** On October 8, 2017 at approximately 11:06am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended**
**Charge#37:** On October 8, 2017 at approximately 3:10pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 762686

**Amended**
**Charge#38:** On October 8, 2017 at approximately 3:10pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended**
**Charge#39:** On October 9, 2017 at approximately 9:02am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge
or consent of his Parole Officer.

**Amended**
**Charge#40:** On October 9, 2017 at approximately 9:02am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

**Amended**
**Charge#41:** On October 10, 2017 at approximately 10:06am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

**Amended**
**Charge#42:** On October 10, 2017 at approximately 10:06am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of his release
in that he had contact with Mr. Robert Akre, without the knowledge or
consent of his Parole Officer and contrary to a special condition imposed
on November 2, 2016.

**Charge#43:** On October 10, 2017 at approximately 2:30pm at the
Suffolk County Correctional Facility located at 15 Glover Drive
Yaphank N.Y 11980, Mr. Warren Ovalle violated rule #7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record without
the knowledge or consent of his Parole Officer.

**Charge#44:** On October 10, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at 15 Glover Drive
Yaphank N.Y 11980, Mr. Warren Ovalle violated rule #13, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre without the knowledge or consent of his Parole Officer and
contrary to a special condition imposed on November 2, 2016

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.          NYSID NO: 09347560J          DIN NO: 10R0095
Warrant#: 782686

Amended
Charge#45:  On October 11, 2017 at approximately12:08p.m while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#46:  On October 11, 2017 at approximately 12:08pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of his release
in that he had contact with Mr. Robert Akre, without the knowledge or
consent of his Parole Officer and contrary to a special condition imposed
on November 2, 2016.

Amended
Charge#47:  On October 12, 2017 at approximately10:19am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#48:  On October 12, 2017 at approximately 10:19am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of his release
in that he had contact with Mr. Robert Akre, without the knowledge or
consent of his Parole Officer and contrary to a special condition imposed
on November 2, 2016.

Amended
Charge#49:  On October 13, 2017 at approximately 11:41am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#50:  On October 13, 2017 at approximately 11:41am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of his release
in that he had contact with Mr. Robert Akre, without the knowledge or
consent of his Parole Officer and contrary to a special condition imposed
on November 2, 2016.

Amended
Charge#51:  On October 13, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at 15 Glover Drive
Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record without
the knowledge or consent of his Parole Officer.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.   NYSID NO: 09347560J      DIN NO: 10R0095
Warrant#: 762686

Amended
Charge#52: On October 13, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive
Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 13, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre without the knowledge or consent of his Parole Officer and
contrary to a special condition imposed on November 2, 2016.

Amended
Charge#53: On October 14, 2017 at approximately 12:53pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#54: On October 14, 2017 at approximately 12:53pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of his release
in that he had contact with Mr. Robert Akre, without the knowledge or
consent of his Parole Officer and contrary to a special condition imposed
on November 2, 2016.

Amended
Charge#55: On October 15, 2017 at approximately 12:12pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#56: On October 15, 2017 at approximately 12:12pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#57: On October 16, 2017 at approximately 12:00pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Name: Ovalle, Warren A.     NYSID NO: 09347560J     DIN NO: 10R0095
Warrant#: 762686

Amended
Charge#58: On October 16, 2017 at approximately 12:00pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#59: On October 17, 2017 at approximately 1:46pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#60: On October 17, 2017 at approximately 1:46pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#61: On October 18, 2017 at approximately 10:43am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#62: On October 18, 2017 at approximately 10:43am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016

Amended
Charge#63: On October 19, 2017 at approximately 1:31pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#64: On October 19, 2017 at approximately 1:31pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Name: Ovalle, Warren A.          NYSID NO: 09347560J          DIN NO: 10R0095
Warrant#: 762686

**Charge#65**: On October 20, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive
Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record without
the knowledge or consent of his Parole Officer.

**Charge#66**: On October 20, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive
Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 13, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre without the knowledge or consent of his Parole Officer and
contrary to a special condition imposed on November 2, 2016.

Amended

**Charge#67**: On October 20, 2017 at approximately 5:51pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended

**Charge#68**: On October 20, 2017 at approximately 5:51pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11901, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended

**Charge#69**: On October 21, 2017 at approximately 9:35pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended

**Charge#70**: On October 21, 2017 at approximately 9:35pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Name: Ovalle, Warren A,
Warrant#: 702686

NYSID NO: 09347560J

DIN NO: 10R0095

Amended

Charge#71: On October 21, 2017 at approximately 10:05pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended

Charge#72: On October 21, 2017 at approximately 10:05pm while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended

Charge#73: On October 22, 2017 at approximately 10:58am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended

Charge#74: On October 22, 2017 at approximately 10:58am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended

Charge#75: On October 23, 2017 at approximately 11:45am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended

Charge#76: On October 23, 2017 at approximately 11:45am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.
Warrant#: 762686          NYSID NO: 09347560J          DIN NO: 10R0095

**Amended Charge#77:** On October 24, 2017 at approximately 12:50pm while at the Suffolk County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release in that he had contact with his co-defendant Mr. Robert Akre an individual known to him to have a criminal record without the knowledge or consent of his Parole Officer.

**Amended Charge#78:** On October 24, 2017 at approximately 12:50pm while at the Suffolk County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980, Mr. Warren Ovalle violated rule #13, of the conditions of his release in that he had contact with Mr. Robert Akre, without the knowledge or consent of his Parole Officer and contrary to a special condition imposed on November 2, 2016.

**Amended Charge#79:** On October 25, 2017 at approximately 11:52am while at the Suffolk County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release in that he had contact with his co-defendant Mr. Robert Akre an individual known to him to have a criminal record without the knowledge or consent of his Parole Officer.

**Amended Charge#80:** On October 25, 2017 at approximately 11:52am while at the Suffolk County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11901, Mr. Warren Ovalle violated rule #13, of the conditions of his release in that he had contact with Mr. Robert Akre, without the knowledge or consent of his Parole Officer and contrary to a special condition imposed on November 2, 2016.

**Charge#81:** On October 25, 2017 at approximately 2:30pm in the Suffolk County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release in that he had contact with his co-defendant Mr. Robert Akre an individual known to him to have a criminal record without the knowledge or consent of his Parole Officer.

**Charge#82:** On October 25, 2017 at approximately 2:30pm in the Suffolk County Correctional Facility located at 15 Glover Drive Yaphank N.Y 11980, Mr. Warren Ovalle violated rule # 13, of the conditions of his release in that he had contact with his co-defendant Mr. Robert Akre without the knowledge or consent of his Parole Officer and contrary to a special condition imposed on November 2, 2016.

STATE OF NEW YORK-EXECUTIVE DEPARTMENT
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Name: Ovalle, Warren A.    NYSID NO: 09347560J    DIN NO: 19R0095
Warrant#: 762686

Amended
Charge#83: On October 26, 2017 at approximately 10:16am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11901, Mr. Warren Ovalle violated rule # 7, of the conditions of
his release in that he had contact with his co-defendant Mr. Robert
Akre an individual known to him to have a criminal record without the
knowledge or consent of his Parole Officer.

Amended
Charge#84: On October 26, 2017 at approximately 10:16am while at the Suffolk County
Correctional Facility located at 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule #13, of the conditions of
his release in that he had contact with Mr. Robert Akre, without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#85: On October 27, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge or consent of
his Parole Officer.

Amended
Charge#86: On October 27, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 13, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre without the
knowledge or consent of his Parole Officer and contrary to a special
condition imposed on November 2, 2016.

Amended
Charge#87: On October 31, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank N.Y
11980, Mr. Warren Ovalle violated rule # 7, of the conditions of his release
in that he had contact with his co-defendant Mr. Robert Akre an individual
known to him to have a criminal record without the knowledge or consent
of his Parole Officer.

Amended
Charge#88: On October 31, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank
N.Y 11980, Mr. Warren Ovalle violated rule # 13, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre without the knowledge or consent of his Parole Officer and
contrary to a special condition imposed on November 2, 2016.

Amended
Charge#89: On November 4, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank
N.Y 11980, Mr. Warren Ovalle violated rule # 7, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre an individual known to him to have a criminal record without
the knowledge or consent of his Parole Officer.

Name: Ovalle, Warren A.
Warrant#: 762686          NYSID NO: 09347560J          DIN NO: 10R0095

**Amended**
**Charge#90:** On November 4, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank
N.Y 11980, Mr. Warren Ovalle violated rule # 13, of the
conditions of his release in that he had contact with his co-defendant
Mr. Robert Akre without the knowledge or consent of his Parole Officer and
contrary to a special condition imposed on November 2, 2016.

**Amended**
**Charge#91:** On November 10, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank
N.Y 11980, Mr. Warren Ovalle violated rule # 7, of
the conditions of his release in that he had contact with his co-
defendant Mr. Robert Akre an individual known to him to have a criminal
record without the knowledge or consent of his Parole Officer.

**Amended**
**Charge#92:** On November 10, 2017 at approximately 2:30pm in the
Suffolk County Correctional Facility located at: 15 Glover Drive Yaphank
N.Y 11980, Mr. Warren Ovalle violated rule # 13, of
the conditions of his release in that he had contact with his co-
defendant Mr. Robert Akre without the knowledge or consent of his Parole
Officer and contrary to a special condition imposed on November 2, 2016.

State of New York – Executive Department
Department of Corrections and Community Supervision

Name: Ovalle, Warren A.     NYSID NO: 063475560J     DIN NO: 19B0055
Warrant#: 762686

## CASE SUMMARY

Warren A. Ovalle is a 40-year-old male who released to NYS DOCCS after serving part of his sentences of 00-00/06-00 and 01-00/03-00 for the convictions of Assault 2nd and Attempted Robbery 2nd. Warren A. Ovalle was sentenced on 1/07/2010 in Suffolk County Court by Honorable Judge Hudson. His maximum expiration date is 03/17/2020. The subject was released to New York State Department of Corrections and Community Supervision in 2002.

### Instant Offense
In the instant offense Warren A. Ovalle in concert with the person described as the victim's brother and involved in what was described as a secret relationship by authorities, noticed a scratch on the 17-year-old victim's back and accused him to be involved with a girl. The victim was handcuffed to a toilet and restrained for a period of more than 12 hours and was repeatedly whipped with a length of coaxial cable and had very little freedom. While Warren A. Ovalle and his co-defendant were asleep, the victim was able to free himself by braking the toilet bracket.

### Criminal History
Warren A. Ovalle's criminal history began 7/1/1997 at the age 20. He had 4 prior arrest yielding 1 felony conviction and 3 violations. His sanctions included probation, local jail and 1 state prison term. violent offenses include attempted robbery 2nd 9/19/01 and I/O for assault 2nd. His criminal behavior pattern is violence and /or aggressive behavior with a weapon, propensity and evidences an emerging record of unlicensed operation of a motor vehicle and drug related activity. Warren A. Ovalle criminal history includes his Instant Offense.

### Prior Parole History
The subject was released to New York State Department of Corrections and Community Supervision 6/28/02. The subject has had two prior parole violations. On 3/23/15 warrant # 0658297 was issued due to the Warren A. Ovalle failing to follow the directions of his assigned parole officer. On 9/27/16 was issued due to Warren A. Ovalle reportedly tampering with his GPS monitor devise. On 9/18/17 warrant # 762538 was issued due to the subject fraternizing with his co-defendant Mr. Robert Akre. Robert Akre's wallet and other personal items were observed in the subject's residence. On 9/18/17 at approximately 6:05am during a visit at the subject's residence located at 15 Locust Avenue, Central Islip N.Y. co-defendant Robert Akre was observed to have run out of the back of the subject's residence, with a quantity of marijuana. On 9/18/17 at approximately 6:15am co-defendant, Robert Akre was apprehended and taken into police custody. On 9/18/17 at approximately 6:05 pm during a visit to the subject's residence located at 15 Locust Street, Central Islip N.Y. the subject was in possession of two large metal knives, three metal razors, eight metal Chinese dragon attack stars, in possession of two clear see through packages with a green leafy substance tightly wrapped separately that were hidden in the bottom of the closet of his common living area, in possession of drug paraphernalia, to wit a silver drug grinder that was observed to still have a green leafy substance in it and to a strong scent. On 9/18/17 at approximately 6:15am upon doing a search at 15 Locust Street Central Islip N.Y in Warren A. Ovalle's common living area, Robert Akre's wallet, birth certificate and his car insurance identification card were found in the residence. Additionally, Robert Akre's car insurance identification card was observed to have Warren A. Ovalle's address. 15 Locust Stre..., Central Islip N.Y listed as his place of residence.

**EXHIBIT 7**

CMSCHRON* * *
NEW YORK STATE - DOCCS
COMMUNITY SUPERVISION
PAROLEE CHRONO REPORT
FROM 01/01/1999 THRU 12/03/2018
* * *
DATE: 12/03/2018
PAGE:      9

NAME: OVALLE,WARREN A
NYSID: 09347560J
DIN: 10R0095

AREA:
SPO NAME:
PO NAME:

DATE _____ TIME ___ TYPE

ACTIVITY          LOCATION

ENTERED BY:



ENTERED BY: SAMPLES,BONTIN M
AREA: SUFFOLK          SPO NAME: SPO,UNK SHAW
10/31/2017 04:05PM PAROLE VIOLATION UNIT          PO NAME: ERICKSEN,JOHN
CONTACT ADDRESS: SUFFOLK-CJ          PVU-PAROLE ADJRN   COURT
WARRANT NO. = 0762538, FINAL HEARING OF 10/31/2017
ADJOURNMENT REASON = BY ATTORNEY OF PAROLEE
SPD REVIEW: 11/07/2017
------------------------------------------------
ENTERED BY: HAHLETTE,SABRINA
AREA: SUFFOLK          SPO NAME: SPO,UNK SHAW
REPORT TAKEN BY: HAHLETTE,SABRINA          PO NAME: ERICKSEN,JOHN
10/30/2017 07:13PM OTHER WORK
SUB VOP SUBMITTED WITH  5 ADDITIONAL FRATENIZING CHARGES THAT WERE DATED FOR
10/6/17, 10/10/17, 10/13/17, 10/20/17 AND 10/25/17 DUE TO P CONTINUING TO
HAVE CONTACT WITH HIS CODEFENDANT WHILE INCARCERATED AT YAPHANK C.F.
SPO REVIEW: 11/07/2017
------------------------------------------------
ENTERED BY: MENCARELLI,CATHERINE
AREA: SUFFOLK          SPO NAME: SPO,UNK SHAW
10/30/2017 01:15PM TELEPHONE FROM OTHER          PO NAME: ERICKSEN,JOHN
SPOKE W/MR. DEL RIO REGARDING VIOLATION CASE.   LAW ENFORCEMENT
IES OF RELEVANT PHOTOS FOR FINAL HEARING.   WRITER NEEDS TO HAVE 3 COLOR COP
SAME. CH#221/OSI          DETECTIVE FANDRY ALSO NEEDS TO HAVE
SFO REVIEW: 11/07/2017
------------------------------------------------
ENTERED BY: JUSTE,GARRY
AREA: SUFFOLK          SPO NAME: SPO,UNK SHAW
10/25/2017 11:30AM OTHER WORK          PO NAME: ERICKSEN,JOHN
REVIEWED SVOP REPORT.
SPO REVIEW: 11/07/2017
------------------------------------------------
ENTERED BY: HAHLETTE,SABRINA
AREA: SUFFOLK          SPO NAME: SPO,UNK SHAW
REPORT TAKEN BY: HAHLETTE,SABRINA          PO NAME: ERICKSEN,JOHN
10/23/2017 12:07PM LETTER TO OTHER
POSCANNED AND EMAILED  OVALLE, WARREN'S PRELIMINARY DECISION TO BATES,LYNDSAY L
(DOCCS) LYNDSAY.BATES@DOCCS.NY.GOV WHO  CONFIRMED BEING  IN RECEIPT OF DOCUMENT
SPO REVIEW: 11/07/2017
------------------------------------------------

# EXHIBIT 8

1    STATE OF NEW YORK

2    EXECUTIVE DEPARTMENT

3    DEPARTMENT OF CORRECTIONS &

4    COMMUNITY SUPERVISION

5    ***********************************************

6                        In the matter of

7                        WARREN OVALLE

8                        NYSID # 09347560J

9                        WARRANT # 762686

10                       DIN # 10R0095

11                       INSTITUTION: Suffolk County Jail

12   ***********************************************

13   HEARING TYPE:       Preliminary Hearing

14   LOCATION:           100 Center Drive
                         Riverhead, NY 11901

15
     DATE:               December 13, 2017
16
     BEFORE:             SHARON BURNETT
17                       Preliminary Hearing Officer

18   APPEARANCES:        JOHN ERICKSEN
                         Parole Revocation Specialist
19
                         GLENN OBEDIN
20                       Attorney for Parolee

21                       WARREN OVALLE
                         Parolee
22

23   HEARING REPORTER:  Sara Galante

24

25

1              PROCEEDINGS

2              PHO BURNETT: Are you Warren Ovalle?

3              PAROLEE: Yes, ma'am.

4              PHO BURNETT: This is a preliminary hearing in the

5    matter of Warren Ovalle, NYSID No. 09347560J, Warrant No.

6    762686.

7              Good morning everyone, my name is Sharon Burnett. I

8    am the Preliminary Hearing Officer designated by the Board of Parole

9    to preside over this preliminary hearing.

10             Because testimonies will be taken, PRS Erickson and

11   Mr. Ovalle, please raise your right hands to be sworn.

12             (Whereupon, PRS Ericksen and Parolee Ovalle were

13   sworn in by PHO Burnett.)

14             PHO BURNETT: Please state your names for the

15   record, starting with the PRS.

16             PRS ERICKSEN: PRS Ericksen, Suffolk area office.

17             PHO BURNETT: Counselor?

18             MR. OBEDIN: Naiburg, Obedin and Weissman, by

19   Glenn Obedin, 320 Carleton Avenue, Suite 4200 Central Islip, New

20   York, for Mr. Ovalle.

21             PHO BURNETT: State your name.

22             PAROLEE: Warren Ovalle.

23             PHO BURNETT: Mr. Ovalle, this preliminary

24   hearing, it's an informal, administrative hearing. It's a hearing to

25   determine whether or not there's reasons to believe, or probable cause

1    to believe, that you violated at least one of the conditions of your

2    release in an important respect. If probable cause is found, you will

3    be held over for the final hearing. If probable cause is not found,

4    within 15 days of the lodge-in of your warrant, your warrant will be

5    vacated and you will return to parole supervision. Do you

6    understand?

7                    PAROLEE: Yes.

8                    PHO BURNETT: Thank you.

9                    Mr. Obedin, have you discussed with Mr. Ovalle the

10   charges and the ways in which he may plea?

11                   MR. OBEDIN: Yes, I have.

12                   PHO BURNETT: Thank you.

13                   And is Mr Ovalle in receipt of his charges, consisting

14   of 95 charges?

15                   MR. OBEDIN: He is.

16                   PHO BURNETT: Okay. There's also a case summary

17   signed by Officer Hamlette on 12/1/2017, and Senior Parole Officer G.

18   Juste.

19                   MR. OBEDIN: Yes, we have reviewed that as well.

20                   PHO BURNETT: Okay. There's also a certificate of

21   release to parole supervision in the name of Warren Ovalle, signed by

22   Mr. Ovalle, on March 17th of 2015.

23                   MR. OBEDIN: Yes, we have that as well.

24                   PHO BURNETT: Okay. There are also other

25   documents that I will not put into the record at this time, as the

1          Division will ask for them to be taken into evidence at the appropriate

2          time. I also have a notice of violation in the name of Warren A.

3          Ovalle, NYSID number and Warrant number are the numbers I read

4          into the record. Where the document has violation of release report

5          received, it says, "Refused to sign", but it is dated 12/4/2017, at

6          which time, Mr. Ovalle was scheduled to have this preliminary

7          hearing held. The box where — the line where Mr. Ovalle would sign

8          that he accepts or requests to have a preliminary hearing states,

9          "Refused to sign". But it was witnessed by Officer Hamlette. Mr.

10         Ovalle, did you receive these documents?

11                    PAROLEE: Yes.

12                    PHO BURNETT: Thank you.

13                    Okay. PRS Ericksen, did you prepare the violation of

14         release report?

15                    PRS ERICKSEN: No, I did not.

16                    PHO BURNETT: Did you review the violation of

17         release report?

18                    PRS ERICKSEN: Yes, I did.

19                    PHO BURNETT: And does such document appear to

20         have been completed in the normal course of business?

21                    PRS ERICKSEN: Yes, it does.

22                    PHO BURNETT: And do you attest to the truthfulness and

23         the accurac of the contents therein?

24                    PRS ERICKSEN: Yes. I do.

25                    PHO BURNETT: At this time I will take into

1   evidence, as State's Exhibit 1, the violation of release report as an

2   accusatory instrument. Are you ready to proceed?

3          PRS ERICKSEN: Yes.

4          PHO BURNETT: Okay. What charge will you

5   proceed on?

6          PRS ERICKSEN: Charge No. 44, Judge.

7          PHO BURNETT: Please read that charge into the

8   record.

9          PRS ERICKSEN: On October 10th, 2017, at

10  approximately 2:30 PMm in the Suffolk County Correctional Facility,

11  located at 15 Glover Drive, Yaphank, New York, 11980, Mr. Warren

12  Ovalle violated Rule No. 7 of the conditions of his release, in that, he

13  had contact with his co-defendant, Mr. Robert Akre, an individual

14  known to him to have a criminal record, without the knowledge or

15  consent of his parole officer.

16          I'm sorry, Judge, I would actually -- I want to proceed

17  on Charge No. 45.

18          MR. OBEDIN: 45?

19          PRS ERICKSEN: Yes. Although -- wait.

20          MR. OBEDIN: Is that the one you just read into the

21  record?

22          PRS ERICKSEN: Hold on. Actually, it is number 44.

23          PHO BURNETT: Same charge, different rule?

24          PRS ERICKSEN: Different rule, but it's Charge No. 44 in the

25  amended copy of the VOP.

1        PHO BURNETT: There's an amended copy?

2        PRS ERICKSEN: Yes. The charges were amended;

3    however, Charge No. 44 is the one I want to proceed with in the

4    amended copy.

5        MR. OBEDIN: Can I just see if your Rule 44 is the

6    same Rule 44 as what I'm looking at?

7        PRS ERICKSEN: Of course, yes. Yes, it is.

8        MR. OBEDIN: Okay.

9        PHO BURNETT: It's the same as this?

10        PRS ERICKSEN: Yes, yes.

11        MR. OBEDIN: It's the same?

12        PRS ERICKSEN: Rule 44.

13        PHO BURNETT: Because yours I got.

14        PRS ERICKSEN: This is the original copy, Judge.

15        PHO BURNETT: Lend me the amended copy.

16        PRS ERICKSEN: Yes.

17        PHO BURNETT: Lend me the amended copy.

18        PRS ERICKSEN: There should be an amended copy

19    there, Judge. It should be in front of it.

20        PHO BURNETT: I only took one package, I gave you

21    back all the others.

22        PRS ERICKSEN: Yes. Can I see this, Judge, please?

23        PHO BURNETT: Yes.

24        PRS ERICKSEN: Thank you. In the front is the

25    amended version. There it is, Judge.

1            PHO BURNETT:  Okay.  And the way you read it into

2     the record is okay?

3            PRS ERICKSEN:  I'm going to read it again, Judge,

4     just to be sure.

5            PHO BURNETT:  Okay.

6            PRS ERICKSEN:  On October 20, 2017 -- this is

7     Charge No. 44, the amended version.  On October 10, 2017, at

8     approximately 2:30 PM —

9            PHO BURNETT:  Slow down.

10           PRS ERICKSEN:  — in the Suffolk County

11    Correctional Facility, located at 15 Glover Drive, Yaphank, New

12    York, 11980, Mr. Warren Ovalle violated Rule No. 13 of the

13    conditions of his release, in that, he had contact with his

14    co-defendant, Mr. Robert Akre, without the knowledge or consent of

15    his parole officer, and contrary to his special condition imposed on

16    November 2nd, 2016.

17           PHO BURNETT:  Mr. Ovalle's plea?

18           MR. OBEDIN:  Not guilty.

19           PHO BURNETT:  Thank you.

20           Officer, please present your case.

21           PRS ERICKSEN:  All right.  Judge, I would like to call

22    in my first witness, Parole Officer Evans.

23           PHO BURNETT:  Hi, Officer.  First initial?

24           PO EVANS:  E.

25           PHO BURNETT:  Officer Evans, please raise your

1           right hand to be sworn.

2                          (Whereupon, PO Evans was sworn in by PHO

3           Burnett.)

4                          PHO BURNETT: Please state your name, shield, and

5           command.

6                          PO EVANS: Eleanor Evans, my shield is 303, my

7           command is Queens II.

8                          PHO BURNETT: Thank you.

9                          Your witness, PRS Ericksen.

10                          PRS ERICKSEN: Parole Officer Evans, do you

11          recognize the individual sitting to the left of me wearing green?

12                          PO EVANS: Yes.

13                          PRS ERICKSEN: Could you tell us who he is?

14                          PO EVANS: Warren Ovalle.

15                          PRS ERICKSEN: Did you supervise Mr. Ovalle under

16          parole supervision at any time?

17                          PO EVANS: Yes.

18                          PRS ERICKSEN: All right. What time period did you

19          supervise him?

20                          PO EVANS: 11/2/2016.

21                          MR. OBEDIN: I'm sorry?

22                          PO EVANS: 11/2/2016.

23                          PRS ERICKSEN: 11/2/2016?

24                          PO EVANS: Yes.

25                          PRS ERICKSEN: Until, approximately, when?

| | |
|---|---|
| 1 | PO EVANS: Until approximately, 3/1/2017. |
| 2 | PRS ERICKSEN: Thank you, Officer. |
| 3 | PO EVANS: You're welcome. |
| 4 | PRS ERICKSEN: All right. Did there come a time |
| 5 | when you reviewed Mr. Ovalle's conditions of release with him? |
| 6 | PO EVANS: Yes. |
| 7 | PRS ERICKSEN: When did you do that? |
| 8 | PO EVANS: 11/2/2016. |
| 9 | PRS ERICKSEN: Did you give him any special |
| 10 | conditions on that date? |
| 11 | PO EVANS: Yes. |
| 12 | PRS ERICKSEN: On what date did you give them? |
| 13 | PO EVANS: 11/2/2016. |
| 14 | PRS ERICKSEN: Thank you. |
| 15 | Already included in the Violation of Release report, I |
| 16 | have a document here I'd like you to take a look at, Parole Officer |
| 17 | Evans. Do you recognize this document? |
| 18 | PO EVANS: Yes. |
| 19 | PRS ERICKSEN: And what is that? |
| 20 | PO EVANS: Special conditions of release to parole |
| 21 | supervision. |
| 22 | PRS ERICKSEN: All right. Did you give these |
| 23 | conditions to Mr. Ovalle? |
| 24 | PO EVANS: Yes. |
| 25 | PRS ERICKSEN: All right. Was that on the date that |

1      you told us?

2                         PO EVANS: Yes.

3                         PRS ERICKSEN: And what date was that again?

4                         PO EVANS: 11/2/2016.

5                         PRS ERICKSEN: All right. Were there any

6      no-contact conditions you gave to Mr. Ovalle?

7                         PO EVANS: Yes.

8                         PRS ERICKSEN: All right. Could you read that

9      condition, if there is one, on this document here?

10                        PO EVANS: Yes. Read it out loud?

11                        PRS ERICKSEN: Yes.

12                        PO EVANS: I will not have contact with the following

13     individual, Akre, Robert, this means I will not attempt to meet in

14     person, contact by letter, telephone, electronic device or computer, or

15     through a third party, or via other means, the above individual the

16     without the knowledge and permission of my parole officer.

17                        PRS ERICKSEN: All right. At the bottom of that

18     document, are there some signature?

19                        PO EVANS: Yes.

20                        PRS ERICKSEN: Whose signatures are there?

21                        PO EVANS: Warren Ovalle and Parole Officer Evans.

22                        PRS ERICKSEN: And that's you, Parole Officer

23     Evans?

24                        PO EVANS: Yes, that's me.

25                        PRS ERICKSEN: All right. And you witnessed Mr.

1    Ovalle sign that condition?

2                    PO EVANS: Yes.

3                    PRS ERICKSEN: Thank you.  And is the date also on

4    that form?

5                    PO EVANS: Yes.

6                    PRS ERICKSEN: And could you read that off of the

7    form for us?

8                    PO EVANS: 11/2/2016.

9                    PRS ERICKSEN: Thank you.  And did you review

10   this condition with Mr. Ovalle?

11                   PO EVANS: Yes.

12                   PRS ERICKSEN: At any time while you were

13   supervising Mr. Ovalle, did you remove his special condition to have

14   no contact with Mr. Akre?

15                   PO EVANS: No.

16                   PRS ERICKSEN: Do you know why the subject was

17   given a no-contact condition with Mr. Akre?

18                   PO EVANS: He was the co-defendant -- did I say that

19   right? He was the person who -- he was the person who, I guess,

20   committed the crime with him. So you would call that a --

21                   PHO BURNETT: Co-defendant.

22                   PO EVANS: Co-defendant, there you go.  Thank you.

23                   PRS ERICKSEN: Thank you, Officer.

24   Judge, I have no further questions at this time.

25                   PHO BURNETT: Do you wish to have a document

1    entered into evidence?

2                    PRS ERICKSEN: Yes, Judge, I'm sorry.

3                    PHO BURNETT: Do you wish to voir dire,

4    Counselor?

5                    MR. OBEDIN: I'm not going to voir dire right now.

6                    PHO BURNETT: Okay. At this time, I will take into

7    evidence, as State's Exhibit Number 2, the special conditions of release

8    to parole supervision that is dated and signed November 2nd of 2016,

9    by Mr. Ovalle, as testified by Officer Evans, as well as Officer Evans.

10   This will be State's 2.

11                   Any questions for Officer Evans?

12                   MR. OBEDIN: Very briefly.

13                   Officer Evans, those conditions, the special conditions

14   particularly that you read into the record that you reviewed with Mr.

15   Ovalle. Those conditions were applicable while Mr. Ovalle was

16   under parole supervision, correct?

17                   PO EVANS: Yes.

18                   MR. OBEDIN: Okay. Thank you.

19                   PHO BURNETT: Who's your next witness?

20                   PRS ERICKSEN: Yes, Judge, I'd like to bring in

21   Officer Hamlette next.

22                   PHO BURNETT: Officer Hamlette?

23                   PRS ERICKSEN: Yes.

24                   PHO BURNETT: Okay. Go ahead.

25                   PO HAMLETTE: Good morning.

1          PHO BURNETT: What is your shield number, Officer?

2          PO HAMLETTE: Shield No. 1236.

3          PHO BURNETT: And your bureau?

4          PO HAMLETTE: Suffolk County area office.

5          PHO BURNETT: Please raise your right hand to be

6  sworn.

7          (Whereupon, PO Hamlette was sworn in by PHO

8  Burnett.)

9          PHO BURNETT: Please state your name, shield, and

10  command.

11          PO HAMLETTE: Sabrina Hamlette, parole officer for

12  Suffolk County area office, Shield No. 1236.

13          PHO BURNETT: Okay. PRS Ericksen, your witness.

14          PRS ERICKSEN: Parole Officer Hamlette, do you

15  recognize the individual sitting to me in green?

16          PO HAMLETTE: Yes.

17          PRS ERICKSEN: Who is he?

18          PO HAMLETTE: Warren Ovalle.

19          PRS ERICKSEN: Thank you. Did you supervise Mr.

20  Ovalle under parole supervision?

21          PO HAMLETTE: Yes.

22          PRS ERICKSEN: Could you tell us what time period?

23          PO HAMLETTE: I supervised Warren Ovalle from

24  March 31st, 2017, to the present.

25          PRS ERICKSEN: Thank you, Officer.

1          Do you know who supervised Mr. Ovalle prior to you?

2          PO HAMLETTE: Yes.

3          PRS ERICKSEN: Who was that?

4          PO HAMLETTE: Parole Officer Evans.

5          PRS ERICKSEN: Thank you. Did you receive Mr.

6    Ovalle's case immediately following Ms. Evans' supervision of Mr.

7    Ovalle?

8          PO HAMLETTE: Yes, I did.

9          PRS ERICKSEN: Thank you. Did there come a time

10   when you reviewed Mr. Ovalle's conditions of release with him?

11         PO HAMLETTE: Yes.

12         PRS ERICKSEN: All right. When did you do that?

13         PO HAMLETTE: April 12th, 2017.

14         PRS ERICKSEN: Did you review a special condition

15   with Mr. Ovalle regarding he have no contact with Robert Akre?

16         PO HAMLETTE: Yes.

17         PRS ERICKSEN: When did you do that?

18         PO HAMLETTE: April 12th, 2017.

19         PRS ERICKSEN: The same date, thank you.

20         At any time during your supervision of Mr. Ovalle, did

21   you tell him that he could have contact with Mr. Akre?

22         PO HAMLETTE: No.

23         PRS ERICKSEN: No further questions, Judge.

24         PHO BURNETT: What special condition did you

25   review with Mr. Ovalle?

1          PO HAMLETTE: The special conditions that PO

2     Evans had him sign on 11/2/2016.

3          PHO BURNETT: Do you have that special condition?

4     Show it to Officer Hamlette.

5          PRS ERICKSEN: Here are the special conditions.

6          PHO BURNETT: Is that the condition you reviewed

7     with him?

8          PO HAMLETTE: Yes.

9          PHO BURNETT: Counselor?

10         MR. OBEDIN: And that condition indicates that Mr.

11    Ovalle is not allowed to have contact with Mr. Robert Akre while

12    Mr. Ovalle is on parole supervision; is that correct?

13         PO HAMLETTE: Yes.

14         MR. OBEDIN: No further questions. Oh, excuse me.

15    Did you have Mr. Ovalle sign those special conditions when you

16    reviewed them with him?

17         PO HAMLETTE: No.

18         MR. OBEDIN: You didn't ask him to sign?

19         PO HAMLETTE: No.

20         MR. OBEDIN: Thank you.

21         PHO BURNETT: Anything else?

22         PRS ERICKSEN: Yes, Judge. But it's your testimony

23    today, Parole Officer, that you reviewed these special conditions and

24    that Mr. Ovalle acknowledged that he was aware of that condition?

25         PO HAMLETTE: Yes.

1          PRS ERICKSEN: Thank you. No further questions.

2          PHO BURNETT: I have a question.

3          When does Mr. Ovalle complete his parole

4    supervision?

5          PO HAMLETTE: The date I have is 3/17/2020.

6          PHO BURNETT: Thank you.

7          PRS ERICKSEN: No further questions, Judge.

8          PHO BURNETT: Thank you. You're excused.

9          PRS ERICKSEN: My next witness, Judge, would be

10   Parole Officer Thomas. Would you like me to call her in?

11          PHO BURNETT: Yes.

12          Your first initial, please.

13          PO THOMAS: K.

14          PHO BURNETT: And your shield number?

15          PO THOMAS: 1608.

16          PHO BURNETT: And your bureau?

17          PO THOMAS: Suffolk County area office.

18          PHO BURNETT: Okay. Please raise your right hand

19   to be sworn.

20          (Whereupon, PO Thomas was sworn in by PHO

21   Burnett.)

22          PHO BURNETT: Please state your name, shield, and

23   command.

24          PO THOMAS: Parole Officer K. Thomas, 1608,

25   Suffolk County area office.

1          PHO BURNETT: PRS Ericksen, your witness.

2          PRS ERICKSEN: All right. Parole Officer Thomas,

3    did there come a time, in your an official duties, that you dropped off

4    a subpoena at the Suffolk County Jail?

5          PO THOMAS: Yes.

6          PRS ERICKSEN: Ms. Thomas, do you recognize this

7    document I placed in front of you?

8          PO THOMAS: Yes, I do.

9          PRS ERICKSEN: What is that document?

10          PO THOMAS: It's a subpoena for a parole hearing.

11          PRS ERICKSEN: All right. And is that the subpoena

12   that you dropped off at the Suffolk County Jail?

13          PO THOMAS: Yes, it is.

14          PRS ERICKSEN: Could you read into evidence,

15   what the subpoena requests from the Suffolk County Jail?

16          PO THOMAS: It lists: Number one, anything relating

17   to the rules, regulations, and/or policies of the Suffolk County Jail,

18   relating to visitation or inmates; number two, logs, lists, or records of

19   all visitors who visited the Suffolk County Jail between September 18,

20   2017, and present, for the purpose of visiting inmate Warren Ovalle;

21   number three, logs, lists, records of all visitors who visited the Suffolk

22   County Jail between September 18, 2017, and actually visited inmate

23   Warren Ovalle; number four, any and all and documentations relating

24   to the rules, regulations, and/or policies of the Suffolk County Jail,

25   relating to phone calls between any person outside the jail and inmates;

1       number five, logs, lists or records of phone calls to and from any

2       person outside the jail and inmate Warren Ovalle between September

3       18, 2017, and present; number six, videos, photographs and/or audio

4       recordings in the custody of Suffolk County Jail, showing the visiting

5       area during each time Warren Ovalle was meeting with a visitor from

6       September 18, 2017, to present.

7                   PRS ERICKSEN: Thank you, Officer.

8                   PHO BURNETT: Do you wish to have that --

9                   PRS ERICKSEN: Yes.

10                  PHO BURNETT: -- document entered into evidence?

11                  PRS ERICKSEN: Yes, Judge.

12                  PHO BURNETT: Counselor, do you wish to voir

13      dire?

14                  MR. OBEDIN: No, Judge.

15                  PRS ERICKSEN: Judge, that's part of additional

16      evidence that I might need.

17                  PHO BURNETT: I'm just going to take this into

18      evidence right now, the subpoena.

19                  PRS ERICKSEN: All right. At some point I will

20      confirm that with another witness that it was part of a package that he

21      prepared. Maybe I can have a copy of that or something?

22                  PHO BURNETT: Well, I'm going to give you back

23      everything.

24                  PRS ERICKSEN: Okay, thank you.

25                  PHO BURNETT: At this time, I will take into

1      evidence as States Exhibit No. 3, the subpoena to the Suffolk County

2      Jail and information as read into the record by Parole Officer Thomas.

3               Anything else?

4               PRS ERICKSEN: Nothing from I O Thomas.

5               PHO BURNETT: Counselor?

6               MR. OBEDIN: No questions.

7               PHO BURNETT: Thank you. Next witness?

8               PRS ERICKSEN: Next witness will be SPO Juste.

9               PHO BURNETT: What's your shield number, Officer

10     Juste?

11              SPO JUSTE: 263.

12             PHO BURNETT: And you're from what bureau?

13             SPO JUSTE: Suffolk.

14             PHO BURNETT: SPO Juste, please raise your right

15    hand to be sworn.

16             (Whereupon, SPO Juste was sworn in by PHO

17    Burnett.)

18             PHO BURNETT: Please state your name, shield, and

19    command.

20             SPO JUSTE: SPO Gary Juste, Shield 363, Suffolk

21    office.

22             PHO BURNETT: PRS Ericksen, your witness.

23             PRS ERICKSEN: Thank you, Judge.

24             SPO Juste, did there come a time, in your official duty

25    as a senior parole officer, that you were asked to pick up some

1     evidence at the Suffolk County Jail in Riverhead, New York, as a

2     result of a subpoena?

3               SPO JUSTE: Yes.

4               PRS ERICKSEN: Did you pick up that evidence --

5               SPO JUSTE: Yes.

6               PRS ERICKSEN: -- SPO Juste?

7               On what date was that?

8               SPO JUSTE: December 11th.

9               PRS ERICKSEN: Thank you. And where did you go

10    to get that evidence?

11              SPO JUSTE: I went to Suffolk County Jail records.

12              PRS ERICKSEN: Where is that located?

13              SPO JUSTE: That's the building next door, adjacent to

14    this building here.

15              PRS ERICKSEN: Thank you, Officer.

16              Judge, am I able to get that back that document?

17              PHO BURNETT: Yes, that's Exhibit 3.

18              PRS ERICKSEN: Yes.

19              SPO Juste, do you recognize this manila envelope?

20              SPO JUSTE: Yes.

21              PRS ERICKSEN: Is this the package you received

22    from the Suffolk County Jail on that date?

23              SPO JUSTE: Yes.

24              PRS ERICKSEN: Yes. Can you look at the

25    documents inside and see if those are the documents and items that

1   you picked up on that date?

2                   PHO BURNETT:  Just tell us what they are.

3                   SPO JUSTE:  Yes.  That's the subpoena, that's the logs,

4   and the three CDs, and this certification.

5                   PHO BURNETT:  Certificate of what?

6                   SPO JUSTE:  Documents we received.

7                   PHO BURNETT:  Okay.

8                   PRS ERICKSEN:  All right.  And actually, that was

9   my next question for you, could you read the certification letter for us?

10                  SPO JUSTE:  Okay.

11                  "I, Lieutenant Carl Schneider, commanding officer of

12  the Suffolk County Sheriff's Records Section hereby certify that the

13  records attached is in the custody of and is a true copy of the full and

14  complete record of the condition act, transaction, or currents, or events

15  of this institution/office regarding inmate Warren Ovalle, 6/08/77,

16  DIN No. 347249 for September 18, 2017, to December 5th, 2017, for

17  the following: One, any and all documents relating to the rules

18  regulations, and/or policies of the Suffolk County Jail relating to

19  visitation of inmates; two, logs, release of records, of all visitors who

20  visited the Suffolk County Jail for the purpose of visiting inmate

21  Warren Ovalle; three, logs, lists of records of all visitors who visited

22  the Suffolk County Jail and who actually visited inmate Warren

23  Ovalle; four, any and all documentations relating to the rules,

24  regulations, and/or policies of the Suffolk County Jail relating to

25  phone calls between any persons outside the jail and inmate Warren

1   Ovalle; five, logs, lists of records of phone calls to any person outside

2   the jail and inmate Warren Ovalle, videos, photographs/audio

3   recordings, showing the visiting area showing each of inmate Warren

4   Ovalle's visits.  There are no records of visitors canceling their visits,

5   photographs of the visiting area and/or audio recordings of the visiting

6   area during this time -- this time period, I'm sorry.

7            I further certify that this record was made in the regular

8   course of business of this institution/office, and it is in the regular

9   course of business of this institutions office to make such record.

10  And such record was made at the time of the condition at

11  transaction or currents or event or within a reasonable time thereafter,

12  December 7, 2017. Signed by Lieutenant Carl Schneider."

13           PRS ERICKSEN:  Thank you.

14           PHO BURNETT:  Do you wish to have that document

15  into evidence?

16           PRS ERICKSEN:  Yes, I would, Judge.

17           PHO BURNETT:  Counselor, any voir dire?

18           MR. OBEDIN:  Yes, I'd like to see that certification

19  document, please.  Thank you.

20           Officer Juste, just to verify on what you read into the

21  record, is it correct that this certification indicates, there are no

22  records of visitors cancelling their visits, photographs of the

23  visiting area and/or audio recordings of the visiting area during this

24  time period?  Meaning, the period requested in the subpoena; is that

25  correct?

1                      SPO JUSTE: May I -- what are you referring to? It

2   says no records of visitors cancelling their visits, photographs of the

3   visiting area and/or audio recordings of the visiting area during this

4   time period.

5                      MR. OBEDIN: Okay. Thank you.

6                      PHO BURNETT: Counselor?

7                      MR. OBEDIN: What is Mr. Ericksen offering into

8   evidence? Just that certification page or the entire package?

9                      PRS ERICKSEN: As of right now, just the certificate

10  page.

11                     MR. OBEDIN: All right. I have no objection to the

12  certification page.

13                     PHO BURNETT: This will be State's Exhibit

14  Number 4.

15                     Anything else?

16                     PRS ERICKSEN: No, Judge.

17                     PHO BURNETT: Counselor, questions for SPO Juste?

18                     PRS ERICKSEN: I'm sorry, I do have more questions,

19  I'm sorry.

20                     In these documents also, Officer, do you see one

21  marked "inmate visitor history"?

22                     SPO JUSTE: Yes. It's dated 12/7/17.

23                     PRS ERICKSEN: All right. And that document's

24  marked "inmate visitor history", SPO Juste?

25                     SPO JUSTE: Yes.

1                    PRS ERICKSEN: Thank you. Could you tell me, in

2     that document, who's name is listed as being the inmate?

3                    SPO JUSTE: Ovalle, Warren.

4                    PRS ERICKSEN: Thank you. And could you go to

5     the section marked "inmate visitor history" and tell me who is listed

6     as being a visitor on 10/10/17?

7                    SPO JUSTE: Robert Akre.

8                    PRS ERICKSEN: Thank you, Officer.

9     No further questions.

10                  PHO BURNETT: Counselor?

11                  MR. OBEDIN: Can I see that, please?

12                  Officer Juste, does it indicate how long the visit lasted

13     on that page?

14                  SPO JUSTE: No, sir.

15                  MR. OBEDIN: Does it indicate whether Mr. Ovalle

16     and Mr. Akre ever actually sat down face-to-face with each other?

17                  SPO JUSTE: It just says "inmate visitor history".

18                  MR. OBEDIN: Does it indicate anywhere on that

19     document whether Mr. Ovalle and Mr. Akre ever actually spoke with

20     each other?

21                  SPO JUSTE: No, sir.

22                  MR. OBEDIN: Does it indicate anywhere on that

23     document that Mr. Ovalle and Mr. Akre used, perhaps, hand signals,

24     instead of verbal communication with each other?

25                  PRS ERICKSEN: Objection, Judge.

1    PHO BURNETT:  What's the objection?

2    PRS ERICKSEN: The objection is, what's the relevance

3    of hand signals --

4    PHO BURNETT:  Doesn't matter what he used.

5    PRS ERICKSEN:  -- or verbal communication.  They

6    were together.

7    PHO BURNETT:  Overruled.

8    Continue.

9    MR. OBEDIN:  Did it indicate anywhere on that

10   document whether Mr. Ovalle and Mr. Akre had any form of

11   communication with each other on October 10th, 2017?

12   SPO JUSTE:  No.

13   MR. OBEDIN:  Okay.  Thank you.

14   PRS ERICKSEN:  I'd like to note my objection.

15   PHO BURNETT:  All right.  Over counsel's objection,

16   I will take into evidence as States Exhibit No. 5, the inmate

17   identification, inmate listed as Warren Ovalle, inmate visitor history.

18   Attention was drawn to 10/10/17.  There are one -- two entries on

19   10/10, visitors are listed as Robert Akre.  Document will be State's 5.

20   Okay.  Anything else?

21   PRS ERICKSEN:  No further questions.

22   PHO BURNETT:  Thank you SPO Juste.

23   Any other questions for SPO Juste?

24   MR. OBEDIN:  Yes, I might.  Can I just see this?

25   PRS ERICKSEN:  Sure.

1                    MR. OBEDIN: Officer Juste, are you indicating that

2        this envelope is the envelope that you received from the Suffolk

3        County Sheriff's Department on -- I don't remember the date that you

4        said.

5                    SPO JUSTE: 12/11, yes.

6                    MR. OBEDIN: On 12/11? Okay.

7                    Was this envelope sealed when you received it or was

8        it opened?

9                    SPO JUSTE: It wasn't open.

10                   MR. OBEDIN: It was sealed?

11                   SPO JUSTE: It was closed.

12                   MR. OBEDIN: Closed, okay. But not glued shut?

13                   SPO JUSTE: No.

14                   MR. OBEDIN: Okay. Did you seal it when you

15       received it? Did you put any kind of tape on it and sealed it?

16                   SPO JUSTE: No.

17                   MR. OBEDIN: Did you initial this envelope anywhere

18       with the date, showing that this is the envelope that you recovered

19       from the Suffolk County Jail?

20                   SPO JUSTE: No.

21                   MR. OBEDIN: So, Officer Juste we have no real way

22       of knowing whether this is the actual envelope you received or not

23       because you didn't make any notations on it anywhere. Do you --

24                   PRS ERICKSEN: Objection, Judge.

25                   PHO BURNETT: Overruled.

1              MR. OBEDIN: Anywhere on this envelope; isn't that

2      correct?

3              SPO JUSTE: I took it to the office with me.

4              MR. OBEDIN: What about this envelope is special

5      that allows you to know that that's the exact —

6              PHO BURNETT: Lower your tone, counselor.

7              MR. OBEDIN: — that's the exact envelope.

8              PHO BURNETT: Lower your tone. Thank you.

9              MR. OBEDIN: To let you know that that's the exact

10     envelope that you received that day?

11             SPO JUSTE: This is the envelope, sir.

12             MR. OBEDIN: That's not an answer to the question.

13             PHO BURNETT: When you received the envelope,

14     has is been in your possession the entire time?

15             SPO JUSTE: Yes, until PRS Ericksen took possession

16     of it.

17             PHO BURNETT: When was that?

18             SPO JUSTE: That was Monday, 11 — December 11th.

19             PHO BURNETT: Okay. Anything else, counselor?

20             MR. OBEDIN: Nothing further.

21             PHO BURNETT: Thank you.

22             Okay. Anything else, PRS?

23             PRS ERICKSEN: Nothing further.

24             PHO BURNETT: Okay. Next witness?

25             PRS ERICKSEN: I'm calling Lieutenant Schneider.

1            PHO BURNETT: Your name, sir.

2            LT. SCHNEIDER: Schneider.

3            PHO BURNETT: That's S-C-H-N-E-I-D-E-R?

4            LT. SCHNEIDER: That's correct.

5            PHO BURNETT: And your shield number?

6            LT. SCHNEIDER: L102.

7            PHO BURNETT: L?

8            LT. SCHNEIDER: L102.

9            PHO BURNETT: And your first initial?

10           LT. SCHNEIDER: K.

11           PHO BURNETT: Okay. And you're from what

12 county? You're from the jail here?

13           LT. SCHNEIDER: Yeah. I'm the duty lieutenant —

14 I'm sorry, I'm not the duty lieutenant, I'm the record room Lieutenant.

15           PHO BURNETT: Okay. Please raise your right hand

16 to be sworn.

17           (Whereupon, Lieutenant Schneider was sworn in by

18 PHO Burnett.)

19           PHO BURNETT: Please state your name, shield, and

20 command.

21           LT. SCHNEIDER: My name is Lieutenant Karl

22 Schneider, I work for the Suffolk County Sheriff's Office, I'm the

23 commanding officer for the record room here at the jail.

24           PHO BURNETT: PRS Ericksen, your witness.

25           PRS ERICKSEN: Yes, Judge.

1    Judge, I believe one of the documents that was part of

2    this package you have. Thank you.

3    PHO BURNETT: There's another document there.

4    PRS ERICKSEN: Yes, thank you, Judge.

5    Lieutenant Schneider, do you recognize this envelope?

6    LT. SCHNEIDER: Yes, I do.

7    PRS ERICKSEN: Could you tell us what this

8    envelope is, or what this envelope contains?

9    LT. SCHNEIDER: This envelope contains a package

10    that we make up whenever we're issued a subpoena. We put the

11    material together that -- whoever's asking for the material, whoever

12    subpoenaed us with all the information that they asked for. And it

13    gets picked up by the agency, this envelope.

14    PRS ERICKSEN: Thank you, Officer. Could you

15    review these items here and tell me if that's what was contained in this

16    package of things that you provided?

17    LT. SCHNEIDER: This packet was made up last

18    week. I went through it last week. I certified that everything in here is

19    -- everything here that is on this sheet is accounted for in this packet

20    right here. So, yes, everything that's -- I, myself, certified that this is

21    all the material that was requested and that we turned over.

22    PRS ERICKSEN: All right. Lieutenant, I refer you to

23    these discs here. Were these discs part of the package?

24    LT. SCHNEIDER: Yes, they are.

25    PRS ERICKSEN: Can you tell us what they are?

1          LT. SCHNEIDER: These are videotapes of the

2     visiting areas of the correctional facilities here at Suffolk County.

3          PRS ERICKSEN: Thank you.

4          LT. SCHNEIDER: This too, or -- there are three of them.

5          PRS ERICKSEN: All three of them.

6          LT. SCHNEIDER: These two are the same, this one

7     here is an audio of the telephone calls made --

8          PRS ERICKSEN: Thank you.

9          LT. SCHNEIDER: -- by this individual.

10          PRS ERICKSEN: And you certify that these are

11     documents -- after review -- that these were the documents that were

12     prepared and provided to the New York State Department of

13     Corrections Community Supervision?

14          LT. SCHNEIDER: That is correct.

15          PHO BURNETT: Counsel, any questions?

16          MR. OBEDIN: Yes, just briefly.

17          Lieutenant, you commented that this is the certification

18     you that you signed, correct?

19          LT. SCHNEIDER: Yes, sir.

20          MR. OBEDIN: And does it indicate that there are no

21     photographs of the visiting area and/or audio recordings of the visiting

22     area? Or is there -- am I reading a double negative here?

23          LT. SCHNEIDER: There is no visiting pictures and

24     there is no visiting audio, just --

25          MR. OBEDIN: Just video?

1    LT. SCHNEIDER: Just video, correct.

2    MR. OBEDIN: Gotcha. So video without sound?

3    LT. SCHNEIDER: That's correct.

4    MR. OBEDIN: Okay. Thank you.

5    PHO BURNETT: Anything else?

6    PRS ERICKSEN: No, Judge.

7    PHO BURNETT: Thank you, Lieutenant.

8    Who's next?

9    PRS ERICKSEN: I'm going to bring in Officer

10   Mencarelli.

11   Officer Mencarelli is actually going to be bringing in a

12   laptop computer so we can present it for further evidence.

13   PHO BURNETT: Thank you for coming in. Can you

14   spell your last name?

15   OFFICER MENCARELLI: M-E-N-C-A-R-E-L-L-I.

16   PHO BURNETT: Shield number?

17   OFFICER MENCARELLI: 221.

18   PHO BURNETT: Suffolk?

19   OFFICER MENCARELLI: Office of Special

20   Investigations.

21   PHO BURNETT: Okay.

22   PRS ERICKSEN: Judge, I'm sorry, I would actually

23   like to enter this entire package into evidence.

24   PHO BURNETT: One second.

25   PRS ERICKSEN: I'm sorry.

1          PHO BURNETT: Special Investigation?

2          OFFICER MENCARELLI: Yes.

3          PHO BURNETT: Okay.

4          PRS ERICKSEN: I'm sorry, Judge, I would like to

5  enter this entire package into evidence.

6          PHO BURNETT: Counsel, you wish to voir dire?

7          MR. OBEDIN: Not voir dire, but object. Based on my

8  prior questioning and a lack of proper chain of custody regarding that

9  envelope and what was within it.

10         PHO BURNETT: Okay. Well we have the officer

11  who actually prepared what was placed in the envelope and given to

12  Officer Juste. So over counsel's objection, I will take the package into

13  evidence, including the three videos, as State's Exhibit No. 6.

14         PRS ERICKSEN: Thank you, Judge.

15         PHO BURNETT: Okay. Please raise your right hand

16  to be sworn.

17         (Whereupon, Officer Mencarelli was sworn in by PHO

18  Burnett.)

19         PHO BURNETT: Please state your name, shield, and

20  command.

21         OFFICER MENCARELLI: Officer Katherine

22  Mencarelli, Shield 221, Office of Special Investigations.

23         PHO BURNETT: Thank you. Officer -- PRS

24  Ericksen, your witness.

25         PRS ERICKSEN: Judge, if I may have the discs that

1          were entered into evidence?

2                    Thank you. These video discs were already entered

3          into evidence. I would like Parole Officer Mencarelli to take a look

4          at.

5                    PHO BURNETT: Are the discs labeled?

6                    PRS ERICKSEN: Yes, they are.

7                    PHO BURNETT: If so, please state what they are.

8                    PRS ERICKSEN: I'm going to have Officer

9          Mencarelli list what they are.

10                    Can you read what it says on the discs, Officer?

11                    OFFICER MENCARELLI: Suffolk County Sheriff's

12          Office video evidence.

13                    PRS ERICKSEN: Thank you. And on that disc, does

14          it also have a start date and time and end date and time?

15                    OFFICER MENCARELLI: Start date is 10/10/2017,

16          14:00 hours, end date and time is 10/10/2017, 15:27 hours.

17                    PRS ERICKSEN: Thank you, Officer.

18                    Officer --

19                    MR. OBEDIN: Judge, may I ask a voir dire question

20          on that?

21                    PHO BURNETT: Sure.

22                    MR. OBEDIN: Officer Mencarelli, did you write that

23          information --

24                    OFFICER MENCARELLI: No.

25                    MR. OBEDIN: -- on that disc?

1        OFFICER MENCARELLI: No, I did not.

2        MR. OBEDIN: Do you know who did?

3        OFFICER MENCARELLI: No.

4        MR. OBEDIN: Okay. Thank you.

5        PHO BURNETT: Anything else?

6        PRS ERICKSEN: Officer Mencarelli, do you know

7   who Robert Akre is?

8        OFFICER MENCARELLI: I do.

9        PRS ERICKSEN: Did you ever supervise him as a

10  parole officer?

11       OFFICER MENCARELLI: Yes.

12       PRS ERICKSEN: Approximately, when did you

13  supervise him?

14       OFFICER MENCARELLI: About 2013.

15       PRS ERICKSEN: All right. So would you say you would

16  be able to identify him by sight?

17       OFFICER MENCARELLI: I would.

18       PRS ERICKSEN: Do you know who Warren Ovalle

19  is?

20       OFFICER MENCARELLI: Yes.

21       PRS ERICKSEN: Do you see him here in this

22  courtroom today?

23       OFFICER MENCARELLI: Yes, I do.

24       PRS ERICKSEN: Could you tell us how you are able

25  to identify Mr. Ovalle?

1        'OFFICER MENCARELLI: Yes. Mr. Ovalle is a

2     person currently under supervision by DOCCS. In 2013, when I

3     supervised Mr. Akre, Mr. Ovalle was his co-defendant. So I had the

4     opportunity to review that folder and that case.

5        Additionally, I've also been involved in investigations

6     that involved both Mr. Ovalle and Mr. Akre.

7        PRS ERICKSEN: All right. So you would say you

8     would be able to identify both of them fairly easily?

9        OFFICER MENCARELLI: Yes.

10       PRS ERICKSEN: Okay. I'm going to ask you to play

11    that disc for this courtroom. And please tell us if, at any point, you

12    see any frames that contain either Mr. Robert Akre or Mr. Ovalle in

13    the video footage.

14       MR. OBEDIN: Judge, I'm going to come around so I

15    can have a better view of the video.

16       PHO BURNETT: I'm going to have them put it there

17    so we can all see it.

18       MR. OBEDIN: Okay.

19       PHO BURNETT: We're going to have to put it where

20    you are, Ericksen.

21       PRS ERICKSEN: All right.

22       PHO BURNETT: And let Mencarelli trade places

23    with you.

24       PRS ERICKSEN: Judge, I would also like to note for

25    the record also, at this time, that the disc that PO Mencarelli is

1    playing, is the disc that was previously noted by the Lieutenant from

2    the Suffolk County Jail as being the video disc evidence that they

3    provided to the Department.

4               PHO BURNETT: So noted.

5               You could stand up over here, Ericksen.

6               PRS ERICKSEN: Okay. Thank you.

7               (Whereupon, Officer Mencarelli plays video.)

8               MR. OBEDIN: What is the timeframe on this?

9               PRS ERICKSEN: It's dated and time stamped, so

10    when we get to the point.

11              MR. OBEDIN: How long are we going to be waiting?

12              PRS ERICKSEN: Not too long.

13              OFFICER MENCARELLI: Do you want me to fast

14    forward?

15              PRS ERICKSEN: If you could fast forward to the

16    point where -- yes.

17              PHO BURNETT: Now Officer Mencarelli, what we're

18    looking at is visitors coming in?

19              OFFICER MENCARELLI: Yes.

20              PHO BURNETT: Okay.

21              PRS ERICKSEN: And Officer Mencarelli, do you

22    recognize this area right here?

23              OFFICER MENCARELLI: Yes, this is the front area

24    of Suffolk County Jail Yaphank facility.

25              PHO BURNETT: Yaphank facility, okay.

1    PRS ERICKSEN: And where is that located?

2    OFFICER MENCARELLI: I believe their address is

3    15 Glover Drive in Yaphank.

4    PRS ERICKSEN: Thank you. And how is it that you

5    recognize this area?

6    OFFICER MENCARELLI: I've been to the jail on

7    multiple occasions to either serve people or do interviews.

8    MR. OBEDIN: I'll stipulate that Officer Mencarello

9    knows where this is.

10   OFFICER MENCARELLI: So this is --

11   PRS ERICKSEN: If you could comment, yeah, what

12   appears to be at certain points or what you think you're seeing and

13   then any evidence that you're very clear about as it occurs.

14   OFFICER MENCARELLI: I'm trying to not to pass it

15   here. But this person right here is the person I know to be Robret

16   Akre. I'll just rewind it a tad.

17   PHO BURNETT: Describe what the person's wearing,

18   please, and describe the person.

19   OFFICER MENCARELLI: Okay. That's the person I know

20   to be Robert Akre, he's a white male, blonde hair about shoulder length,

21   he's wearing a maroon top with some wording on the back and blue

22   colored pants.

23   PHO BURNETT: Okay.

24   OFFICER MENCARELLI: The time stamp here is

25   14:04 and 47 seconds on October 10th, 2017. And if I let the video

1       play --

2                    PRS ERICKSEN: Please do.

3                    OFFICER MENCARELLI:  -- he walks up to the

4       visiting desk there to sign in.

5                    And I just like to point out that, over the course of my

6       interactions with Mr. Akre, I did observe him previously with that leg

7       brace on.  So that's just another identifier for him there.  He goes

8       ahead and signs in.  And then he walks over to get to a locker.

9                    So this time stamp is 14:19 at about 23 seconds, this is

10      when the visitors start entering the visiting area. This is Mr. Akre

11      seated here in the second seat from the end. 14:19 at about 50

12      seconds is when the inmates start to enter the visiting area. 14:20

13      50 seconds, this is Mr. Ovalle at the top of the screen getting his seat

14      assignment, he's going to be walking around. He enters this frame

15      here, 14:21 and about 9 seconds.

16                   So he walks down, Mr. Akre stands up, they embrace

17      for a few seconds, and then they sit down and proceed with the visit.

18                   PRS ERICKSEN: Okay.  Mencarelli, are you able to

19      pan in closer to that?

20                   OFFICER MENCARELLI:  I believe there's another

21      shot that goes closer.

22                   PRS ERICKSEN: Okay.  Thank you.

23                   OFFICER MENCARELLI: So this is the zoomed in

24      section of the visit showing Mr. Ovalle down on the left wearing the

25      yellow and Mr. Akre there on the right, wearing the same shirt, pants,

1    blonde hair.

2                    PHO BURNETT: What time is that stamped?

3                    OFFICER MENCARELLI: This still right here is

4    15:05 and 54 seconds.

5                    PRS ERICKSEN: If I could please pass and go back

6    over here? Thank you.

7                    PHO BURNETT: Okay. So let the record reflect that

8    we're looking at -- we looked at several shots, this one is Mr. Ovalle

9    and Mr. Akre embraced, hugged, sat down. And we're looking at the

10   screen shot, where they're sitting directly across from each other.

11                   PRS ERICKSEN: All right. PO Mencarelli, could you

12   just advance the video for a little bit, just to show that this wasn't just

13   a chance encounter, that they do spend a little bit of time together,

14   also.

15                   OFFICER MENCARELLI: So here's 15:07, 15:10,

16   15:14, 15:17.

17                   PRS ERICKSEN: All right. So clearly, there's some

18   time elapsed there.

19                   OFFICER MENCARELLI: Yes. And then this is the

20   end here of the visit. And when the visit is over, they stand up and

21   embrace again before the visit is ended. Do you need me to fast

22   forward?

23                   PHO BURNETT: Yes, please. Well, they're standing

24   now. They're both standing here.

25                   OFFICER MENCARELLI: Time stamp here is 15:25

1   and 1 second.

2                   PHO BURNETT: Hugged each other.

3                   OFFICER MENCARELLI:   They talk for a few more

4   seconds and then the visit ends.

5                   PRS ERICKSEN: Now, do you -- the location where

6   they're sitting, do you also recognize this location where they actually

7   were sitting across from each other?

8                   OFFICER MENCARELLI: Yes.

9                   PRS ERICKSEN: And where is that?

10                  OFFICER MENCARELLI:   That is Yaphank visiting

11  facility.

12                  PRS ERICKSEN: Thank you. And again, that address

13  is?

14.                 OFFICER MENCARELLI:   15 Glover Drive in

15  Yaphank.

16                  PRS ERICKSEN: Thank you. And you already noted

17  how you have knowledge of that location.

18                  Have you brought any photo evidence with you?

19                  OFFICER MENCARELLI: Yes.

20                  PRS ERICKSEN: Can I please see that?

21                  OFFICER MENCARELLI:   So I have some

22  photographs of Mr. Akre and Mr. Ovalle that are printed from

23  eJustice CJIM system.  The system keeps track of everybody that has

24  a NYSID or is on parole or on probation. And we're able to have access

25  to those photographs.

1                     PRS ERICKSEN: And you generated those

2     photographs as you do in the normal course of your duties?

3                     PO MENCARELLI: Yes.

4                     PRS ERICKSEN: Thank you. Would you also happen

5     to print any pictures from this video?

6                     PO MENCARELLI: I did. So --

7                     PRS ERICKSEN: This photo right here, Officer,

8     what's this a photo of?

9                     OFFICER MENCARELLI: That's a photo from the

10    video we just played, showing Mr. Ovalle on the left, Mr. Akre on the

11    right, inside of Yaphank visiting room, it's dated 10/10/2017 at

12    14:55 hours.

13                    PRS ERICKSEN: Judge, I'd like to enter that into

14    evidence.

15                    PHO BURNETT: Show it to counsel, please,

16    I mean, we saw the video.

17                    MR. OBEDIN: That's what I was going to say, but

18    okay.

19                    PHO BURNETT: The video is good.

20                    PRS ERICKSEN: Okay. If I could, just for the record,

21    you said these were printed from eJustice?

22                    OFFICER MENCARELLI: Yes. One front of each

23    individual and one side profile of each individual.

24                    PRS ERICKSEN: I would like these entered, Judge.

25                    PHO BURNETT: And that's of whom?

1          OFFICER MENCARELLI: This first one here is Mr.

2     Robert Akre, date of birth, 1/18/86.

3          PHO BURNETT: That's who you supervised?

4          OFFICER MENCARELLI: Yes.

5          PHO BURNETT: That was on parole supervision?

6          OFFICER MENCARELLI: Yes.

7          This is the side profile of Mr. Robert Akre, this is

8     the front photograph of Mr. Ovalle --

9          PHO BURNETT: Well, we don't need that. Mr.

10    Ovalle is right here.

11         OFFICER MENCARELLI: -- and his side profile.

12         PRS ERICKSEN: That's good. All right. And you

13    were able to identify as both of them as Mr. Akre and Mr. Ovalle as

14    co-defendants at this time?

15         OFFICER MENCARELLI: Yes.

16         PHO BURNETT: Any voir dire on the pictures of Mr.

17    Akre?

18         MR. OBEDIN: I don't see the relevance, Your Honor,

19    the officer already identified Mr. Akre, indicated that she supervised

20    him. I'm not sure what the purpose of the photos are.

21         PHO BURNETT: Okay. Over counsel's objection, I

22    will take into evidence as State's No. 7, the photograph of Mr. Robert

23    S. Akre, date of birth listed as 1/18/1986, that Officer Mencarelli

24    testified that she supervised him while he was on parole supervision.

25         PRS ERICKSEN: Before you leave Parole Officer

1 Mencarelli, I would just like you to pull up the screen shot again, of

2 Mr. Ovalle and Mr. Akre sitting --

3    PHO BURNETT:  Why is that necessary?  Are you

4 going to ask another question?

5    PRS ERICKSEN:  No.  I wanted to ask -- I wanted to

6 bring the parole officer of record in to also identify.

7    PHO BURNETT:  We have Officer Mencarelli who

8 supervised here to testify.

9    PRS ERICKSEN:  All right.

10    PHO BURNETT:  I mean, she can bring it up, go

11 ahead.

12    OFFICER MENCARELLI:  What was the time stamp

13 again?

14    PRS ERICKSEN:  The time stamp was --

15    MR. OBEDIN:  What was the purpose of this?

16    PHO BURNETT:  For the PO of record to identify

17 both parolees, or parolee and ex-parolee.

18    MR. OBEDIN:  Okay.  So we'll just leave it like that --

19    PHO BURNETT:  Yes.

20    MR. OBEDIN:  -- frozen?

21    PHO BURNETT:  Yes.

22    MR. OBEDIN:  That's what I thought.  Okay.

23    OFFICER MENCARELLI:  Do you need a specific

24 time or --

25    PRS ERICKSEN:  No, that's fine.

1      PHO BURNETT: I think 15:05 is a good time. All

2    right. That's good, you can leave it. Go back, go back. Yes, that's

3    good.

4      OFFICER MENCARELLI: Okay. So that's 15:14.

5      PHO BURNETT: Okay. Do one without the hand --

6    without his hand in his face, Mr. Akre's hand. Yes. What time is that?

7      OFFICER MENCARELLI:  That is 15:13 and

8    33 seconds.

9      PHO BURNETT: Okay. Any questions for Officer

10    Mencarelli, counselor?

11      MR. OBEDIN: Thank you. Officer Mencarelli, you

12    had concerns about Mr. Akre and Mr. Ovalle potentially

13    communicating with each other?

14      PRS ERICKSEN: Objection, Judge.

15      PHO BURNETT: What was the question?

16      MR. OBEDIN: You had concerns about Mr. Akre and

17    Mr. Ovalle communicating with each other? Did you have concerns

18    about that?

19      PRS ERICKSEN: Objection, Judge. What's the

20    pertinence?

21      PHO BURNETT: What's the relevancy of that

22    question, Counselor? When you say "concern" what do you mean?

23      MR. OBEDIN: Well, it was a special condition,

24    correct, that Mr. Ovalle not have communication with Mr. Akre?

25      PHO BURNETT: Well she's not the parole officer of

1    record.

2              MR. OBEDIN: Were you aware of that special

3    condition?

4              OFFICER MENCARELLI: Yes, I was.

5              MR. OBEDIN: Okay. Did you or, to your knowledge,

6    anyone else from your office, put in a request to the jail that Mr.

7    Ovalle not be able to receive visits from Mr. Akre?

8              PRS ERICKSEN: Objection, Judge.

9              PHO BURNETT: I'll allow it.

10             OFFICER MENCARELLI: No.

11             MR. OBEDIN: No, you did not?

12             OFFICER MENCARELLI: No, I did not.

13             MR. OBEDIN: Okay. Are you aware if anyone else

14   from the Division of Parole put in such a request?

15             OFFICER MENCARELLI: I'm not aware. I can just

16   say I did not.

17             MR. OBEDIN: You did not. Okay. Thank you.

18             PHO BURNETT: Okay. Any questions for Officer

19   Mencarelli?

20             PRS ERICKSEN: No.

21             PHO BURNETT: Thank you very much.

22             Who's coming back now?

23             PRS ERICKSEN: I'm going to bring Officer Hamlette.

24             (Whereupon, a brief recess was taken.)

25             PHO BURNETT: We're back on the record.

1       Officer Hamlette, you're still under oath.

2       PO HAMLETTE:  Okay, thanks.

3       PHO BURNETT:  PRS Ericksen, your witness.

4       PRS ERICKSEN:  All right.  Parole Officer Hamlette,

5   I would just like to you to view this video image on the computer

6   here.  Do you recognize the individuals in that image?

7       PO HAMLETTE:  Yes, I do.

8       PRS ERICKSEN:  All right.  Could you identify them?

9       PO HAMLETTE:  Yes.  The young man in the orange

10  suit to the left of the screen is Warren Ovalle.  And the male to the

11  right of the screen is Robert Akre.

12      PRS ERICKSEN:  All right.  And you said -- what

13  color did you say he was wearing?

14      PO HAMLETTE:  I want to say orange or yellow.

15      PRS ERICKSEN:  Okay.  Thank you, Officer.  And

16  how are you able to identify them?

17      PO HAMLETTE:  Warren Ovalle is my parolee, I

18  supervised him on parole.  Robert Akre, I can identify him from 9/18,

19  he is the co-defendant for Warren Ovalle.

20      PRS ERICKSEN:  All right.  And how -- how can you

21  identify him?  Have you seen photos of him?  Have you seen him?

22  How would you identify him?

23      PO HAMETTE:  Yes.  I identified Robert Akre

24  through a photo on 9/17/2017, and also by seeing him in person on

25  9/18 at the -- at Warren Ovalle's residence.

1    PRS ERICKSEN: All right. No further question,

2    Judge.

3    PHO BURNETT: What date was that?

4    PO HAMLETTE: 9/18/2017.

5    PRS ERICKSEN: I'm sorry, Judge. One more --

6    PHO BURNETT: One second.

7    PRS ERICKSEN: I'm sorry.

8    PHO BURNETT: 9/18/2017 --

9    PO HAMLETTE: Yes.

10   PHO BURNETT: -- you saw Mr. Akre?

11   PO HAMLETTE: Yes.

12   PHO BURNETT: At whose residence?

13   PO HAMLETTE: Warren Ovalle's residence.

14   PHO BURNETT: Okay.

15   PRS ERICKSEN: One further question. And this

16   photograph here that's of this video, could you just tell me what the --

17   PHO BURNETT: The still shot of the video.

18   PRS ERICKSEN: Yes, the still shot, could you tell me

19   what the date --

20   PO HAMLETTE: Yes.

21   PRS ERICKSEN: -- and time is?

22   PO HAMLETTE: Absolutely. October 10th, 2017. And

23   it's 15 hours -- 15:13 hours.

24   PRS ERICKSEN: All right. Thank you.

25   No further questions.

1    MR. OBEDIN: Officer Hamlette, what you've

2    identified, that occurred on October 10, 2017; is that right?

3    PO HAMLETTE: Yes.

4    MR. OBEDIN: This incident at the jail where Mr.

5    Ovalle is in the visiting area with Mr. Akre, correct? That's October

6    10th of '17?

7    PO HAMLETTE: Yes.

8    MR. OBEDIN: And you were Mr. Ovalle's parole

9    officer at that time on that date?

10   PO HAMLETTE: Yes.

11   MR. OBEDIN: Okay. So you were in charge of

12   supervising him while released from custody; is that correct?

13   PO HAMLETTE: Yes.

14   MR. OBEDIN: But Mr. Ovalle wasn't released from

15   custody on that date; isn't that correct?

16   PRS ERICKSEN: Objection, Judge.

17   PHO BURNETT: Overruled. Continue.

18   PO HAMLETTE: Yes.

19   MR. OBEDIN: Mr. Ovalle was incarcerated on that

20   date, correct?

21   PO HAMLETTE: Yes.

22   MR. OBEDIN: So you're not supervising him while

23   he's in custody; isn't that correct?

24   PRS ERICKSEN: Objection, Judge.

25   PHO BURNETT: Overruled.

1               PO HAMLETTE: While he's incarcerated I'm still

2   responsible for Warren Ovalle.

3               MR. OBEDIN: Is Mr. Ovalle under your direct

4   supervision while he's incarcerated for a violation of parole?

5               PO HAMLETTE: No.

6               MR. OBEDIN: Thank you.

7               PRS ERICKSEN: Officer -- redirect.

8               Officer, what is Mr. Ovalle's maximum expiration date

9   while he was on parole?

10              PO HAMLETTE: His maximum expiration date is

11  March 17, 2020.

12              PRS ERICKSEN: All right. So had Mr. Ovalle, on

13  October 10, 2017, completed his parole supervision?

14              PO HAMLETTE: No.

15              PRS ERICKSEN: All right.

16              PHO BURNETT: Mr. Ovalle, you could go back to

17  the center, thank you.

18              PRS ERICKSEN: Officer Hamlette, could I ask you

19  again just to take a look at the special condition that was given to Mr.

20  Ovalle regarding no contact with Robert Akre? Would you read that

21  special condition again?

22              PO HAMLETTE: Special condition says that, "I,

23  Ovalle, Warren, middle initial A, acknowledge that the following

24  special conditions have been imposed upon me and that the special

25  conditions will remain in effect until the termination of my legal

1     period of supervision, 3/17/2020, unless otherwise amended in writing

2     by the Department of Corrections and Community Supervision. I will

3     not have contact with the following individual: Akre, Robert." This

4     means that he will not attempt to meet in person, communicate by

5     letter, telephone and electronic device, i.e. computer, or through a

6     third party or via other means, the above individuals without

7     knowledge and permission of my parole officer.

8              PRS ERICKSEN: Thank you, Officer.

9              MR. OBEDIN: And Officer Hamlette, that is while

10    Mr. Ovalle is under conditions of release; is that correct?

11             PO HAMLETTE: That is until the expiration of his

12    parole.

13             MR. OBEDIN: Officer Hamlette, while someone you

14    are supervising is in custody for a parole violation, they are not

15    under--

16             PRS ERICKSEN: Objection.

17             MR. OBEDIN: -- community release, are they?

18             PO HAMLETTE: No.

19             MR. OBEDIN: If a parolee you are supervising is

20    found at their subsequent parole hearing not to have been in violation

21    of their parole, they are then told that they are being returned to

22    supervised release; isn't that correct?

23             PO HAMLETTE: Yes.

24             MR. OBEDIN: At this time, on this date, October 10th,

25    , 2017, Mr. Ovalle was in custody on a parole violation; isn't that

1      correct?

2                          PO HAMLETTE:  Yes.

3                          MR. OBEDIN:  No further questions.

4                          PHO BURNETT:  Officer Hamlette -- do you have any

5      questions of Officer Hamlette?

6                          PRS ERICKSEN:  No, no further questions.

7                          PHO BURNETT:  Officer Hamlette, while a parolee is

8      in custody, in this case, in a jail, if that parolee exhibit any behavior

9      that would violate the condition of his release, would you be required

10     to write charges and charge the parolee, in this case, Mr. Ovalle, with

11     those behaviors?

12                         PO HAMLETTE:  Yes.

13                         PHO BURNETT:  Okay.  Anything else?

14                         PRS ERICKSEN:  No further questions.

15                         PHO BURNETT:  Any questions?

16                         MR. OBEDIN:  No.

17                         PHO BURNETT:  Okay.  Thank you very much for

18     coming in.

19                         Anything else, PRS Ericksen?

20                         PRS ERICKSEN:  Nothing else.

21                         PHO BURNETT:  Will your client testify?

22                         MR. OBEDIN:  No.

23                         PHO BURNETT:  Okay.  Closing?

24                         PRS ERICKSEN:  Judge, Department feels that we

25     have clearly established that Mr. Ovalle, in fact, on October 10th,

1   2017, at approximately 2:30 PM in the Suffolk County Correctional

2   facility, located at 15 Glover Drive, Yaphank, New York, violated

3   Rule No. 13, of the conditions of this release, in that, he had contact

4   with his co-defendant Mr. Robert Akre, without the knowledge or

5   consent of his parole officer and contrary to his special condition

6   imposed on November 2nd, 2016. We find this to be a violation in an

7   important respect based on the fact that Mr. Ovalle and Mr. Akre were

8   co-defendants in a very serious crime that involved the mutilation of

9   Mr. Akre's brother while being —

10              MR. OBEDIN: Objection to the term "mutilation".

11              PRS ERICKSEN: Judge, it's my closing statement.

12   It's not evidence.

13              PHO BURNETT: Is this knowledge that's reported to

14   the Court when he was sentenced? Is it in the pre-sentence

15   investigation?

16              PRS ERICKSEN: I couldn't say, but I will give you --

17   I'm going to read to you a copy of the instant offense from the

18   Violation of Release report, Judge. "The victim was handcuffed to a

19   toilet and restrained for a period of more than 12 hours and was repeatedly

20   whipped with a length of coaxial cable and had very little freedom. While

21   Warren A. Ovalle and his co-defendant was asleep, the victim was able to break

22   free by breaking the toilet bracket.

23              Additionally, the prior custody of Mr. Ovalle, parole

24   officers went to Mr. Ovalle's residence where Mr. Akre was seen,

25   actually exiting the back door of the residence.

1              MR. OBEDIN: Objection. Has nothing to do --

2              PHO BURNETT: Sustained.

3              PRS ERICKSEN: Ovalle was actually found at the

4 residence --

5              MR. OBEDIN: Objection.

6              PHO BURNETT: There was testimony by the officer

7 that she met Mr. Akre on 9/18 at the parolee's residence, that's how

8 she also recognized Mr. Akre.

9              Go ahead.

10              PRS ERICKSEN: Mr. Akre was apprehended and

11 found carrying felony weight marijuana and scales.

12              PHO BURNETT: Sustained.

13              MR. OBEDIN: Thank you.

14              PHO BURNETT: Just regarding what was testified to

15 here you can close on.

16              PRS ERICKSEN: All right.

17              PHO BURNETT: No new information.

18              PRS ERICKSEN: All right. All right. Judge, based

19 on the seriousness of the instant offense, the Division gave a very

20 important special condition of the no contact between the two

21 individuals. And we feel that this is a violation in an important

22 respect based on the fact that they were given this no-contact

23 condition, regardless of where the contact occurred. Mr. Ovalle was

24 still under the supervision of parole until his maximum expiration

25 date of 3/17/2020, as noted in the special condition and on his release

1   sheet.

2          Therefore, we feel that we have very easily proven

3   probable cause that they did have contact.

4          PHO BURNETT: Thank you.

5          Counselor?

6          MR. OBEDIN: Clearly, Your Honor, they have not

7   met their burden here of probable cause.  When an individual on

8   parole supervision is violated, for parole, he then becomes an inmate.

9   He is no longer on parole supervision.  The regulations themselves

10  indicate, in terms of conduct of a hearing, Section 8005.7(a)(6),

11  If the charges alleging a violation of parole are not sustained

12  at the violation hearing, the warrant will be lifted and the releasee

13  "restored to supervision".  That cannot be defined in any

14  other way.  It means that the individual, while incarcerated, is not on

15  supervision.  That was a special condition of his release.

16          Yes, I would agree with the Court in questioning

17  Officer Hamlette, that if Mr. Ovalle, perhaps, committed a new crime,

18  an assault, if a new charge were brought against him while in custody,

19  that could be some type of violation, but not any special condition that

20  only regards Mr. Ovalle's release while on supervision.  You cannot

21  find that the definition of "restored to supervision" has more than one

22  meaning.

23          While Mr. Oval is in custody, he is not under the

24  supervision of parole.  And that condition cannot be held against him.

25  Additionally, Officer Hamlette indicated that she read the special

1    conditions to Mr. Ovalle but never actually had him sign them. The

2    rules and regulations of parole specify, specifically, that every time a

3    parolee gets a new parole officer to supervise them, that parole officer

4    is required to read the special conditions to the parolee and have the

5    parolee acknowledge by signing that he understands those

6    conditions. That was not done here. But I don't think we ever have

7    to get to that. But if the Court finds that we do, there's that as well.

8    They have not met their burden, as small as it is.

9              PHO BURNETT: Thanks, counselor.

10             So regarding the special condition that was given to

11   Mr. Ovalle by Officer Evans and was reiterated by Officer Hamlette

12   when she met with him on 3/31/2017. Counsel, I'd like for you to

13   show me that document that DOCCS provided that every time a

14   parolee is given to a new parole officer they have the sign a special

15   condition. There is no such regulations. Once the special conditions

16   is reviewed by the current parole officer, that's all that it takes.

17             Now, regarding the charge, that on 10/10 of 2017 at

18   approximately 2:30 PM, Mr. Ovalle had contact with a person he's not

19   supposed to have contact with by signing a special condition not to

20   have such contact, and that is of Robert Akre. Officer Mencarelli

21   testified that she did supervise Mr. Akre, she identified Mr. Akre on

22   the video. This interaction with Mr. Akre and Mr. Ovalle was

23   definitely not accidental, it was a planned and accepted visit. Mr.

24   Akre went to the Yaphank jail where he had to sign in, he had to wait

25   to be seen. Mr. Ovalle accepted the visit by sitting down with Mr.

1     Akre for way over ten minutes or so interaction. They hugged each

2 other, embraced each other at the onset of the interview and at the end

3 of the interview. Clearly, it's a cordial, friendly interaction.

4     With that being said, Mr. Ovalle, I do find probable

5 cause to Charge No. 44, Rule No. 13. That on 10/10/2017 at

6 approximately 2:30 PM at the Yaphank County Correctional Facility,

7 located at 15 Glover Drive, in Yaphank, New York, you, Mr. Ovalle,

8 violated that rule, Condition No. 13 that you're not supposed to have

9 contact with Mr. Akre. And, as evidenced by this videotape, that was

10 clear that you did have contact with him. That was without

11 permission of your parole officer. And that condition was imposed on

12 November 2nd, 2016.

13     This probable cause finding is a violation in an

14 important respect and you will be held over for your final hearing.

15 That final hearing will be scheduled for January 18, 2018, to be held

16 here at the Riverhead County Jail.

17     Record is closed.

18     MR. OBEDIN: May I just ask the Court one thing?

19     PHO BURNETT: Sure.

20     MR. OBEDIN: Is it the Court's finding that Mr.

21 Ovalle, while an inmate on a violation of parole, was still under the

22 supervision directives, the special conditions of his parole?

23     PHO BURNETT: As long as Mr. Ovalle has not

24 reached his maximum expiration, he is under parole supervision,

25 when he's released he's in the community being supervised. So as

1    long as he hasn't reached his maximum expiration of March 13, 2020,

2    Mr. Ovalle is on parole and he has to comply with the conditions of

3    his release, even when he's in custody in a jail or a lock up.  Yes.

4            MR. OBEDIN:  Okay.

5            PHO BURNETT:  Thank you everyone.

6            PRS ERICKSEN:  Thank you.

7            MR. OBEDIN:  Thank you.

8            PHO BURNETT:  Record is closed.

9            (Whereupon, this proceeding was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATE

3

4          I, Sara Galante, Court Reporter and Notary Public, in and for

5    the State of New York, do hereby certify that I attended the foregoing

6    proceedings, took stenographic notes of the same, and that the

7    foregoing, consisting of 58 pages, is a true and accurate copy of same

8    and whole thereof.

9

10   Dated:  December 13, 2017

11

12                                          Sara Galante
13                                          Sara Galante

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 9

1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF SUFFOLK
2  -------------------------------------------x

3  PEOPLE OF THE STATE OF NEW YORK,                    WRIT OF
   ex rel WARREN OVALLE,                         HABEAS CORPUS
4
5                          Petitioner-Appellant,

6               -against-

7  MICHAEL FRANCHI, Warden of Suffolk County
   Correctional Facility,
8
9                          Respondents.

   -------------------------------------------x
10

11                         **Wednesday, January 31, 2018**
                           Suffolk Supreme Court
12                         Riverhead, New York

13

   B E F O R E :              HONORABLE JAMES HUDSON
14                            Acting Supreme Court Justice

15
   A P P E A R A N C E S :
16
        STATE OF NEW YORK
17      OFFICE OF THE ATTORNEY GENERAL
        ERIC T. SCHNEIDERMAN
18      Attorney for Respondent
           300 Motor Parkway
19         Suite 320
           Hauppauge, New York  11788
20      BY:  LORI PACK, ESQ., Assistant Attorney General

21

22      NAIBURG, OBEDIN & WEISSMAN, ESQS.
        Attorneys for Petitioner Warren Ovalle
23         320 Carleton Avenue
           Central Islip, New York  11722
24      BY:  GLENN OBEDIN, ESQ.

25

1       THE CLERK:  Will Warren Ovalle please step up and I

2  will need appearances by Counsel, please.

3       THE COURT:  Do we place on the record that this is

4  a Special Term of the Supreme Court pursuant to Article 10

5  of the Civil Practice Law and Rules.

6       THE CLERK:  Sounds perfect.

7       THE COURT:  All right.  Thank you.

8       Good morning, Counsel.

9       MR. OBEDIN:  Good morning, Your Honor.

10      THE COURT:  Good morning, Mr. Ovalle.  I wish we

11  could have reunited under more pleasant circumstances.  I

12  recall meeting you quite a number of years ago and I was the

13  Judge who sentenced you.  Please have a seat, Mr. Ovalle.

14  Would you like a glass of water or anything, sir?

15      WARREN OVALLE:  No, sir.

16      THE COURT:  All right.  If you wish at anytime to

17  confer with Mr. Obedin, we won't stand on ceremony.  Feel

18  free to let him know that you wish to confer with him in

19  private and we'll stop the proceeding immediately.  All

20  right, sir?

21      WARREN OVALLE:  Yes.

22      THE COURT:  Thank you.

23      MR. OBEDIN:  Your Honor, for the record, Naiburg,

24  Obedin and Weissman by Glenn Obedin, 320 Carleton Avenue,

25  Suite 1400, Central Islip, New York.

1    THE COURT:  Thank you.

2         On behalf of the Petitioner, you have filed this

3    writ of habeas corpus, the application for the writ of

4    habeas corpus, and the State of the sovereign people

5    represented by Miss Pack have submitted an affirmation in

6    opposition and you have been afforded the opportunity for

7    reply which I have also reviewed, Counsel.

8         Now, we had a brief conference before I took the

9    bench and I had a discussion as far as a point of

10   clarification in the reply --

11        MR. OBEDIN:  Yes.

12        THE COURT:  -- regarding the status or the use of

13   the term post-release supervision versus community

14   supervision and whether that was a distinction versus just a

15   clarification, so if you would clarify that for the Court's

16   edification, then I would be happy to hear any further

17   remarks that you'd like to have although since you do have

18   the burden of proof, the law does give you the right to

19   speak last, so.

20        MR. OBEDIN:  However you want to do it, Your Honor.

21   Do you want Miss Pack to go first, want me to go first?

22        THE COURT:  Usually -- we had a discussion

23   regarding the opposition by the State.  It did not appear on

24   the brief, correct me if I'm wrong, Miss Pack, to dispute

25   any of the alleged facts.  It was the legal arguments that

1   the State respectfully took exception to.  So if that is the

2   case, then would there be any objection to the stipulation

3   that the facts as alleged are deemed established.

4           MR. OBEDIN:  The facts which brought us here, the

5   facts which alleged the violation of parole we can stipulate

6   are accurate.

7           MS. PACK:  I'll stipulate to that, Your Honor.

8           THE COURT:  Thank you very much.  So that would

9   obviate the need to hear testimony or other evidence at this

10  time.  Instead we'll confine ourselves to the excellent

11  arguments for which, for the record, I wish to compliment

12  both yourself and Miss Pack that the briefs that have been

13  submitted in this matter give credit to our profession and

14  both your clients are well served.

15          MS. PACK:  Thank you.

16          MR, OBEDIN:  Thank you, Your Honor.

17          THE COURT:  Please.

18          MR. OBEDIN:  So the thrust of our argument is that

19  when an individual is placed on parole, post-release

20  supervision, there are many conditions placed upon that

21  individual.  There are standard conditions such as you

22  cannot be arrested for a new crime, et cetera.  Then there

23  are special conditions which only come into effect if the

24  individual is in fact placed back out in the community.  For

25  instance, a condition indicating a curfew at their house.

1   That's certainly a condition of parole, but it's also

2   specifically a condition of community supervision.

3           If the person is incarcerated, for instance in this

4   case on a parole violation, that condition no longer is in

5   effect. Same way with the standard condition that

6   Mr. Ovalle not be allowed to fraternize with known felons.

7   He's being held in jail. Clearly he is fraternizing with

8   known felons everyday. That's a condition of community

9   release, not the standard condition of parole. The same can

10  be said for not being able to get visits from an individual

11  while on release. This was a condition that was written as

12  a condition of his release.

13          I questioned the parole officer at the preliminary

14  hearing. I asked the parole officer, did you tell the jail

15  that Mr. Ovalle was not allowed to receive visits from

16  Mr. Akre. Did you tell them that he's not allowed to. Did

17  you de-authorize that. She said no.

18          Mr. Ovalle doesn't make the visits. A visit is

19  made, he's brought down and a visitor is there. The reason

20  that parole didn't de-authorize such visits is because they

21  were not legally allowed to. Mr. Akre can make a visit to

22  see Mr. Ovalle and while Mr. Ovalle is incarcerated, he's

23  not subject to the special conditions of community

24  supervision. There is an absolute distinction.

25          I argued at the preliminary hearing in my summation

that if the case here were that Mr. Ovalle were charged with
a new assault while being held in the facility, that clearly
would be a violation of his post-release supervision, his
parole, because that's a standard condition that as long as
an individual is on parole or post-release supervision, they
cannot violate, but the special conditions of release to the
community that only are effected while a person is in actual
community release, those are distinct. Any other reading
would not make sense. They have to be distinct. And that's
our argument. That's the crux of our argument.

And while Mr. Ovalle is being held in jail on a
violation of parole or for whatever reason, if he were
arrested on a new crime and being held in the jail, his
special conditions that are only applicable during community
release would have to be suspended. Otherwise the result
would be absurd.

For instance, I'll just say it one more time, if he
had to still maintain the condition of not fraternizing with
known felons, it would be upon him and incumbent upon him to
indicate to the jail that he needs to be placed in solitary
confinement else he would be in violation of his conditions
of community release. That doesn't make any sense.

Additionally, if they're going to argue that, well,
that obviously he can't be in control of that and he's not
in control of his curfew while he's incarcerated, then I

1  would say it would be incumbent upon parole to visit

2  Mr. Ovalle and to lay out for him which of the conditions of

3  community supervision he still has to abide by and which

4  ones he doesn't have to abide by.

5          Any other reading, again, in my opinion, would not

6  make sense.

7          THE COURT:  Thank you very much, Mr. Obedin.

8          The Court will hear from the People of the State of

9  New York.  The Sovereign People of the State of New York as

10  a distinction from the People of the State of New York,

11  represented by the Attorney General.

12          MS. PACK:  Thank you, Your Honor.  Lori Pack for

13  New York State Division of Corrections and Community

14  Supervision.

15          Your Honor, Defendant's Counsel's argument is based

16  upon his interpretation of the law.  The law is very clear

17  and the crux of this issue is whether the special conditions

18  attached to post-release supervision continue while an

19  inmate is incarcerated.

20          The law is very clear on that.  In fact, there's

21  specific case law that holds that these conditions continue

22  while an inmate is in jail, and I have cited them in my

23  papers.  For instance, an order, a special condition not to

24  contact a victim of a rape when the inmate was calling that

25  victim.  There is not a single case that has held, that I

1   can find, that has held that special conditions do not

2   follow an inmate when they are incarcerated.

3           And the law is clear. It says -- the Executive Law

4   says, a person shall, while on parole, a conditional

5   release, be in the local custody until expiration of the

6   maximum term of a period of sentence or expiration of the

7   period of supervision or return to an institution under the

8   jurisdiction of DOCCS.

9           It says that when a person is released to

10  post-release supervision, that post-release supervision

11  continues until they are released from post-release

12  supervision after their maximum expiration date and nothing

13  else. Whether they're incarcerated or they go to a Willard

14  Program or they go to a Halfway Program, nothing else

15  impairs the special conditions.

16          The special conditions are part of post-release

17  supervision. There is no distinction between conditions

18  that are attached to post-release supervision when somebody

19  is out in the community or as an inmate in either a state or

20  a local facility. There is no distinction.

21          And one final thing. I wanted to address the

22  Defendant's argument that it is impossible for special

23  conditions to follow an inmate because very often one of the

24  special conditions is that they cannot fraternize with known

25  felons.

1          While on the outside, if that were the case, it's

2      simply a matter of impossibility.  If it is impossible for a

3      parolee to abide by conditions of curfew or fraternizing

4      with known felons, then they don't have to comply with that.

5      This is common sense.  When they go to their report day and

6      they're out in the community, they report to their parole

7      officer and they're sitting in a waiting room with anywhere

8      between five and 50 other known felons.  That is known to

9      parole.  That is okay and that is condoned by the parole

10     officer.  The parole officer knows that when you're in the

11     Suffolk County Correctional Facility, you're going to be

12     surrounded by known felons.

13          It's the same argument when they're out in the

14     community because it's the same conditions and the parole

15     officers know that when they're sitting there on report day,

16     they're sitting in a waiting room surrounded by known

17     felons.

18          And there is not a single case in New York State,

19     to my knowledge, that holds that special conditions do not

20     continue when a person under post-release supervision is

21     incarcerated.  On the contrary, there is a great deal of

22     case law or a significant amount of case law that holds that

23     these special conditions do apply.

24          I just would like Your Honor to articulate the

25     reasons for His decision on the record, if you wouldn't

1    mind.

2              THE COURT:  If I may ask a question of Counsel.

3    The State has argued that, in part, the petition is

4    premature.  Could you respond to that so that in that there

5    was a preliminary hearing, but no final revocation hearing.

6    Please respond to that.

7              MR. OBEDIN:  I believe the State only argued that

8    with regard to one particular argument which I have omitted

9    from my argument today, so.

10             THE COURT:  However your papers speak --

11             MR. OBEDIN:  Okay.  So I will --

12             THE COURT:  If you wish, you can rely on your

13   papers in that regard.  I don't want to put you on the spot

14   because as we all are taught in law school, vox emissa

15   volat; litera scripta manet which is the spoken word flies,

16   but the written letter remains, and I consider the

17   statements made by Counsel, as eloquent as they are, to be

18   merely an addendum to the eloquence of the papers that have

19   already been presented before me.

20             MR. OBEDIN:  Again, Your Honor, I'll just state for

21   you that I remain silent with my arguments today with regard

22   to that particular issue and I'm relying upon the arguments

23   that I'm making here and the State did not deem these issues

24   premature.  The issue of the legal definition of community

25   supervision, post-release supervision, that's the argument

1    that I'm bringing before you.  I would --

2              THE COURT:  I'm sorry, I don't mean to interrupt

3    you, but we have to chose our words with care.  Beware the

4    negative pregnant.  Qui tacet consentire videtur.  When you

5    say that you're silent on it, you're not conceding the

6    State's --

7              MR. OBEDIN:  I rely on my papers.

8              THE COURT:  All right.  Very good.  I just wanted

9    to clarify because --

10             MR. OBEDIN:  Yes.  And if I may just, since I have

11   the burden, if I may have just a final word.

12             THE COURT:  Yes, certainly.

13             MR. OBEDIN:  Again, I think that the Attorney

14   General is misinterpreting the difference between

15   post-release supervision and community supervision.  There's

16   a difference.  When an individual is first sentenced to

17   state term, they're sentenced to a determinate term of

18   prison or an indeterminate term of prison and then a period

19   of post-release supervision which has become the word for

20   parole in our State.  That's what we call it, post-release

21   supervision.  Community supervision is a separate and

22   distinct part of post-release supervision and to argue that

23   they're one and the same would be nonsensical.

24             We cite cases, People ex rel. Richman v. Warden,

25   Bronx House of Detention.  A plain reading of the statute,

1  in particular use of the word restored, makes abundantly

2  clear that an individual is not on community supervision,

3  community supervision, while in violation status and

4  therefore not subject to the conditions or special

5  conditions imposed.

6          We never argued that Mr. Ovalle wasn't still on

7  post-release supervision or parole. What we're arguing is

8  that he cannot possibly violate a condition of community

9  supervision, community release while being on post-release

10 supervision, but held in a facility.

11         THE COURT: Thank you. The case that Counsel cited

12 is found at 122 Miscellaneous 2d 957, Supreme Court Bronx,

13 1984. Thank you for bringing that case to the Court's

14 attention. I did enjoy reading it. Thank you very much.

15         MR. OBEDIN: You're welcome.

16         THE COURT: The Court is prepared to rule at this

17 time. The Court thanks Counsel for the courtesy copies of

18 their respective briefs that were submitted in this matter

19 that allowed the Court to review it, be guided by the cases

20 that were cited by Counsel as well as to do its own research

21 and I'm prepared to rule from the bench at this time.

22         Mr. Ovalle, you're represented here -- please have

23 a seat, Counsel. You don't have to remain standing.

24         MR. OBEDIN: Thank you, Your Honor.

25         THE COURT: Mr. Ovalle, represented here by

Mr. Obedin, contends that the defendant -- relator is the
proper term actually, was not on post-release supervision on
December 10 of 2017 and that contact with Mr. Robert Akre at
the Suffolk County Jail was not a violation of post-release
supervision quote, in an important respect, which is a
direct quotation from the applicable statute, Executive Law
Section 259-i (3)(c)(iv).

Mr. Ovalle was convicted of assault in the second
degree on January 7, year 2010 and received six years
incarceration to be followed by five years of post-release
supervision.  Incarceration was completed on March 17 of
2015 and he was released to post-release supervision at this
time.  The maximum expiration date of same is March 19 of
2020.

Now, Mr. Obedin relies on Penal Law Section 70.43
(3)(b) and section 70.43 -- excuse me, that same subdivision
and definition of delinquency and cites to the case of
People versus ex rel. VanFossen and Dillon found at 72 A.D.
2d 166, Fourth Department 1980.

Additionally, he cites to the case of People versus
ex rel. Gonzalez versus New York State Board of Parole, 103
A.D. 2d 855, Second Department 1984 which I particularly
enjoyed reading that decision and as I recall, it was
authored by Justice Lawrence Bracken of happy memory.

Now, reading from that decision, and great emphasis

1   is placed on it by Mr. Ovalle, and I quote, *"respondent's*

2   *actions indicated reasonable diligence in attempting to*

3   *locate petitioner."* I'm reading the citation. *"His*

4   *sentence was properly interrupted by the declaration of his*

5   *delinquency. The interruption continued until April 20 of*

6   *1983 when he was returned to an institution under the*

7   *control of the New York State Department of Correction.*

8   *Following his release from federal custody, petitioner had a*

9   *continuing obligation to report to the division of parole.*

10  *Petitioner knew he was declared delinquent and admitted the*

11  *charges. The circumstances which led to his enjoying nine*

12  *months of freedom between his release from federal custody*

13  *and his apprehension cannot be said to have been beyond his*

14  *control. Special term correctly refused to credit him with*

15  *these nine months. However, the correct maximum expiration*

16  *and conditional release dates were calculated from the*

17  *incorrect date of delinquency."*

18          Now, that is taken from pages 855 through '56 of

19  the decision. Note the word "interruption". I find,

20  Counsel, although you argue it well, that it's taken out of

21  context. It refers to the tolling of the sentence, not

22  extinguishing the parole itself or the terms thereof.

23          The Petitioner's remaining case law is similarly

24  distinguishable from the matter at hand, but we'll address

25  some of that later.

1          In opposition to Mr. Ovalle's application,
2    Miss Pack cites to, inter alia, Oriole versus Saunders and
3    that's 66 A.D. 3d 280, First Department 2009 which in
4    relevant part states:   *"The automatic --- "* again I quote:
5    *"The automatic revocation of petitioner's parole triggered*
6    *by his conviction of a new felony during the period when he*
7    *absconded from his parole did not preclude Division of*
8    *Parole from taking any further action on parole violation*
9    *charges that preexisted the new felony."*  Citing to
10   Executive Law Section 259-i(3)(d)(iii).
11          And it further states:  *"A final revocation hearing*
12   *with respect to the earlier charges would serve the purpose*
13   *of determining whether petitioner had become delinquent in*
14   *observing his parole obligations, thereby interrupting the*
15   *running of his earlier sentence as of the date of the parole*
16   *violation charges."*
17          Also the State cites to People ex rel. Hayes versus
18   New York State Department of Correctional Services found at
19   78 A.D. 3d 1591, Fourth Department 2010, leave to appeal
20   denied 16 New York 3d 705 in 2011.
21          And it states in relevant part:  *"As a parolee,*
22   *petitioner remained in the legal custody of the Division of*
23   *Parole",* it cites the statute, *"until expiration of the*
24   *maximum term or the period of sentence or expiration of the*
25   *period of supervision, including any period of post-release*

*supervision or return to the custody of the respondent.*

*Thus, petitioner was on parole despite the fact he was*

*incarcerated when he committed the assault in question."*

And that quote is found at pages 1591 through '92.

Miss Pack also cites the People versus Bowen found

at 6 Miscellaneous 3d 760, Supreme Court Kings County 2005.

And I'm reading from that decision and that involved a

person committing the promoting prison contraband in the

second degree and the Court found that he was *"in violation*

*of his probation despite the fact that he was serving the*

*jail component of his sentence before the commencement of*

*his supervision by probation. Thus, his probation may be*

*revoked and he may be resentenced to a longer period of*

*incarceration without probation."* And that's at page 762 of

the Miscellaneous.

We do find, however, although it was well argued as

I expected by the State, this case to be of limited utility

because it confined its analysis to a six-month

incarceration and a five-year probation split. The theory

is the same and I can understand why it was cited, however

the statutes are different, so the Court is reluctant to

rely upon it as persuasive authority.

The Attorney General also cites to the holding of

People versus Filipowicz found at 111 A.D. 3d 1022, Third

Department 2013. In that particular case, the defendant had

1     pled guilty to rape in the second degree and criminal

2     contempt in the first degree and was sentenced to an

3     aggregate term of probation of ten years.  In addition, a

4     ten year order of protection was issued precluding the

5     defendant from having any contact with the victim.  "A

6     *probation officer filed an affidavit of violation alleging*

7     *that while the defendant was incarcerated at the Ulster*

8     *County Jail on an unrelated matter, he enlisted another*

9     *inmate to call the victim several times."*

10         So in that particular case, that was upheld as far

11     as the status of the defendant being under probation

12     supervision at the same time as being incarcerated.  And I'm

13     quoting from pages 1022 through 1023 of the A.D. 3d opinion.

14     We find these facts to be analogous to the case before us.

15         Mr. Obedin has submitted a reply clarifying that

16     Mr. Ovalle was actually not subject to the conditions of

17     community supervision and you very carefully, and I commend

18     you, Counsel, as distinguishing how that is a part of, but

19     not identical to post-release supervision, it's an aspect

20     of, and cites the case of Richman on behalf of Williams

21     versus the Warden of the Bronx House of Detention.

22         And in this particular case law, the Court held

23     that the relator was denied his right to attend the

24     preliminary revocation hearing and it dealt with a purported

25     waiver of a right to be present.  The Court found he wasn't

1    afforded a preliminary hearing within 15 days of the

2    execution of a parole warrant.  These limited facts and

3    holding do not permit a reasonable extrapolation to support

4    Mr. Ovalle's argument before us today.  I find it's too

5    factually distinguishable.

6         Mr. Obedin also cites to People versus ex rel. Levy

7    versus Dalsheim found at 66 A.D. 2d 827, that's Second

8    Department 1978 and affirmed 48 New York 2d 1019, falls for

9    this proposition, namely that Mr. Ovalle was not actually

10   subject to the conditions of community supervision while in

11   violation status and not subject to conditions or the

12   special conditions imposed.

13        So let us look at the facts of that particular case

14   and in that particular case, the Court was reviewing an

15   application for -- excuse me, a writ which sought to

16   overturn a determination regarding a final parole revocation

17   hearing.  In that particular case, it was clear that the

18   respondents had violated Section 259-i of the Executive Law

19   because they had not held a hearing within 90 days of the

20   probable cause determination.  So once again, the holding

21   was limited to a declaration regarding the failing to hold

22   that hearing.

23        I've heard no argument that the purported actions

24   of the Respondent or failure to receive in a timely fashion,

25   so I find ultimately the Petitioner, to prevail on this

1   point, must distinguish People versus Filipowicz just cited

2   before.  And it is no easy task, although knowing what is at

3   stake here because there is nothing dearer to our hearts

4   than liberty and to seek it.

5       Let us remember the language found in New York

6   Executive Law Section 259-i.  *"Persons presumptively*

7   *released, paroled, conditionally released or released to*

8   *post-release supervision from an institution under the*

9   *jurisdiction of the department shall"* -- I'm going over

10  this, it's not literal, I'm jumping to a different

11  section -- *"shall, while on presumptive release, parole,*

12  *conditional release or post-release supervision, be in the*

13  *legal custody of the department until expiration of the*

14  *maximum term or period of sentence or expiration of the*

15  *period of supervision including any period of post-release*

16  *supervision or return to imprisonment in the custody of the*

17  *department as the case may be."*

18      Now, note the words that I use from 259-i.  The use

19  of the word "imprisonment", not simply custody, not simply

20  delinquency, and once again we're guided by a motto, to use

21  the language of the old law, expressio unius est exclusio

22  alterius, which means that when one thing is said, all

23  others are excluded.  The writing in this case, the statute

24  says one thing, all others are excluded.

25      And I also draw Counsel's attention to the opinion

1   found in the case of People versus Overton, 86 A.D. 3d, page

2   four, Second Department 2011, which states, and it actually

3   quotes the matter of Oriole versus Saunders: *"A convicted*

4   *person released from incarceration on parole continues to*

5   *serve his or her sentence while on parole and earns credit*

6   *toward the maximum expiration date of the sentence unless*

7   *and until the Division of Parole declares that person to be*

8   *delinquent and revokes parole."*

9       Note the inclusive language.

10       Based on the foregoing, we find that the Petitioner

11   has failed to establish that he was not subject to the terms

12   and conditions of his post-release supervision.

13       Remaining argument is that contact with Robert Akre

14   at the Suffolk County Jail was not a violation of

15   post-release supervision in an important respect.

16       The Attorney General argues that this was a

17   preliminary determination and therefore a premature claim.

18   If such a determination is made at the final hearing, then

19   it will be appropriate to review.  That is their position.

20       In addition to the cases cited by Miss Pack, the

21   case of People versus ex rel. Ariola versus Sears at 53 A.D.

22   3d 1001, Third Department 2008 also stands for this

23   proposition.

24       However, we come back to the case cited by

25   Mr. Obedin, People versus ex rel. Van Fossen versus Dillon,

WRIT - OVALLE

1    72 A.D. 2d 166. The facts therein involved a habeas

2    proceeding of a preliminary hearing and the Court heard it

3    on the merits.

4         So let us consider then, this matter is ripe for

5    review. This provides small consolation for Mr. Ovalle,

6    unfortunately, since we have already found that Mr. Ovalle

7    was on post-release supervision simultaneously with his

8    detention at the Suffolk County Jail.

9         The finding at the preliminary hearing, namely that

10   he had violated the special condition of not having contact

11   with Mr. Akre, cannot be said to be incorrect or not an

12   important respect of his post-release supervision.

13        The language found in VanFossen versus Dillon

14   actually argues the State's case in this regard. I quote

15   from that decision at page 169. *"Upon finding that there*

16   *was evidence at a preliminary parole violation hearing*

17   *which, if believed, was sufficient to support a finding of*

18   *probable cause and that required procedural rules were*

19   *followed, the Court's power to review is exhausted and it*

20   *must dismiss a writ of habeas corpus."*

21        We also find that the evidence at a preliminary

22   parole violation hearing which, if believed, was sufficient

23   to support a finding of probable cause and that required

24   procedural rules were followed.

25        Accordingly, your exception being noted, Counsel,

1    the writ is dismissed.  Thank you.

2            Mr. Ovalle, I do not take any pleasure in this

3    ruling.  I'm serious what I said about liberty being the

4    dearest things to our hearts, here and in many ways in life,

5    there are people in life or all over this world and under

6    our country's flag, but I took an oath to uphold the law and

7    I searched for any case which I could find which I felt, or

8    any statute which I felt could support the excellent

9    argument.  It has -- there is a common sense to Mr. Obedin's

10   argument, but it's for the legislature to come up with that

11   remedy, not for the Court to fashion its own.

12           Yes, Mr. Ovalle.

13           WARREN OVALLE:  Your Honor, during my

14   incarceration, I studied.  This (indicating) is actually the

15   Assembly book for the bill for the merger of the two

16   agencies, parole and corrections, to form the DOCCS, and on

17   page 72 of it, and in 259 it clearly distinguishes that and

18   because this is a new legislation, and Mrs. Pack, she argued

19   everything past 2011 of February 1st in itself.  She didn't

20   argue February 1st, 2011 and now.  It's new legislation of

21   which this bill is written in.  And it states that community

22   supervision means the supervision of individuals released

23   into the community on temporary release, presumptive

24   release, parole, conditional release, post-release

25   supervision or medical parole.  And then it also states --

1   and that's line 42.

2          Also it states on line 23 of the same page, an

3   inmate means a person committed to the custody of the

4   department of corrections or a person convicted of a crime

5   and committed to the custody of the sheriffs or the county

6   jail, the local department of corrections.

7          I am in custody of the Sheriffs Department.  There

8   is no distinction at all that I am called an inmate or a

9   prisoner.  I am not called a parolee.  I'm not called a

10  releasee.  It is unequivocal that I am definitely an inmate

11  and I am in their care.

12         So parole, if parole could have said at any point

13  in time, Mr. Ovalle, while you're on parole or you deal with

14  any stipulations, violations while you're still in our care

15  and that you still have to abide by our rules, it would be a

16  different story, but they have not written it and I haven't

17  gotten special conditions and went through five different

18  parole officers and not once was this ever written because

19  if this does in fact mean that while you're incarcerated

20  you're still in the supervision of parole, then clearly

21  every parolee from here on in would have violated their

22  terms in one respect or another because of the things that

23  were going on in jail itself, especially Upstate New York

24  where they hold eight to ten thousand parolees on

25  violations.

1       This bill was written after the fact.  Everything

2  that's cited from Mrs. Pack's summation, it is previous to

3  this (indicating).  This is new law (indicating).  There's

4  nothing here today.  We are making that.

5       This is stating that I am an inmate, a prisoner

6  upon the Suffolk County Sheriffs Department under the Warden

7  of Michael Franchi.  I am not a releasee or parolee.  I have

8  a preliminary hearing, yes, that found me to be delinquent

9  and it's holding me to a final revocation.  But once again,

10 the revocation is revoked.  It clearly states revocation to

11 be revoked of.

12      So I understand your ruling, but I'm asking you,

13 please, I have suffered enough.  I did my six years of

14 incarceration.  Parole has not been kind to me at one state

15 or another.  I am asking you to allow me to go home to my

16 family and be restored so I can be productive.  They have

17 denied me that right.

18      THE COURT:  Mr. Ovalle, do not think this doesn't

19 weigh upon me.  I am the man who sentenced you to prison and

20 I took no pleasure in that and I took no pleasure in this.

21 I felt I was doing my duty.  What you have brought to my

22 attention finds no purchase as of yet in any of the case law

23 that I could research that had a bearing on your case.  And

24 the cases of the -- particularly the case of the Appellate

25 Courts bind me as surely as any statute and that is why I

1    feel I had to rule the way I did.

2          But you have made a record. You made it well.

3    You're articulate yourself and you had outstanding Counsel

4    and it is for the Appellate Courts now to decide whether I

5    decided correctly.

6          I wish you good luck, sir.

7          MR. OBEDIN:  Thank you, Your Honor.

8          THE COURT:  Thank you very much, Mr. Obedin.

9    Thank you, Miss Pack.

10          (Whereupon, proceedings concluded.)

11        *          *          *          *          *

12            C E R T I F I C A T I O N

13          I, Barbara J. Skinder, a Senior Court Reporter for

14    the Supreme Court of the State of New York, County of

15    Suffolk, do hereby certify that the foregoing transcription

16    of the within proceedings held on Wednesday, January 31,

17    2018 before Honorable James Hudson is a true and accurate

18    transcription of my stenographic notes.

19          Furthermore, photocopies made of this transcript by

20    any party cannot be certified by me to be true and accurate.

21          Therefore, only those copies bearing an original

22    signature in blue ink are official certified copies.

23

24    3/14/2018
      Dated

25

      SG

                                          CERTIFIED COPY
                                          Barbara J. Skinder

                                          HON. JAMES C. HUDSON

# EXHIBIT 10

1   STATE OF NEW YORK

2   EXECUTIVE DEPARTMENT

3   DEPARTMENT OF CORRECTIONS &

4   COMMUNITY SUPERVISION

5   **************************************************

6                        In the matter of

7                        WARREN OVALLE

8                        NYSID #093475600

9                        WARRANT #762686

10                       DIN #10R0095

11                       INSTITUTION: Suffolk County Jail

12  **************************************************

13  HEARING TYPE:        Final Revocation Hearing

14  LOCATION:            15 Glover Drive
                         Yaphank, NY 11980

15  DATE:                March 1, 2018

16  BEFORE:              MARY ROSS
                         Administrative Law Judge

17

18  APPEARANCES:         E. DEL RIO
                         Parole Violations Chief

19
                         GLENN OBEDIN
20                       Attorney for Parolee

21                       WARREN OVALLE
                         Parolee

22

23

24

25  HEARING REPORTER:    Sara Galante

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | ALJ ROSS: This is the case of Warren Ovalle, |
| 3 | Warrant No. 762686, NYSID No. 09347560J. I'm Administrative |
| 4 | Law Judge Mary Ross. |
| 5 | Your appearances for the record. |
| 6 | PVU CHIEF DEL RIO: Chief Del Rio, Parole |
| 7 | Violations Unit. |
| 8 | MR. OBEDIN: Glenn Obedin, Obedin, Naiburg, and |
| 9 | Weissman, for Mr. Ovalle. |
| 10 | PAROLEE: Warren Ovalle. |
| 11 | ALJ ROSS: Okay. Before we begin the contested |
| 12 | hearing, Mr. Del Rio, is there going to be any recommendations from |
| 13 | you? |
| 14 | PVU CHIEF DEL RIO: Yes, Your Honor. We've |
| 15 | conveyed an offer to Mr. Ovalle's attorney of an 18-month offer on |
| 16 | this matter. |
| 17 | ALJ ROSS: Okay. And I did counter that with the |
| 18 | 12-months with the DOCCS alternative program. |
| 19 | MR. OBEDIN: Okay. Mr. Ovalle has been made |
| 20 | aware of those two offers and he's prepared to go forward with his |
| 21 | hearing; is that correct? |
| 22 | PAROLEE: Yes. |
| 23 | ALJ ROSS: Okay. Are both sides ready? |
| 24 | PVU CHIEF DEL RIO: Department is ready, Your |
| 25 | Honor. |

1        MR. OBEDIN: We are ready.

2        ALJ ROSS: Okay. Mr. Ovalle, it looks like you owe

3    nothing to sentence, you still owe 2 years, 3 months, 16 days to PRS;

4    is that right?

5        PAROLEE: No. March 17, 2020 would be my

6    maximum expiration date.

7        ALJ ROSS: All right. I'm just telling you what the

8    detail sheet says, and that's what I'll go by. But it's really the people

9    upstate that verify that.

10        PAROLEE: Is that because I'm not credited any

11    delinquent time?

12        ALJ ROSS: I have no idea. Yeah, I don't know.

13    Usually, what happens is the people upstate in Albany, they're the

14    ones that certify how much time you have, but that's just the amount

15    of time on the detail sheet which we received.

16        PAROLEE: But that can always be corrected, right?

17        ALJ ROSS: Oh, yes.

18        PAROLEE: So we're probably going off of the

19    November 30th date, the day the violation was lodged, and that would

20    probably be the 2 years, 3 months then.

21        PVU CHIEF DEL RIO: Yeah, 2 years 3 months from

22    the lodge-in of the warrant. That would take you out to 2020.

23        PAROLEE: Right. But I would still get credit from

24    the time that I'm serving?

25        PVU CHIEF DEL RIO: You're getting credit from the

1        September warrant, those things are credited towards as though you

2        were reporting. You don't get any jail time credited as of those days.

3        You get jail time credit for this violation as of November 30th.

4                    PAROLEE: So I will be getting credit from

5        November 30th to now?

6                    PVU CHIEF DEL RIO: Right now, you have four

7        months already credited towards the 12 months the Court's offering.

8                    PAROLEE: Right. Even though there's a delinquent

9        time of September 23rd, do I get September and October?

10                    PVU CHIEF DEL RIO: You get that -- if you enter a

11       plea of guilty to November 30th, I'd be willing to do that.

12                    PAROLEE: I'm not guilty of anything.

13                    PVU CHIEF DEL RIO: I'm just saying.

14                    PAROLEE: Right. So if I don't plead guilty, I don't

15       get November to --

16                    PVU CHIEF DEL RIO: You get --

17                    PAROLEE: -- September to November, I mean?

18                    PVU CHIEF DEL RIO: No.

19                    PAROLEE: Even though I served the time in jail?

20                    PVU CHIEF DEL RIO: You don't get that towards

21       whatever the sentence this Court may or may not impose.

22                    PAROLEE: So that means it's interrupting that time

23       and that time does not accrue towards me and that it lay in limbo?

24                    PVU CHIEF DEL RIO: No. Anything from

25       September to November period that you were incarcerated on the

1    previous warrant is credited towards your being on parole, so it comes

2    off the back end of the time owed but not towards the jail time credit

3    that this court may impose.

4              PAROLEE: Well, my max-out date is 2020.

5              PVU CHIEF DEL RIO: Yes.

6              PAROLEE: So would, regardless, that change the date

7    of March 17, 2020? That's what I want to know.

8              PVU CHIEF DEL RIO: That would change it.

9    Because if they determine that you owe 2 years, 3 months, 16 days

10    based on the delinquency date of September 23rd.

11              PAROLEE: So if I'm getting delinquency date of

12    September 23rd to November 30th, then violations 1 through 95 will

13    be dismissed at this point because there is no time nor was I on parole

14    nor would I get credit for it?

15              PVU CHIEF DEL RIO: I don't see any of those

16    charges. No charge should be -- you shouldn't be charged with

17    anything.

18              PAROLEE: From September?

19              PVU CHIEF DEL RIO: Yeah. Well, what happens is,

20    I know what you're saying now. Now I understand what you're

21    saying. Apparently, they can charge you for the time period where

22    you were getting visits when you were incarcerated, although it wasn't

23    part of the original warrant. So they can stop your time as of that

24    time. They can go back to that. I mean, I've seen the Department also

25    go back when -- go ahead.

1       PAROLEE: I'm not disputing that.

2       ALJ ROSS: I think we have two lawyers in this room.

3       PVU CHIEF DEL RIO: I'm not one of them.

4       ALJ ROSS: I'm sorry. We have one lawyer and one

5   parole specialist, and they should be the people being doing the

6   talking here today. You want to say something, you talk to your

7   lawyer and your lawyer can convey your point. I'm not having two

8   lawyers on one side.

9       MR. OBEDIN: Okay. So can you give me one

10  moment?

11      ALJ ROSS: Sure.

12      (Whereupon a discussion was held off the record.)

13      MR. OBEDIN: So if the violations all occurred

14  between 9/23 and 11/30, is that --

15      PVU CHIEF DEL RIO: Yeah, that's the dates.

16      MR. OBEDIN: That's correct, right?

17      PVU CHIEF DEL RIO: Yeah, those are the dates.

18      MR. OBEDIN: So is the -- so the allegation is that

19  these violations occurred while Mr. Ovalle was under parole

20  supervision, correct?

21      PVU CHIEF DEL RIO: Right.

22      MR. OBEDIN: Even though he's incarcerated?

23      PVU CHIEF DEL RIO: That's correct.

24      MR. OBEDIN: Okay. So then, wouldn't he have to

25  get credit for that time if he were found to have committed any of

1    these violations?

2              PVU CHIEF DEL RIO:  He'll get credit -- the credit

3    was started September 23rd date is sustained.  If they sustain the

4    September 23rd date, that's the date that his time stops.

5              Now, with regards to him being incarcerated on a

6    parole warrant --

7              MR. OBEDIN:  Yeah.

8              PVU CHIEF DEL RIO:  -- even though you're

9    incarcerated in local jail --

10             MR. OBEDIN:  Right.

11             PVU CHIEF DEL RIO:  -- on a parole warrant, until a

12   judge sustains the delinquency date and determines that you're now a

13   state inmate, you're a parolee being detained.  You're still on parole

14   supervision and required to follow the rules and regulations.  It's the

15   same thing that happens if there's a parolee whose being detained in

16   the local jail who involves himself in criminal activity within the jail,

17   assaulting an officer, the Department can bring those charges against

18   him because he's still under parole supervision, although there is a

19   warrant.

20             MR. OBEDIN:  Right, but --

21             PVU CHIEF DEL RIO:  And I believe that's an

22   argument you guys made before the writ court and the writ court

23   dismissed your charges or your claim, indicating that the writ court

24   supreme court judge determined that an individual in county jail

25   remains under supervision and is subject to the parole conditions,

1   until which time an administrative law judge determines that he's now

2   a state inmate.

3                    MR. OBEDIN: I think the question that we're asking

4   though, is in regards to delinquent time.

5                    PAROLEE: Yes.

6                    MR. OBEDIN: That is the question, so --

7                    ALJ ROSS: If any of those charges from September

8   get sustained today --

9                    MR. OBEDIN: Yes.

10                   ALJ ROSS: -- then he will get credit for that time,

11  right?

12                   PVU CHIEF DEL RIO: Right.

13                   ALJ ROSS: Exactly.

14                   PVU CHIEF DEL RIO: The good time was stopped as

15  of that time.

16                   PAROLEE: So if I get credit, and I just want this on

17  the record.

18                   MR. OBEDIN: Well, first tell me.

19                   (Whereupon a discussion was held between Mr. Obedin and

20  Parolee Ovalle.)

21                   MR. OBEDIN: My understanding is you're not getting

22  credit right now because nothing has been sustained yet, but if

23  something is sustained then you will get credit.

24                   PAROLEE: But in the beginning he said --

25                   MR. OBEDIN: It doesn't matter. It's being clear now.

1    So that's where we stand. As of today, as of right now, you haven't

2    received time for that. But if something were sustained today against

3    you, beginning September 23rd, you would then receive credit.

4                    PVU CHIEF DEL RIO: I interpret credit as being

5    jail-time credit. And jail-time credit begins effective as to the lodging

6    of the warrant. This warrant was lodged on November 30th;

7    therefore, the time that he owes of two years, X amount of days or

8    whatever have you, will start November 30th. It would not start

9    September. Understand? So if he gets --

10                   ALJ ROSS: He gets parole credit.

11                   MR. OBEDIN: But he would get credit for time --

12                   ALJ ROSS: On parole.

13                   MR. OBEDIN: Okay. So now I'm a little confused.

14   Just so I understand --

15                   PVU CHIEF DEL RIO: No. No. In other words --

16                   MR. OBEDIN: If he would get credit for -- if he were

17   sentenced to an amount of jail time today, he would get credit dating

18   back to September 23rd --

19                   PVU CHIEF DEL RIO: No.

20                   MR. OBEDIN: -- on that jail time.

21                   PVU CHIEF DEL RIO: No, he would not. If he gets a

22   year sentence today from this court, he would -- his time would be up

23   November 30, 2018, not September.

24                   MR. OBEDIN: Okay.

25                   PVU CHIEF DEL RIO: But they stopped his time as

1  of September. So the stopping of the clock means he's not getting

2  parole-time credit as of September. He's not getting any credit as of

3  September. But the jail-time credit, what's going to be credited

4  towards him based on any sentence, will begin on September 30.

5             MR. OBEDIN: So what is the credit that would

6  retroactively go back to 9/23 if there's a finding today?

7             PVU CHIEF DEL RIO: That stopped his clock. That

8  charge, if sustained, will stop his clock. In other words --

9             MR. OBEDIN: I don't know what "stop his clock"

10  means.

11            PVU CHIEF DEL RIO: It means that that behavior

12  that occurred on September 23rd --

13            MR. OBEDIN: Yes.

14            PVU CHIEF DEL RIO: -- that behavior has been

15  declared delinquent. Therefore, his parole credit, as time on parole,

16  stop.

17            MR. OBEDIN: As of 9/23.

18            PVU CHIEF DEL RIO: As of 9/23. It starts again on

19  November 30th. Now, he can get that time back by pleading guilty to

20  a charge and get the delinquent time up until the lodging of the

21  warrant.

22            PAROLEE: Or found not guilty.

23            PVU CHIEF DEL RIO: Or found not guilty, right.

24  One or the other.

25            MR. OBEDIN: Okay.

1       PAROLEE: But my question is --

2       MR. OBEDIN: But ask me.

3       PAROLEE: I apologize, Ms. Ross, I know I have a

4   lawyer, but --

5       ALJ ROSS: No. I'm not allowing it.

6       (Whereupon, Mr. Obedin conferred with his client.)

7       MR. OBEDIN: Okay. Well, that's not really an --

8   that's not an argument for here.

9       PAROLEE: But it has to be on the record.

10       ALJ ROSS: I had no involvement in that last case, so I

11   don't know what went on.

12       PVU CHIEF DEL RIO: Neither was I.

13       ALJ ROSS: Nor can I make any rulings.

14       PAROLEE: Right. But we have to put it on the

15   record, in case there is an appeal.

16       ALJ ROSS: But that's why you have a lawyer, and I'm

17   not going to stay say that to you again.

18       MR. OBEDIN: And I'll make that clear, if and when it

19   becomes appropriate today, after we do the hearing.

20       ALJ ROSS: Certainly, you can put that as part of

21   summation, or just make a record of it.

22       MR. OBEDIN: Right. Because as of this point,

23   nothing has been calculated and nothing has been done.

24       ALJ ROSS: Right. And all of this is on the record

25   right now. We're on the record right now.

1           MR. OBEDIN: Can I just take Mr. Ovalle outside for

2    one moment, Judge?

3              (Whereupon a brief recess was taken.)

4           MR. OBEDIN: Maybe you can explain to me just

5    once on the record what parole's position is, just regarding the

6    timeframe of the first violation, of the September 23rd violation,

7    which is not the subject of today's hearing.

8           PVU CHIEF DEL RIO: It actually is.

9           MR. OBEDIN: The violation that --

10          PVU CHIEF DEL RIO: No. The previous violation

11   didn't cover anything happening in September. The previous parole

12   violation, your client was charged with activities that occurred on or

13   about May.

14          MR. OBEDIN: But wasn't he held from

15   September 23rd?

16          PAROLEE: September 18th.

17          PVU CHIEF DEL RIO: Yeah, the warrant was lodged

18   September 18th.

19          MR. OBEDIN: Right. So that --

20          PVU CHIEF DEL RIO: And he had a preliminary

21   hearing on September 25th. Then you guys filed the writ.

22          MR. OBEDIN: Right.

23          PVU CHIEF DEL RIO: You won the writ.

24          MR. OBEDIN: Right. November 30th.

25          PVU CHIEF DEL RIO: Whenever that was.

1                              MR. OBEDIN: Yes.

2                              PVU CHIEF DEL RIO: And I wasn't involved in it.

3                              MR. OBEDIN: No, I understand.

4                              PVU CHIEF DEL RIO: The field operation got wind

5   that there was ongoing visits with the co-defendant that occurred on

6   or about September 23rd --

7                              MR. OBEDIN: Right.

8                              PVU CHIEF DEL RIO: -- while he was incarcerated

9   in the local jail. As a result of that, the field operations issued the

10   warrant charging him with accepting and being visited by his

11   co-defendant in local custody.

12                           MR. OBEDIN: Beginning September 23rd.

13                         PVU CHIEF DEL RIO: Yeah. And I understand -- I

14   mean, I'm trying to understand your position, or maybe you can

15   explain your position, but it is my understanding that although an

16   individual is incarcerated on our warrant, while incarcerated on a

17   warrant, if the determination has not been made that he's in actual

18   violation of any charge, the stipulation of any court, then the

19   stipulation made by the Court, and thus sentencing him that he's not a

20   state inmate until that time.

21                    If the Court has not imposed a sentence based on any

22   violation, he continues to be a parolee incarcerated; and therefore,

23   subject to the rules and regulations of parole.

24                       MR. OBEDIN: Okay. That would be true even if

25   while in custody, the Department is not responsible for the inmates

1    while they're being housed, correct?

2    PVU CHIEF DEL RIO:  Yes.

3    MR. OBEDIN:  That's parole's position?

4    PVU CHIEF DEL RIO:  That's parole's position.

5    MR. OBEDIN:  Okay.

6    PVU CHIEF DEL RIO:  An example of that is having

7    an individual who's incarcerated on a parole warrant who has not had

8    a final hearing, this decision, who engages in assaultive behavior

9    while in the institution, against either another inmate and/or staff,

10    those charges can be brought against him while he's in local custody.

11    MR. OBEDIN:  Correct.  Okay.

12    PVU CHIEF DEL RIO:  That's while he's continuously

13    on parole even though a warrant is issued on him, because a final

14    disposition has not been made by an administrative law judge.

15    MR. OBEDIN:  Okay.

16    ALJ ROSS:  Are we ready to proceed?

17    MR. OBEDIN:  Yes.

18    ALJ ROSS:  Okay.

19    And you're ready to proceed, Mr. Del Rio?

20    PVU CHIEF DEL RIO:  Yes, Your Honor.

21    ALJ ROSS:  Would you please raise your right hand,

22    Mr. Del Rio?

23    (Whereupon, PVU Chief Del Rio was sworn in by ALJ

24    Ross.)

25    ALJ ROSS:  And Mr. Ovalle, in case you testify,

1    would you raise your right hand?

2           (Whereupon, Parolee Ovalle was sworn in by ALJ

3    Ross.)

4           ALJ ROSS: Okay. Are there any issues before we call

5    the first witness?

6           PVU CHIEF DEL RIO: Any what?

7           ALJ ROSS: Issues.

8           PVU CHIEF DEL RIO: Not on my part.

9           ALJ ROSS: Anything else?

10           MR. OBEDIN: No.

11           ALJ ROSS: Okay. As you all know, this is an

12    administrative hearing and the level of proof is a preponderance of the

13    evidence.

14           Do you wish to waive a reading of the rights and enter

15    a plea of not guilty for your client, Mr. Obedin?

16           MR. OBEDIN: Yes, Judge.

17           ALJ ROSS: Okay. And that's Charges 1 through --

18           PVU CHIEF DEL RIO: There's numerous charges,

19    Your Honor. I believe there's a supplementary.

20           ALJ ROSS: There is. It's Charges 1 through 116.

21           MR. OBEDIN: Wait.

22           ALJ ROSS: A plea of not guilty has been entered on

23    those charges.

24           MR. OBEDIN: Where --

25           ALJ ROSS: They were given to your partner last time

1       he was here.

2                       MR. OBEDIN: Okay. Your Honor, if I can have a

3       moment. I haven't seen this.

4                       ALJ ROSS: Sure. I think they're all more of the same.

5                       MR. OBEDIN: All right.

6                       Your Honor, Mr. Ovalle is objecting to these

7       supplementary violation charges based on the fact that he wasn't given

8       the opportunity to have a preliminary hearing regarding these

9       additional charges.

10                      ALJ ROSS: And that certainly is an issue for a writ.

11                      MR. OBEDIN: Okay.

12                      ALJ ROSS: Okay. Mr. Del Rio, are you ready to call

13      your first witness?

14                      PVU CHIEF DEL RIO: Yes, ma'am.

15                      ALJ ROSS: Who is the first witness?

16                      PVU CHIEF DEL RIO: Parole Officer Evans.

17                      ALJ ROSS: And before you do that, just as protocol,

18      the VOP as well as the Certificate of Release and Notice of Violation

19      are entered into evidence as People's No. 1.

20                      (Whereupon a brief recess was taken.)

21                      ALJ ROSS: Parole Officer, what's your badge

22      number?

23                      PO EVANS: 303.

24                      PVU CHIEF DEL RIO: What command is that?

25                      PO EVANS: My command is Queens Two.

1          ALJ ROSS:  And would you raise your right hand?

2          (Whereupon, Parole Officer Evans was sworn in by

3     ALJ Ross.)

4          ALJ ROSS:  Okay.  Mr. Del Rio, you may proceed.

5          PVU CHIEF DEL RIO:  Yes, Your Honor, thank you.

6     May I have just a moment, Judge?

7          ALJ ROSS:  Sure.

8          PVU CHIEF DEL RIO:  Thank you, Your Honor.

9     Ms. Evans, by whom are you employed?

10          PO EVANS:  New York Department of Corrections

11     and Community Supervision, DOCCS.

12          PVU CHIEF DEL RIO:  And do you know one Warren

13     Ovalle?

14          PO EVANS:  Yes, I do.

15          PVU CHIEF DEL RIO:  And do you see him in the

16     courtroom?

17          PO EVANS:  Yes.

18          PVU CHIEF DEL RIO:  And can you identify him?

19          PO EVANS:  He's the gentleman to your right.

20          ALJ ROSS:  Could you identify the piece of clothing?

21          PO EVANS:  Yes, a green top.

22          PVU CHIEF DEL RIO:  Can the record reflect that

23     PO Evans has identified Mr. Ovalle.

24          How is it that you know him?

25          PO EVANS:  I supervised him, he's under my

1    supervision.

2         PVU CHIEF, DEL RIO:  And let me show you this

3    document.  Do you recognize this document?

4         PO EVANS:  Yes, I do.

5         PVU CHIEF DEL RIO:  Can you identify that

6    document for the Court?

7         PO EVANS:  It's the special conditions of release to

8    parole supervision.

9         PVU CHIEF DEL RIO:  And whose name, if any, is on

10   that document?

11        PO EVANS:  My name appears and so does

12   Mr. Ovalle.

13        PVU CHIEF DEL RIO:  And is there any numbers

14   specific to Mr. Ovalle?

15        PO EVANS:  Yes, his NYSID number.

16        ALJ ROSS:  And what is that?

17        PO EVANS:  It is 09347560J.

18        PVU CHIEF DEL RIO:  Let the record reflect that

19   PO Evans did identify Mr. Ovalle and the NYSID number that's

20   associated with him.

21        Could you tell the Court what, if any, instructions did

22   you instruct as a result of the special condition?

23        PO EVANS:  Do you want me to read it?

24        PVU CHIEF DEL RIO:  I want you to tell the Judge

25   and then if we need, you can read it.

1      PO EVANS: It was a special condition for Mr. Ovalle

2  to not have any contact with one Mr. Robert Akre.

3      PVU CHIEF DEL RIO: And who is Mr. Akre?

4      PO EVANS: The co-defendant.

5      PVU CHIEF DEL RIO: And is he the co-defendant for

6  this particular case which Mr. Ovalle is on parole?

7      PO EVANS: Yes.

8      PVU CHIEF DEL RIO: And does your signature

9  appear on this document?

10      PO EVANS: Yes.

11      PVU CHIEF DEL RIO: And where does that signature

12  appear?

13      PO EVANS: On the second page, lower bottom of the

14  second page.

15      PVU CHIEF DEL RIO: And did you witness

16  Mr. Ovalle's signature on that page?

17      PO EVANS: Yes.

18      PVU CHIEF DEL RIO: And did you instruct

19  Mr. Ovalle not to have contact with Mr. Akre?

20      PO EVANS: Yes.

21      PVU CHIEF DEL RIO: And did he understand that?

22      PO EVANS: Yes.

23      PVU CHIEF DEL RIO: How do you know he

24  understood that?

25      PO EVANS: Because I explained the conditions to

1    him, you know, in detail, and he understood that he was a

2    co-defendant and he is not have to have any contact with him, as

3    stated in the conditions of release to parole supervision.

4                    PVU CHIEF DEL RIO:  Your Honor, I'm going to ask

5    for the document to be entered as State Exhibit 2.

6                    ALJ ROSS:  Mr. Obedin, you have any objection?

7                    MR. OBEDIN:  No objection.

8                    ALJ ROSS:  Okay.

9                    MR. OBEDIN:  I've seen a copy.

10                   PVU CHIEF DEL RIO:  No further questions, Your

11   Honor.

12                   ALJ ROSS:  Okay.  Mr. Obedin any questions?

13                   MR. OBEDIN:  Thank you.

14                   Officer Evans, do you know the exact dates that you

15   supervised Mr. Ovalle?

16                   PO EVANS:  Yes, I do.

17                   MR. OBEDIN:  Can you tell me what dates?

18                   PO EVANS:  11/2/2016 to 3/1/17.

19                   MR. OBEDIN:  11/2/16 to 3/1/17?

20                   PO EVANS:  Yes.

21                   MR. OBEDIN:  Okay.

22                   And I noticed that Government's 2 is entitled "Special

23   Conditions of Release"; is that right?

24                   PO EVANS:  Yes.

25                   MR. OBEDIN:  Are there also standard conditions that

1   are given to an individual when they're released to parole supervision?

2   PO EVANS: Yes, he already signed when he reports

3   to me with board mandated conditions. So he comes in, when he

4   reports to me, with conditions.

5   MR. OBEDIN: So he comes to you, he already has

6   general conditions --

7   PO EVANS: Yes.

8   MR. OBEDIN: -- that have been given to him. And

9   then you can choose to impose certain special conditions if you

10  believe it's appropriate; is that correct?

11  PO EVANS: Yes.

12  MR. OBEDIN: Okay. And the special conditions, is it

13  required that you, as the parole officer, that you review them with

14  Mr. Ovalle?

15  PO EVANS: Yes.

16  MR. OBEDIN: And is it required that he sign these

17  conditions in front of you?

18  PO EVANS: Yes. That he understands, yes.

19  MR. OBEDIN: Before signing them, make sure that

20  he understands?

21  PO EVANS: That I explain them, yes.

22  MR. OBEDIN: Okay. And does each parole officer

23  have the right to impose special conditions on an individual who

24  they're supervising?

25  PVU CHIEF DEL RIO: I'm going object, Your Honor,

1   to the phrasing of the question with regards to each parole officer.

2   She can't testify to what each parole officer in the State of New York

3   does or doesn't do.

4                    ALJ ROSS:  Right.  Can you rephrase the question?

5                    MR. OBEDIN:  Yes.  Judge, just to be clear, I'm not

6   asking what any particular other parole officer would do.  I'm asking,

7   generally speaking, does a parole officer, any parole officer, do they

8   have the right to impose special conditions on a person they're

9   supervising?  Not anyone specifically, but in general, when you're a

10  parole officer and you're supervising individuals, do you have a right

11  to impose special conditions?

12                   PO EVANS:  Can I answer that?

13                   ALJ ROSS:  Yes.

14                   PO EVANS:  Yes.

15                   MR. OBEDIN:  And you ended your supervision of

16  Mr. Ovalle on March 1st of 2017?

17                   PO EVANS:  Yes.

18                   MR. OBEDIN:  Okay.  Do you know who the parole

19  officer was who took of over supervision on 3/2/17?

20                   PO EVANS:  Yes.

21                   MR. OBEDIN:  And who would that have been?

22                   PO EVANS:  Officer Hamlette.

23                   MR. OBEDIN:  PO Hamlette.  Okay.

24                   So is it fair to say that at the time these violations

25  allegedly occurred that you were not Mr. Ovalle's parole officer?

1          PO EVANS: Yes.

2          MR. OBEDIN: You had an opportunity to read the

3     violations?

4          PO EVANS: Yes, I did.

5          MR. OBEDIN: Right. So they began on September

6     23rd of 2017, so at that point you were no longer supervising him?

7          PO EVANS: September 21st of 2017?

8          MR. OBEDIN: 23rd.

9          PO EVANS: Yes, I was no longer his officer.

10         MR. OBEDIN: Do you know -- if you know, was

11    Officer Hamlette Mr. Ovalle's parole officer on September 23rd,

12    2017?

13         PO EVANS: I believe so.

14         MR. OBEDIN: Okay. And when you take over

15    supervision of a parolee, do you always make it -- withdrawn.

16         When you take over supervision of a parolee, whether

17    it's straight out of a state facility or if you take over from another

18    parole officer, do you always review any special conditions with that

19    parolee?

20         PO EVANS: Absolutely.

21         ALJ ROSS: And you always have that parolee sign it

22.   after you --

23         PO EVANS: Absolutely.

24         MR. OBEDIN: -- do, so that you --

25         PO EVANS: Absolutely.

1          MR. OBEDIN: -- know he understands.

2          PO EVANS: Absolutely.

3          MR. OBEDIN: Okay. If I can just have one moment,

4    Your Honor.

5          ALJ ROSS: Sure.

6          MR. OBEDIN: Okay. Just one or two more questions,

7    Officer Evans.

8          PO EVANS: Sure.

9          MR. OBEDIN: Other than having Mr. Ovalle review

10   and sign special conditions of parole, are there any other conditions

11   that you reviewed with Mr. Ovalle, other than the standard conditions

12   he came down with from upstate and these special conditions that

13   have been put in as an exhibit, were there any other conditions or

14   anything that you expected of Mr. Ovalle as a parolee to abide by that

15   you reviewed with him and had him sign?

16         PO EVANS: Just the board mandated conditions and

17   my special conditions; however, supervising Mr. Ovalle, he -- any

18   issues that he had or he felt he didn't understand, I always made

19   myself available with Warren. Anything that he had he had my cell

20   phone, he could have called about any concerns because that's the

21   rapport that we had.

22         MR. OBEDIN: Thank you. I'm just asking if there

23   was anything, other than the --

24         PO EVANS: No.

25         MR. OBEDIN: -- standard conditions that he came

1          down with and the exhibit that went in, the special conditions.

2                          PO EVANS: Nothing else.

3                          MR. OBEDIN: That was it?

4                          PO EVANS: Yes.

5                          MR. OBEDIN: Okay. Thank you, Officer.

6                          PO EVANS: Thank you.

7                          PVU CHIEF DEL RIO: No further questions, Your

8          Honor.

9                          ALJ ROSS: Thank you, Ms. Evans.

10                         PO EVANS: Thank you.

11                         ALJ ROSS: Mr. Del Rio, your next witness?

12                         (Whereupon a brief recess was taken.)

13                         ALJ ROSS: Would you put your name on the record?

14                         SPO JUSTE: Senior Parole Officer Gary Juste, Shield

15         363, Suffolk area office.

16                         ALJ ROSS: First name Gary?

17                         SPO JUSTE: Yes.

18                         ALJ ROSS: Would you raise your right hand.

19                         (Whereupon, Senior Parole Officer Juste was sworn in

20         by ALJ Ross.)

21                         ALJ ROSS: Thank you.

22                         You may proceed.

23                         PVU CHIEF DEL RIO: SPO Juste, by whom are you

24         employed?

25                         SPO JUSTE: DOCCS.

1    PVU CHIEF DEL RIO: In what capacity?

2    SPO JUSTE: Senior Parole Officer.

3    PVU CHIEF DEL RIO: Okay. On or about

4    September of 2017, were you responsible for supervising

5    PO Hamlette?

6    SPO JUSTE: Yes.

7    PVU CHIEF DEL RIO: And during that time period,

8    did you engage in case conference with Ms. -- with Parole Officer

9    Hamlette?

10    SPO JUSTE: Yes.

11    PVU CHIEF DEL RIO: And during that time period,

12    did Parole Officer Hamlette make any request of you regarding

13    Mr. Ovalle's special conditions?

14    SPO JUSTE: No.

15    PVU CHIEF DEL RIO: Did the parole officer, at any

16    time during the conference, seek your permission to modify any

17    special condition related to Mr. Ovalle?

18    SPO JUSTE: No.

19    PVU CHIEF DEL RIO: And do you know where

20    Parole Officer Hamlette is today?

21    SPO JUSTE: She's on medical leave.

22    PVU CHIEF DEL RIO: And could you tell the Court

23    what, if any, efforts you made to get Officer Hamlette here?

24    SPO JUSTE: Yes. We issued a subpoena, I went to

25    her house to serve her the subpoena, I went to her house and I

1    attached it to her door. I've called her several times and I also mailed

2    the subpoena to her house.

3    　　　　　　　　PVU CHIEF DEL RIO: And you've been unable to

4    communicate with Ms. Hamlette at this point?

5    　　　　　　　　SPO JUSTE: Yes.

6    　　　　　　　　PVU CHIEF DEL RIO: And to your knowledge, she's

7    out on extended medical leave and is unavailable?

8    　　　　　　　　SPO JUSTE: Yes.

9    　　　　　　　　PVU CHIEF DEL RIO: So as the senior parole officer,

10    during the case conferences you would be made aware if any special

11    conditions were made to modify any conditions as it relates to

12    Mr. Ovalle; is that correct?

13    　　　　　　　　SPO JUSTE: Yes.

14    　　　　　　　　PVU CHIEF DEL RIO: And do you recall whether or

15    not any condition was modified, related to Mr. Ovalle's contact with

16    Mr. Robert Akre?

17    　　　　　　　　SPO JUSTE: No.

18    　　　　　　　　PVU CHIEF DEL RIO: And what is your knowledge

19    as it related to Mr. Ovalle and Mr. Akre?

20    　　　　　　　　SPO JUSTE: They are co-defendants.

21    　　　　　　　　PVU CHIEF DEL RIO: And regarding any contact?

22    　　　　　　　　SPO JUSTE: That they are not supposed to have any

23    contacts at all.

24    　　　　　　　　PVU CHIEF DEL RIO: And you have not approved,

25    during your supervision, or given any permission for Mr. Ovalle to

1        have contact with Mr. Akre?

2                      SPO JUSTE: No.

3                      PVU CHIEF DEL RIO: I have no further questions.

4                      ALJ ROSS: Mr. Obedin?

5                      MR. OBEDIN: Yes, Your Honor, thank you.

6                      Officer Juste, is Officer Hamlette still employed by the

7        Department of Parole?

8                      SPO JUSTE: Yes.

9                      MR. OBEDIN: Okay. And when did you subpoena

10       Officer Hamlette?

11                     SPO JUSTE: It was the Friday, the 23rd, February.

12                     MR. OBEDIN: Friday the 23rd of February?

13                     SPO JUSTE: Yes.

14                     MR. OBEDIN: And did you also indicate that you

15       went by her home?

16                     SPO JUSTE: Yes.

17                     MR. OBEDIN: Was that to serve the subpoena or was

18       that after the subpoena had been served?

19                     SPO JUSTE: To serve the subpoena on her.

20                     MR. OBEDIN: And did you successfully serve the

21       subpoena upon her?

22                     SPO JUSTE: No. I attached the subpoena to her door

23       because she -- I called, she did not answer my calls, and I attached the

24       subpoena to her door.

25                     MR. OBEDIN: And you're her supervising parole

1    officer?

2    SPO JUSTE: Yes.

3    MR. OBEDIN: You're her boss?

4    SPO JUSTE: Yes.

5    MR. OBEDIN: Okay. And it's your testimony here

6    today that one of your employees has been out of contact with you

7    now for a weeks' time even though you attempted to serve a judicial

8    subpoena upon her?

9    SPO JUSTE: She's on medical leave.

10    MR. OBEDIN: That's not what I asked.

11    Is it your testimony that she's been out of touch with

12    you and never responded to the office regarding the subpoena?

13    SPO JUSTE: No.

14    MR. OBEDIN: When Mr. Ovalle met with Officer

15    Hamlette, when Officer Hamlette took over her supervision of

16    Mr. Ovalle, were you present for that meeting?

17    SPO JUSTE: No. I was not in the Suffolk office yet.

18    MR. OBEDIN: Okay. So you have no idea what

19    Officer Hamlette and Mr. Ovalle discussed that day, correct?

20    PVU CHIEF DEL RIO: Excuse me, objection. What

21    date was that?

22    MR. OBEDIN: The day that Officer Hamlette took

23    over parole supervision of Mr. Ovalle.

24    PVU CHIEF DEL RIO: We still don't know what day

25    it is.

1          ALJ ROSS: Okay. I believe it was -- I believe we do

2      know that.

3          PVU CHIEF DEL RIO: I think it was March 2nd of --

4          ALJ ROSS: 2017, Right.

5          MR. OBEDIN: March 2nd, 2017.

6          PVU CHIEF DEL RIO: So that's asked and answered.

7          MR. OBEDIN: Okay. So you have no idea what their

8      discussion was when they met?

9          SPO JUSTE: No.

10         MR. OBEDIN: You have no idea what Officer

11     Hamlette might have indicated to Mr. Ovalle in terms of any special

12     conditions, correct?

13         SPO JUSTE: We've had conferences, she never

14     indicated to me that she modified the special conditions.

15         MR. OBEDIN: Okay. But you weren't there the day

16     that she actually spoke to Mr. Ovalle, the day that she took over,

17     correct?

18         PVU CHIEF DEL RIO: That's asked and answered.

19         MR. OBEDIN: Okay.

20         Do we know if Ms. Hamlette -- Officer Hamlette,

21     excuse me -- reviewed any special conditions with Mr. Ovalle, made

22     sure he understood them, and had him sign any special conditions.

23     Were you aware of any of this?

24         SPO JUSTE: We discussed that she did not make --

25     did not modify the special conditions.

1        MR. OBEDIN: She indicated to you that she did not

2        modify the special conditions?

3        SPO JUSTE: Correct.

4        MR. OBEDIN: Okay. Did she indicate to you

5        whether she reviewed the special conditions already in existence with

6        Mr. Ovalle to make sure that he understood them?

7        SPO JUSTE: Yes, she did.

8        MR. OBEDIN: She indicated that to you?

9        SPO JUSTE: She did review the special conditions

10       with Mr. Ovalle once she started supervising Mr. Ovalle.

11       MR. OBEDIN: You're saying that because she told

12       you that at some subsequent meeting?

13       SPO JUSTE: It's also, I believe, April 12th we had a

14       meeting that she had a meeting and they discussed the special

15       condition, yes.

16       MR. OBEDIN: Wait. So now you're saying that you

17       were at a meeting with Officer Hamlette and Mr. Ovalle --

18       SPO JUSTE: We discussed it. I wasn't in --

19       ALJ ROSS: Let him answer the question.

20       SPO JUSTE: They discussed the special conditions.

21       Usually, when a parolee is transferred to a parole officer, they

22       discuss -- they review the special conditions, even if they don't issue a

23       new one, they review the same special condition and it goes on to the

24       max date.

25       MR. OBEDIN: So if I understand your answer, you

1        weren't there when they met. You're saying that usually an officer

2        will review the special conditions with a parolee. So your testimony

3        is that since that's what usually happens, that's what happened here?

4                SPO JUSTE: We had conference, I have had

5        conference with Officer Hamlette, she never indicated to me that she

6        modified special conditions.

7                MR. OBEDIN: And as you sit here today, you have no

8        contact or control over Officer Hamlette. Is that what you're telling

9        us?

10                SPO JUSTE: I served her, attempted to serve her with

11        the subpoena, we're unable to reach her. I called her several times on

12        the telephone. I went to her house, I mailed her the subpoena and we

13        did not get any answer.

14                MR. OBEDIN: Okay. If I can just have one minute,

15        Judge?

16                ALJ ROSS: Sure.

17                (Whereupon, a brief recess was taken.)

18                MR. OBEDIN: To your knowledge, did Officer

19        Hamlette ever have Mr. Ovalle sign any special conditions of parole?

20                SPO JUSTE: No, I'm not aware of that.

21                MR. OBEDIN: You're not aware of that. Okay.

22                I have no more questions of Officer Juste.

23                ALJ ROSS: Any re-direct?

24                PVU CHIEF DEL RIO: Yes.

25                Officer Juste, this is the parole violation, all right? I'm

1     going to show you this parole violation.  Do you recognize the

2     signatures on the last page?

3                    SPO JUSTE:  Yes, that's Officer Hamlette on the left

4     and this is my signature to the right.

5                    PVU CHIEF DEL RIO:  And when did you date this?

6                    SPO JUSTE:  December 7, 2017.

7                    PVU CHIEF DEL RIO:  And do you recognize these

8     charges?

9                    SPO JUSTE:  Yes.

10                    PVU CHIEF DEL RIO:  And who drafted them?  Who

11     wrote them out?

12                    SPO JUSTE:  Officer Hamlette.

13                    PVU CHIEF DEL RIO:  And she wrote those charges

14     while under your supervision?

15                    SPO JUSTE:  Yes.

16                    PVU CHIEF DEL RIO:  And those charges, she's

17     charging Mr. Ovalle with having contact with Mr. Robert Akre?

18                    SPO JUSTE:  Yes.

19                    PVU CHIEF DEL RIO:  And did you discuss whether

20     or not she had given permission on those particular dates to have

21     contact with Robert Akre?

22                    SPO JUSTE:  Yes.  She did not.

23                    MR. OBEDIN:  I'm going to object.  That's hearsay.

24     Officer Hamlette is not here, what she answered is hearsay, she should

25     be here.

1    PVU CHIEF DEL RIO: It's not hearsay when she's

2    engaged in case conferences with her senior parole officer and

3    drafting charges and having the senior parole officer issue a warrant

4    based on the charges.

5    MR. OBEDIN: It's always hearsay.

6    ALJ ROSS: And hearsay is allowed at all of these

7    hearings.

8    SPO JUSTE: She never gave her permission.

9    PVU CHIEF DEL RIO: But you had case conferences

10   with her --

11   SPO JUSTE: Correct.

12   PVU CHIEF DEL RIO: -- regarding this particular

13   charges?

14   SPO JUSTE: Correct.

15   PVU CHIEF DEL RIO: And it -- did Officer Hamlette

16   indicate to you that on or before September 23rd, did Ms. Hamlette

17   indicate to you on or about September -- or before September 23rd

18   that he she had given Mr. Ovalle to have permission with Mr. Akre?

19   SPO JUSTE: No.

20   PVU CHIEF DEL RIO: I have no further questions.

21   MR. OBEDIN: I have nothing further.

22   ALJ ROSS: Thank you, Officer Juste.

23   SPO JUSTE: Thank you.

24   (Whereupon, a brief recess was taken.)

25   ALJ ROSS: Good morning. Please state your name

1          for the record.

2                              INVESTIGATOR LUGO:  Investigator Lugo.

3                              ALJ ROSS:  Shield number?

4                              INVESTIGATOR LUGO:  172.

5                              ALJ ROSS:  Would you raise your right hand.

6                              (Whereupon, Investigator Lugo was sworn in by ALJ

7          Ross.)

8                              ALJ ROSS:  You may proceed.

9                              PVU CHIEF DEL RIO:  Officer Lugo, by whom are

10         you employed?

11                             INVESTIGATOR LUGO:  New York State

12         Department of Community Supervision.

13                             PVU CHIEF DEL RIO:  In what capacity are you

14         employed?

15                             INVESTIGATOR LUGO:  Investigator.

16                             PVU CHIEF DEL RIO:  And on or about -- do you

17         know one Mr. Warren Ovalle?

18                             INVESTIGATOR LUGO:  I don't know him

19         personally, I know of him.

20                             PVU CHIEF DEL RIO:  Have you ever seen him

21         before?

22                             INVESTIGATOR LUGO:  Yes.

23                             PVU CHIEF DEL RIO:  And do you see him in the

24         courtroom?

25                             INVESTIGATOR LUGO:  Yes.

1     PVU CHIEF DEL RIO: Can you identify him?

2     INVESTIGATOR LUGO: Right here.

3     PVU CHIEF DEL RIO: And did there come a time

4     when you were conducting an investigation on Mr. Warren Ovalle and

5     Mr. Robert Akre?

6     INVESTIGATOR LUGO: Yes.

7     PVU CHIEF DEL RIO: And do you recall when that

8     was?

9     INVESTIGATOR LUGO: I don't remember the date

10     off the top of my head, but it was last year.

11     PVU CHIEF DEL RIO: Okay. And what was the

12     nature of -- what was your role in that investigation?

13     INVESTIGATOR LUGO: I had to take the

14     photographs at the house.

15     PVU CHIEF DEL RIO: Okay. I'm going to show you

16     this document. Here you go, sir.

17     Do you recognize that?

18     INVESTIGATOR LUGO: Yes.

19     PVU CHIEF DEL RIO: Did you take that photograph?

20     INVESTIGATOR LUGO: Yes, I did.

21     PVU CHIEF DEL RIO: And where were you when

22     you took that photograph?

23     INVESTIGATOR LUGO: Inside of 15 East Locust

24     Street, Central Islip.

25     PVU CHIEF DEL RIO: And do you recall when you

1       took that photograph?

2                             INVESTIGATOR LUGO:  Approximately, 6:57 AM

3       on September 18th.

4                             PVU CHIEF DEL RIO:  And what is that a photo of?

5                             INVESTIGATOR LUGO:  That is a photo of a New

6       York State Driver's License for one Robert Akre.

7                             PVU CHIEF DEL RIO:  And what is that license

8       number?

9                             INVESTIGATOR LUGO:  909-736-213.

10                            PVU CHIEF DEL RIO:  And do you know anyone else

11      who lives at 15 -- what is that -- Locust Street, Central Islip?

12                            INVESTIGATOR LUGO:  Yes, that would be

13      Mr. Warren Ovalle.

14                            PVU CHIEF DEL RIO:  And you took this

15      photograph?

16                            INVESTIGATOR LUGO:  Yes.

17                            PVU CHIEF DEL RIO:  And you took this photograph

18      in the normal course of business as an investigator for the New York

19      State Department of Correction Community Supervision?

20                            INVESTIGATOR LUGO:  Yes.

21                            PVU CHIEF DEL RIO:  And was it your responsibility

22      to take those photographs on this day?

23                            INVESTIGATOR LUGO:  Yes.

24                            PVU CHIEF DEL RIO:  And did you keep these

25      photographs in the normal course of business and did you store them

1  in the normal course of business by New York State Department of

2  Corrections?

3          INVESTIGATOR LUGO: Yes.

4          PVU CHIEF DEL RIO: Your Honor, I ask that the

5  photo be taken into evidence.

6          MR. OBEDIN: I'll object as to relevance to the

7  violations being charged.

8          ALJ ROSS: Right. Could you explain?

9          PVU CHIEF DEL RIO: Your Honor, it's our

10  contention that this ID and the ID number was utilized to enter the

11  correctional facility while visiting Mr. Ovalle during the time period

12  in question.

13          ALJ ROSS: Okay. For that purpose, I'll allow it.

14          PVU CHIEF DEL RIO: I have no further questions.

15          ALJ ROSS: This becomes People's 3.

16          MR. OBEDIN: I have no questions.

17          Oh, I'm sorry. One moment, please.

18          I have no questions.

19          ALJ ROSS: Thank you.

20          PVU CHIEF DEL RIO: Your Honor, at this time,

21  we're requesting permission to bring a laptop in so we can view a

22  DVD, unless you want to stipulate to the video.

23          MR. OBEDIN: No.

24          PVU CHIEF DEL RIO: It's a video that we'd like to

25  show the Court of the visiting area at the county jail.

1          ALJ ROSS: And we're waiting for the corrections

2    officer to make a decision?

3          PVU CHIEF DEL RIO: They have it in custody.

4          ALJ ROSS: Okay.

5          PVU CHIEF DEL RIO: They have to -- when you

6    bring the video or something in they keep it in a locker, they don't let

7    you walk in with electronics, so it has to be escorted. It would have

8    been convenient to have it here, but it's the way they do it.

9          (Whereupon a discussion was held off the record.)

10         ALJ ROSS: Could you please state your name for the

11   record?

12         LT. SCHNEIDER: My name is Lieutenant Karl

13   Schneider, L102, Karl with a K.

14         ALJ ROSS: Thank you. And your shield number

15   again?

16         LT. SCHNEIDER: L102, L as in Larry, 102.

17         PVU CHIEF DEL RIO: Lieutenant Schneider, by

18   whom are you employed?

19         ALJ ROSS: Hold on. I need you to raise your right

20   hand.

21         PVU CHIEF DEL RIO: Sorry.

22         (Whereupon, Lieutenant Schneider was sworn in by

23   ALJ Ross.)

24         ALJ ROSS: Okay. You may proceed.

25         PVU CHIEF DEL RIO: Officer Schneider, by whom

1       are you employed?

2                           LT. SCHNEIDER: Suffolk County Sheriff's Office.

3                           PVU CHIEF DEL RIO: In what capacity?

4                           LT. SCHNEIDER: I'm the Commanding Officer of the

5       record room.

6                           PVU CHIEF DEL RIO: And when you say the

7       commanding officer for the record room, what exactly does that

8       entail?

9                           LT. SCHNEIDER: All the goings on in the record

10      room. The record room is responsible for all inmate court records,

11      when they are discharged, their disciplinary records, court

12      appointments, writs, in and out of the facility and so on. Most of the

13      legal work to an inmate.

14                          PVU CHIEF DEL RIO: And did you receive a

15      subpoena regarding the case of Mr. Warren Ovalle?

16                          LT. SCHNEIDER: Yes, I did.

17                          PVU CHIEF DEL RIO: And as a result of the

18      subpoena, what, if anything, did you do?

19                          LT. SCHNEIDER: Whatever the subpoena required.

20      We often get subpoenaed by agencies, usually it's from the office of

21      the District Attorney, parole, probation, whatever the subpoena

22      requests, whatever information, my office will gather the information.

23      I will take it, certify it, check it for accuracy, look over all the

24      documents. We then turn it over to the department that is requesting

25      information.

1          PVU CHIEF DEL RIO: Let me show you this

2     document. You recognize that document?

3          LT. SCHNEIDER: Yes, sir.

4          PVU CHIEF DEL RIO: Who, if anyone's name, is on

5     that document?

6          LT. SCHNEIDER: Well, it's my certification and my

7     signature.

8          PVU CHIEF DEL RIO: And what is your -- can you

9     describe that to the Court?

10          LT. SCHNEIDER: Okay. Once the subpoena is

11     issued to our office, obviously it requests certain materials, visitor

12     logs, phone calls, phone records, possibly videos, on occasion. If we

13     have access to that, my office has access to it, my staff will gather all

14     the information that the subpoena requests. Once it's all gathered,

15     they turn it over to my office, and at that time I check it to make sure

16     that everything is asked for in the subpoena is in the packet that's been

17     provided for me. If it's all provided, I check it for -- make sure it's

18     authentic, make sure it's the actual documents from the sheriff's

19     department. I make sure that any discs or CDs have actual material

20     on them. And at that point we turn them over to the requesting

21     agency when they present us with an original subpoena.

22          PVU CHIEF DEL RIO: And in this particular case,

23     what, if any, documents did you turn over to the Department of

24     Corrections and Community Supervision?

25          LT. SCHNEIDER: Okay. The -- as stated here, the

1       visiting records, that we turned over, we probably turned over the --

2       when an inmate is visited by a civilian, that civilian's name is entered

3       into the computer, the time, whatnot, and scanned into the computer.

4       And then it's -- I would present that as a visiting log. And every

5       inmate would have a visitor history in the computer. I will basically

6       just bring their visitor history up, if that's what asked for, for whatever

7       dates are asked for. And I will present -- I just will just that print out

8       in my office, or someone on my staff will do that. The other records

9       here, apparently, this is the -- there were no recordings.

10                      PVU CHIEF DEL RIO: But in this particular case,

11      based on your certification, these were for visiting records regarding

12      which civilian witness?

13                      LT. SCHNEIDER: If I'm pronouncing the name right,

14      Robert Akre.

15                      PVU CHIEF DEL RIO: And who was the inmate

16      being visited?

17                      LT. SCHNEIDER: Mr. Warren Ovalle.

18                      PVU CHIEF DEL RIO: And you're certifying that

19      these records that I have in my possession --

20                      LT. SCHNEIDER: Right.

21                      PVU CHIEF DEL RIO: -- and you have --

22                      LT. SCHNEIDER: I do.

23                      PVU CHIEF DEL RIO: -- are accurate and true?

24                      LT. SCHNEIDER: Yes, sir. These are the ones -- all

25      these documents come directly from a department computer. These

1          would have been made by an officer at the visiting unit.

2                          PVU CHIEF DEL RIO:  And I like to draw your

3          attention to page -- your page 3, my page 2, your page 2.

4                          MR. OBEDIN:  My page?

5                          PVU CHIEF DEL RIO:  Two.

6                          That's a February 6th visit; is that correct?

7                          LT. SCHNEIDER:  That's correct.

8                          PVU CHIEF DEL RIO:  And who --

9                          ALJ ROSS:  What year is that?

10                         PVU CHIEF DEL RIO:  I'm sorry?

11                         ALJ RISS:  What year is that?

12                         PVU CHIEF DEL RIO:  2018.

13                         ALJ ROSS:  Thank you.

14                         PVU CHIEF DEL RIO:  You want to look on?

15                         ALJ ROSS:  No, that's okay.

16                         MR. OBEDIN:  Is that this page?

17                         PVU CHIEF DEL RIO:  Yeah.  February 6th.

18                         MR. OBEDIN:  Got it.

19                         LT. SCHNEIDER:  9:43 34 seconds?

20                         PVU CHIEF DEL RIO:  And who is the inmate being

21          visited?

22                         LT. SCHNEIDER:  Warren Ovalle.

23                         PVU CHIEF DEL RIO:  And can you tell the Court the

24          civilian visiting?

25                         LT. SCHNEIDER:  Robert Akre.

1           PVU CHIEF DEL RIO: And is there any identification

2    that's utilized or inputted into the computer that represents any form

3    of ID given by the defendant -- the visitor?

4           LT. SCHNEIDER: Yes. This ID number on the

5    left-hand side, that's a New York State driver's license number, that

6    909-736-203 is his driver's license number. That license is also

7    scanned in the computer when a -- when the visitor comes to the

8    facility.

9           PVU CHIEF DEL RIO: And I want to show you this

10    document. We're back to the picture of the license.

11           MR. OBEDIN: Okay.

12           PVU CHIEF DEL RIO: You didn't take that picture,

13    right, sir?

14           LT. SCHNEIDER: No.

15           PVU CHIEF DEL RIO: You've never seen that picture

16    before?

17           LT. SCHNEIDER: No.

18           PVU CHIEF DEL RIO: Could you inform the Court

19    could you identify the number on the license?

20           LT. SCHNEIDER: 909-736-213.

21           PVU CHIEF DEL RIO: Would you say that that

22    matches the same identification number that's on your record?

23           LT. SCHNEIDER: Yes, sir.

24           PVU CHIEF DEL RIO: And who, if anyone's, name is

25    that on that license?

1       LT. SCHNEIDER: Robert Akre.

2       PVU CHIEF DEL RIO: And the address?

3       LT. SCHNEIDER: 15 East Locust Street, Central

4  Islip, New York.

5       PVU CHIEF DEL RIO: Okay. Thank you very much.

6       Now, have you had an opportunity to look through the

7  document? Can you look through it, because I don't want to look

8  through every single document. I mean, we can do that, but for

9  expedience purposes, can you tell the Court when these records began

10 and when they end?

11      LT. SCHNEIDER: My first document here is on

12 February 6, 2018. Do you want every date or just the last page?

13 That's all also February 6th. So they each --

14      PVU CHIEF DEL RIO: They all seem to be

15 February 6th.

16      LT. SCHNEIDER: Oh, that's when the report was

17 generated. I'm sorry.

18      PVU CHIEF DEL RIO: Okay.

19      LT. SCHNEIDER: That's when we ran the report.

20      PVU CHIEF DEL RIO: Can you tell me when the --

21 so you generated this on February 6, 2018?

22      LT. SCHNEIDER: Correct. That's when it was asked

23 for.

24      PVU CHIEF DEL RIO: Can you tell the Court when

25 the visits were?

1                    LT. SCHNEIDER:  This is on my page 3, I think your

2     page 2, is December 15, 2017.

3                    PVU CHIEF DEL RIO:  And the second page?

4                    LT. SCHNEIDER:  December 22, 2017.

5                    PVU CHIEF DEL RIO:  And the page after that?

6                    LT. SCHNEIDER:  December 27, 2017.

7                    PVU CHIEF DEL RIO:  And after that?

8                    LT. SCHNEIDER:  December 29, 2017.

9                    PVU CHIEF DEL RIO:  Continue.

10                   LT. SCHNEIDER:  January 3rd, 2018, January 6th,

11    2018, January 12th, 2018.  This is a different visitor -- but it's also

12    the -- I'm sorry, yeah, January 18th, 2018, January 19th, 2018,

13    January 23rd, 2018, January 27th, 2018, and January 30th, 2018.

14                   PVU CHIEF DEL RIO:  And in looking at these

15    documents as we have, would you attest to the accuracy and

16    truthfulness of the documents?

17                   LT. SCHNEIDER:  Yes, they are definitely truthful.

18                   PVU CHIEF DEL RIO:  And were these documents

19    prepared in the normal course of business by the Suffolk County

20    Sheriff's Department?

21                   LT. SCHNEIDER:  Yes, they are.

22                   PVU CHIEF DEL RIO:  And is it your responsibility to

23    maintain these records?

24                   LT. SCHNEIDER:  My office will certify that these are

25    accurate.  These particular records here are entered into the computer

in the visiting units, whether it be Yaphank or Riverhead. We have no

reason for these in my office, per se, but I can gain access to these

through my computer in the record room and only Sheriff's personnel

would have access.

PVU CHIEF DEL RIO: But would you attest that

these are records kept in the normal course of business --

LT. SCHNEIDER: They are definitely records --

PVU CHIEF DEL RIO: -- by the Suffolk County

Sheriff's Department?

LT. SCHNEIDER: Yes, they are.

PVU CHIEF DEL RIO: And are they true and

accurate to the best of your knowledge?

LT. SCHNEIDER: Yes, sir.

PVU CHIEF DEL RIO: And it's the responsibility of

the Sheriff's Department to maintain these records; is that correct?

LT. SCHNEIDER: Yes.

PVU CHIEF DEL RIO: And you also indicated that

you keep videos as well?

LT. SCHNEIDER: Once again, our department will

keep those --

PVU CHIEF DEL RIO: But you're able to gather them

as a result of the subpoena?

LT. SCHNEIDER: If necessary, yes we can.

PVU CHIEF DEL RIO: You gathered --

LT. SCHNEIDER: Yes.

1              PVU CHIEF DEL RIO:  You were requested and you

2       did gather some video?

3              LT. SCHNEIDER:  That's correct.

4              PVU CHIEF DEL RIO:  I'm going to stop questioning

5       him on this so you can voir dire on this, and then we can do the video

6       separately.

7              MR. OBEDIN:  I have no voir dire on this.

8              PVU CHIEF DEL RIO:  Okay.  So I will request that

9       this be entered into evidence.

10             ALJ ROSS:  Okay.  This becomes People's 4.

11             Thank you.

12             PVU CHIEF DEL RIO:  Do you recognize that?

13             LT. SCHNEIDER:  Yes, sir.

14             PVU CHIEF DEL RIO:  And what do you recognize

15      that to be?

16             LT. SCHNEIDER:  This is a video that was requested

17      through a subpoena that we provided, once again, by whatever agency

18      is requesting it.

19             PVU CHIEF DEL RIO:  Did you provide that video?

20             LT. SCHNEIDER:  I provided it to the agency.  I didn't

21      burn the DVD.

22             PVU CHIEF DEL RIO:  I know you didn't.

23             LT. SCHNEIDER:  Our IT guy comes to our office and

24      burns this and I check it for accuracy to make sure it's exactly what's

25      been asked for.

1          PVU CHIEF DEL RIO:  He burns it by your request?

2          LT. SCHNEIDER:  Yes.

3          PVU CHIEF DEL RIO:  You made the request for

4     them to burn this particular DVD?

5          LT. SCHNEIDER:  Yes.

6          PVU CHIEF DEL RIO:  And these particular dates

7     were burned as a result of your request?

8          LT. SCHNEIDER:  That's correct.

9          PVU CHIEF DEL RIO:  And you made the request

10    based on the subpoena?

11          LT. SCHNEIDER:  That's correct.

12          PVU CHIEF DEL RIO:  And after it's burned, it's then

13    given to you?

14          LT. SCHNEIDER:  That's correct.

15          PVU CHIEF DEL RIO:  And then you view it?

16          LT. SCHNEIDER:  That's correct.

17          PVU CHIEF DEL RIO:  And view it for accuracy?

18          LT. SCHNEIDER:  Yes.  I just make sure that, once

19    again, that it's subpoena specific dates, times, what they want.  I make

20    sure that it's what's provided, for accuracy.

21          PVU CHIEF DEL RIO:  And you recognize that be to

22    be one of the DVDs that were requested?

23          LT. SCHNEIDER:  That's correct, I do.

24          PVU CHIEF DEL RIO:  And you -- at some point that

25    was given to you?

1      LT. SCHNEIDER: That's correct.

2      PVU CHIEF DEL RIO: And you certify that it's true

3      and accurate?

4      LT. SCHNEIDER: Yes. I looked at it myself,

5      personally.

6      PVU CHIEF DEL RIO: We'll have an opportunity to

7      look at it.

8      MR. OBEDIN: Can I just have a look at the disc?

9      Now, Lieutenant, there are some names written on

10     here, Warden, Frankie, and a corrections officer Pashkey?

11     LT. SCHNEIDER: Frankie, Warden, Pashkey, that's

12     correct,

13     MR. OBEDIN: Your name is nowhere on this; is that

14     correct?

15     LT. SCHNEIDER: That's correct.

16     MR. OBEDIN: And your initials are nowhere?

17     LT. SCHNEIDER: That's correct.

18     MR. OBEDIN: Okay. All right. I have no objection

19     to this.

20     Are you going to be playing that? I want to come

21     around.

22     PVU CHIEF DEL RIO: Yes, we are. It's just going to

23     take a moment to key it up. As soon as it comes up I'll let you know.

24     ALJ ROSS: Will you be putting that into evidence?

25     PVU CHIEF DEL RIO: Yes, after we view it. Right

1        now, I would ask that it be marked for identification.

2        ALJ ROSS: Okay. That would be People's 5 for

3        identification.

4        PVU CHIEF DEL RIO: Do you know what we're

5        looking at?

6        LT. SCHNEIDER: Yes.

7        PVU CHIEF DEL RIO: How do we know what date is

8        here?

9        It's up if you want to come over, well, not up yet. It's

10        not actually up. I'm not sure what I'm looking at.

11        PAROLEE: Are we on the record?

12        COURT REPORTER: Yes.

13        PVU CHIEF DEL RIO: What if I click on this?

14        LT. SCHNEIDER: If you click the screen --

15        PV CHIEF DEL RIO: All right. All right.

16        ALJ ROSS: For the record, now, would you please

17        identify what you're looking at?

18        MR. OBEDIN: We're not looking at anything right

19        now.

20        LT. SCHNEIDER: That was the visiting room of the

21        Yaphank correctional facility.

22        PVU CHIEF DEL RIO: I really don't know what

23        happened. I pressed the wrong button.

24        What is this?

25        LT. SCHNEIDER: You closed it. So if you hit "Start"

1      and go back to My Computer, you should be able to access is again.

2                    PVU CHIEF DEL RIO:  This right here?

3                    LT. SCHNEIDER:  Yes.

4                    PVU CHIEF DEL RIO:  Okay.  You know more than

5      me then.

6                    Okay.  Here we go now.  I'm not touching it again.  Is

7      that the area we want to look at?

8                    LT. SCHNEIDER:  That's the visiting room.

9      Depending on where the visit was, I'm not sure.

10                    PVU CHIEF DEL RIO:  Okay.  Is there any way of

11     making them all play at the same time?

12                    LT. SCHNEIDER:  You -- that would take a more

13     computer literate person than myself.  I'm not sure.

14                    PVU CHIEF DEL RIO:  Okay.  I'm okay with what I

15     know.  Look at that it's actually going -- they're working.  They're

16     actually moving, right?  Would you agree?

17                    LT. SCHNEIDER:  Yes.

18                    ALJ ROSS:  Mr. Ovalle, can you see this?

19                    PAROLEE:  I can see.

20                    MR. OBEDIN:  Can you stop it for one second,

21     please?  Can you pause it?

22                    PVU CHIEF DEL RIO:  Okay, here we go.  I didn't see

23     that.  I paused them all.

24                    MR. OBEDIN:  I'm going to object to this because

25     what Lieutenant has testified to so far and what was given to the Court

1    and what was already put into evidence was a subpoena covering

2    dates at end of December into January of 2018. This is time stamped

3    October 10th of 2017. We haven't heard anything regarding anything

4    from October 10th of 2017.

5                    PVU CHIEF DEL RIO: He's received a subpoena

6    covering the whole entire -- he's indicated he received --

7                    MR. OBEDIN: We haven't seen that.

8                    ALJ ROSS: Well, let's see what the subpoena that's in

9    evidence is for.

10                   PVU CHIEF DEL RIO: I didn't put a subpoena into

11   evidence.

12                   ALJ ROSS: The certification was for visits from

13   12/15/17 to 1/30/18.

14                   So objection sustained.

15                   LT. SCHNEIDER: Isn't there a second subpoena that

16   you should have?

17                   PVU CHIEF DEL RIO: Let me see what I have here.

18                   LT. SCHNEIDER: I believe I received two for

19   Mr. Ovalle.

20                   PVU CHIEF DEL RIO: Hold on. Maybe it's in here.

21   Here it goes.

22                   You recognize that letter?

23                   LT. SCHNEIDER: Yes. This is another certification

24   letter I signed on December 7, 2017.

25                   PVU CHIEF DEL RIO: And what period of time did

1    that cover?

2                    LT. SCHNEIDER:  Excuse me?

3                    PVU CHIEF DEL RIO:  What is the period of time did

4    that certification cover?

5                    LT. SCHNEIDER:  September 18th, 2017, to

6    December 5th, 2017.

7                    PVU CHIEF DEL RIO:  And did you prepare that

8    document?

9                    LT. SCHNEIDER:  This here?  Yes, I did.

10                   PVU CHIEF DEL RIO:  Did you prepare that

11   document in the normal course of business as an employee of the

12   County Sheriff's Department of Suffolk County?

13                   LT. SCHNEIDER:  Yes, I did.

14                   PVU CHIEF DEL RIO:  And does your name appear

15   on that document?

16                   LT. SCHNEIDER:  Yes, sir.

17                   PVU CHIEF DEL RIO:  And what caused you to

18   prepare that?

19                   LT. SCHNEIDER:  I received a subpoena requesting

20   the information that's on the certification.

21                   PVU CHIEF DEL RIO:  That's the only copy I have.

22                   MR. OBEDIN:  Okay.

23                   PVU CHIEF DEL RIO:  I don't know if you recall the

24   subpoena, it's been a while.

25                   LT. SCHNEIDER:  I receive 20 a week so I'd have to

1    review what you have.

2                    PVU CHIEF DEL RIO: Was is as a result of receiving

3    a subpoena that you prepared that certification?

4                    LT. SCHNEIDER: That is correct, yes.

5                    PVU CHIEF DEL RIO: I'm going to ask the Court to

6    take at least the certification into evidence. I don't think the subpoena

7    is necessary.

8                    MR. OBEDIN: I'm sorry, what's --

9                    ALJ ROSS: He's placing the subpoena into evidence.

10                   MR. OBEDIN: Okay.

11                   ALJ ROSS: You have no objection?

12                   MR. OBEDIN: No.

13                   ALJ ROSS: Okay.

14                   PVU CHIEF DEL RIO: And as a result --

15                   MR. OBEDIN: That's the earlier subpoena that we

16   were just --

17                   LT. SCHNEIDER: Yes.

18                   MR. OBEDIN: Okay.

19                   PVU CHIEF DEL RIO: I always have a problem

20   reading these things.

21                   I'm going to show you this document. Do you

22   recognize that document?

23                   LT. SCHNEIDER: Yes. It's an inmate visitor history

24   for Mr. Ovalle.

25                   PVU CHIEF DEL RIO: And does anyone else's

1    name -- who were the visitors?

2                    LT. SCHNEIDER:  Everyone and dates, or?

3                    PVU CHIEF DEL RIO:  Just --

4                    LT. SCHNEIDER:  Starting with 12/21, Sylvie Ovalle,

5    that same day was Robert Akre.

6                    PVU CHIEF DEL RIO:  How about in September?

7                    LT. SCHNEIDER:  September 29th, 2017, Robert

8    Akre; September 29th, 2017, Sylvie Ovalle.

9                    PVU CHIEF DEL RIO:  Can we concentrate just on

10   Robert Akre?

11                   LT. SCHNEIDER:  10/10/2017, Robert Akre.  I'm

12   sorry, so yeah, October 13, 2017, Robert Akre; October 20, 2017,

13   Robert Akre; October 25, 2017, Robert Akre.

14                   Continue?

15                   PVU CHIEF DEL RIO:  I think the Court can read the

16   rest.

17                   MR. OBEDIN:  If I may, Lieutenant, when this list

18   indicates on the same date --

19                   LT. SCHNEIDER:  That's correct.

20                   MR. OBEDIN:  -- Robert Akre and Sylvie Ovalle, for

21   instance, on 9/29/17.

22                   LT. SCHNEIDER:  Right.

23                   MR. OBEDIN:  Would that visit be taking place at the

24   same time or would that be multiple visits?

25                   LT. SCHNEIDER:  It could be the same time it could

1       be at different times. I can --

2               MR. OBEDIN: How we would we know that?

3               LT. SCHNEIDER: These records we looked at a short

4       while ago, the other subpoena. The time that person comes in --

5               MR. OBEDIN: Yes.

6               LT. SCHNEIDER: -- is on that. When they come in

7       they get their ID scanned. When I look Mr. Akre's identification -- if

8       you could show it to me, I could tell you the time and then I'll explain.

9       When I looked at the visitor logs, those individual logs.

10              PVU CHIEF DEL RIO: I have written ones that don't

11       reflect the other ones. Could you identify these?

12              LT. SCHNEIDER: Yeah, there's a -- if you look at the

13       other subpoenas -- the other records, I can show you.

14              PVU CHIEF DEL RIO: The Judge -- yeah, I have a

15       copy of that. This one here.

16              LT. SCHNEIDER: For instance, when Mr. Akre came

17       to visit Mr. Ovalle, they scanned in his driver's license -- Mr. Akre,

18       they scanned his driver's license in.

19              MR. OBEDIN: Right.

20              LT. SCHNEIDER: It was then put into in the

21       computer at 14:17. If we have the records that were subpoenaed for

22       this Ms. Sylvia Ovalle's visitor logs, you would also have an identical

23       minute there, within a minute or two of each other, probably they

24       came together for a visit.

25              MR. OBEDIN: Okay. So Lieutenant, what you're

1    reading from the is the second subpoena which deals with visits

2    beginning late December of '17 into early January of '18, correct?

3              LT. SCHNEIDER: Right.

4              MR. OBEDIN: What we're looking at here, in terms of

5    an inmate visitor history, is from September 29th of 2017 through

6    December 1st of 2017. So this history pre-dates the information you

7    have here?

8              LT. SCHNEIDER: That's correct. So for instance,

9    looking at what I have here, this form here --

10             MR. OBEDIN: Right.

11             LT. SCHNEIDER: -- there's no way of me knowing if

12   these two people came in at the exact same time. I could find out, we

13   have records for that, but just by looking at that this, no, I can't.

14             MR. OBEDIN: If it was a visit involving both of them

15   at the same time with Mr. Ovalle or whether they were separate visits;

16   is that right?

17             LT. SCHNEIDER: That's correct. I would have to

18   have other documents that my office would be able to provide.

19             MR. OBEDIN: Okay. And is it fair to say that in

20   every instance on this inmate visitor history between 9/29 of 2017 and

21   December 1st of 2017, every time a visit is indicated for Mr. Robert

22   Akre, there is a visit from Sylvie Ovalle at the same -- on the same

23   date?

24             LT. SCHNEIDER: On the same date.

25             Highly unlikely that every one of those would be a

1    different time, highly unlikely.

2              MR. OBEDIN: That they would be a different time?

3              LT. SCHNEIDER: Yeah.

4              MR. OBEDIN: Meaning that --

5              LT. SCHNEIDER: It would be the same session.

6              MR. OBEDIN: That Mr. Ovalle would be meeting

7    with them at the same time?

8              LT. SCHNEIDER: It would be highly probable they

9    were at the same session. There's no way of me knowing that without

10   further documenting -- seeing further documents on my computer. It

11   would be highly unlikely that they would have the same -- they would

12   have different visits, per se, so close. Put it this way, an inmate is

13   allowed, without looking at these dates, an inmate gets two visits a

14   week.

15             MR. OBEDIN: Right.

16             LT. SCHNEIDER: That's his two right there.

17             MR. OBEDIN: Right.

18             LT. SCHNEIDER: Okay? That would be it. They

19   wouldn't be able to come another time if they're not together. So if

20   during the same week, they're both there at the same date again, it's

21   only one visit they came at the same time.

22             MR. OBEDIN: Okay. So you can tell, based upon the

23   number of visits on here, that this was a visit with both Mr. Akre and

24   Mr. Ovalle's mother at the same time with Mr. Ovalle in all of these

25   instances.

1      LT. SCHNEIDER: It would be highly probable that

2  they came together.

3      MR. OBEDIN: Okay. Thank you.

4      LT. SCHNEIDER: They could split the session also,

5  so I don't know if they're sitting next to each other. Sylvie and Robert

6  can take half the visit, they could be sitting there next to each other.

7  There's no way of me knowing from that.

8      MR. OBEDIN: And just, how long -- is every visit the

9  same amount of time?

10      LT. SCHNEIDER: No. A lot of them are cut short for

11  various reasons. Sometimes a visitor will come in and say, "I only

12  have five minutes, I'm going to get out of here." Another person, it

13  would be a light visiting day, the officers, if they choose to, they can

14  let the inmates sit there longer.

15      MR. OBEDIN: Oh, they can. It's flexible?

16      LT. SCHNEIDER: Yeah, if there's nothing going on,

17  everything's quiet, everyone's obeying the rules.

18      MR. OBEDIN: Okay. So it's flexible, but you can't

19  tell, again, from the inmate visitor history list how long the visits

20  were?

21      LT. SCHNEIDER: Just by this? No, I can't.

22      MR. OBEDIN: Okay. Would you be able to tell by

23  this?

24      LT. SCHNEIDER: No.

25      MR. OBEDIN: Or does this only show the time in?

1          LT. SCHNEIDER: This is the time in. Then you'd

2    have to go -- there are other records.

3          MR. OBEDIN: Can you find out?

4          LT. SCHNEIDER: I mean, you can find out. It would

5    be a lot of homework. And I don't know if visiting is keeping the

6    records longer period of time, then a week, say, or two weeks.

7          PVU CHIEF DEL RIO: But the records do indicate, to

8    your knowledge, that visits took place between Mr. Ovalle and

9    Mr. Akre on these particular days?

10          LT. SCHNEIDER: There's no doubt in my mind that

11    they did have visits.

12          PVU CHIEF DEL RIO: And whether they were

13    together with his mother or not together, it does show that Mr. Akre

14    did visit Mr. Ovalle on those particular dates?

15          LT. SCHNEIDER: He definitely visited on those

16    dates, no doubt about it.

17          PVU CHIEF DEL RIO: I would ask that the Court

18    take the document — I don't have a copy. You want a copy?

19          MR. OBEDIN: Yeah, we can do that after the fact.

20          PVU CHIEF DEL RIO: Okay. I would ask the Court,

21    we enter something for identification?

22          ALJ ROSS: For identification?

23          PVU CHIEF DEL RIO: One was for identification.

24          ALJ ROSS: Yeah, that was for the other certification.

25          PVU CHIEF DEL RIO: All right. I'd like to enter --lis

1               this the Court's?  No, it's not.

2                     ALJ ROSS:  Okay.  This is the one that goes back to

3               October.

4                     PVU CHIEF DEL RIO:  That copy is September to

5               October.

6                     ALJ ROSS:  Those are the dates?

7                     PVU CHIEF DEL RIO:  Yeah, and then we'll go back

8               to the video.

9                     ALJ ROSS:  Okay.

10                    MR. OBEDIN:  Can I see that for one second?  Thank

11               you.

12                    LT. SCHNEIDER:  Just hit the arrow for it to start.

13                    PVU CHIEF DEL RIO:  Is there any way, to get it to

14               October 10th?

15                    LT. SCHNEIDER:  I would imagine.

16                    PVU CHIEF DEL RIO:  So how do we do that?

17                    LT. SCHNEIDER:  So you need 1400 hours, so you

18               need to fast-forward 30 minutes.

19                    PVU CHIEF DEL RIO:  Okay.  So we need to --

20                    LT. SCHNEIDER:  So you need to go to the next

21               frame.  I don't know what the intervals are on this computer.

22                    PVU CHIEF DEL RIO:  Well, can we do this?

23                    LT. SCHNEIDER:  You can try --

24                    ALJ ROSS:  And --

25                    MR. OBEDIN:  I'm sorry.

1    ALJ ROSS:  Can you identify for the stenographer?

2    PVU CHIEF DEL RIO:  Yeah.  I'll do that now.

3    Lieutenant, can you identify what we're looking at?

4    LT. SCHNEIDER:  Yes.  There are four frames on this

5    screen, three of them have a picture of the visiting area where both

6    inmates and their visitors will meet for the visit.

7    PVU CHIEF DEL RIO:  And this is the visiting area

8    for where?

9    LT. SCHNEIDER:  Excuse me?  The visiting area for

10   the Yaphank visiting facility.

11   PVU CHIEF DEL RIO:  Okay.  And that's this facility?

12   LT. SCHNEIDER:  Correct.  And the fourth frame is

13   just the reception area for the Yaphank facility.

14   PVU CHIEF DEL RIO:  And you're familiar with this

15   facility?

16   LT. SCHNEIDER:  Yes, sir.

17   PVU CHIEF DEL RIO:  And how are you familiar

18   with it?

19   LT. SCHNEIDER:  I've worked on and off in this

20   facility hundreds of time for overtime, for --

21   PVU CHIEF DEL RIO:  How long have you been

22   employed -- strike that.

23   You've been in this particular location numerous

24   times?

25   LT. SCHNEIDER:  I've been in this location as a

1      Sargent and as a Lieutenant.

2                              PVU CHIEF DEL RIO: And you recognize this

3      facility?

4                              LT. SCHNEIDER: No doubt about it, yes.

5                              PVU CHIEF DEL RIO: And you recognize it to be

6      what location?

7                              LT. SCHNEIDER: The visiting area of the Yaphank

8      facility.

9                              PVU CHIEF DEL RIO: Okay. Can we play it now?

10                             MR. OBEDIN: Sure. Did we get a cue to a particular

11     time?

12                             LT. SCHNEIDER: It's at 14:00, if you -- where's the

13     arrows?

14                             PVU CHIEF DEL RIO: It disappeared. I think it's

15     going to key up.

16                             MR. OBEDIN: What time are we at? We're up to 2

17     o'clock and 25 seconds right now and moving.

18                             PVU CHIEF DEL RIO: It looks like it's moving.

19                             MR. OBEDIN: And what time are we looking for?

20                             LT. SCHNEIDER: You're going to -- you'll be

21     watching this for 30 minutes if you're going the way are you now.

22                             PVU CHIEF DEL RIO: So what do I do?

23                             LT. SCHNEIDER: So try hitting that half if you could,

24     yeah. Now, if you could hit this little guy right over there, yeah, you

25     should be able to go forward. Try going down. It's not going? Try

1   hitting the half then, maybe.

2                      PVU CHIEF DEL RIO: I did that. I think this is the

3   speed.

4                      LT. SCHNEIDER: It should be forwarding right now.

5                      PVU CHIEF DEL RIO: Now we're at 14:30.

6                      MR. OBEDIN: 14:40, it's going by two second

7   intervals. I think it's going by, I don't know, 15 second intervals

8   maybe.

9                      PVU CHIEF DEL RIO: Let me try something.

10                     LT. SCHNEIDER: There's something else we could

11  try.

12                     PVU CHIEF DEL RIO: Two -- what?

13                     LT. SCHNEIDER: 1430. Is that what saying before?

14                     PVU CHIEF DEL RIO: 2:30.

15                     MR. OBEDIN: 2:30. So you still have 15 minutes to

16  go, you're at 2:14, 2:28, 2:29, 2:30 and one second, 2:30 and

17  11 seconds.

18                     PVU CHIEF DEL RIO: That right there. That cool?

19                     LT. SCHNEIDER: Works for me.

20                     PVU CHIEF DEL RIO: This is the visiting area, right?

21  Oh, it gets bigger. Are we playing yet? We're not playing.

22                     LT. SCHNEIDER: No, you have to hit it at the

23  bottom.

24                     MR. OBEDIN: We're at 2:30 and 53 seconds. It's

25  moving in five second intervals.

1                    PVU CHIEF DEL RIO: And the visitors are on this

2      side?

3                    LT. SCHNEIDER: Yes. You can tell by the way

4      they're dressed.

5                    PVU CHIEF DEL RIO: It looks like these guys on this

6      side are the inmates, and the visitors are over here.

7                    LT. SCHNEIDER: It's different angles.

8                    ALJ ROSS: You're going to have to explain what

9      you're looking at because it's going to come out terrible.

10                    PVU CHIEF DEL RIO: Oh, I'm sorry.

11                    We're looking at the visiting area. The visits have

12      already commenced, it looks like it's 2:33.

13                    MR. OBEDIN: Just to be clear, when you say the

14      visits have commenced, you're speaking in general terms --

15                    PVU CHIEF DEL RIO: Generally, yeah.

16                    MR. OBEDIN: -- not with regard to Mr. Ovalle.

17                    PVU CHIEF DEL RIO: Right. There are inmates and

18      civilians at this point. At one point there was nobody there.

19                    ALJ ROSS: And how is the visiting room set up?

20                    LT. SCHNEIDER: In what aspect?

21                    ALJ ROSS: In terms of where the inmates would be

22      and where the visitors would be.

23                    LT. SCHNEIDER: Every inmate is assigned a

24      position. Every -- all these, as you can tell here, you can't really see a

25      number, but every stool here is numbered.

 1                              ALJ ROSS: Okay.

 2                              LT. SCHNEIDER: When they walk in for their visit,

 3      an inmate is told, you'll be a number ten, you'll be a number nine.

 4      Sometimes their visitors will be there waiting for them already

 5      because, obviously, they're assigned the same post except on the other

 6      side of the table.

 7                              ALJ ROSS: Okay.

 8                              LT. SCHNEIDER: That's where they keep a

 9      clipboard. I don't know how long they keep those. It's more just for

10      just having a nice organized visiting session, as opposed to long-term

11      record keeping.

12                              MR. OBEDIN: Let me ask you one question in regard

13      to that.

14                              LT. SCHNEIDER: Okay.

15                              MR. OBEDIN: When an inmate receives a card, or

16      whatever, saying to go to the seat number --

17                              LT. SCHNEIDER: There's no card, he's just told.

18                              MR. OBEDIN: Oh, he's told, Go to seat number nine.

19                              LT. SCHNEIDER: Right.

20                              MR. OBEDIN: Is he told who the visitor is or just to

21      go to that seat --

22                              LT. SCHNEIDER: No, it's --

23                              MR. OBEDIN: -- as a visit?

24                              LT. SCHNEIDER: It's really not necessary because 99

25      percent of the time I would say, they know who their visitor is going

1    to be.

2                        PVU CHIEF DEL RIO: How is that?

3                        LT. SCHNEIDER: They're made by appointments.

4                        PVU CHIEF DEL RIO: How does that work?

5                        LT. SCHNEIDER: The person -- like, an inmate's

6    family member will call up a number at the visiting unit, I'd like to

7    visit so-and-so on so-and-so date. There's a schedule by their last

8    name on when they can go and get an appointment for their visit.

9                        PVU CHIEF DEL RIO: And is the inmate notified?

10                       LT. SCHNEIDER: No, it's really not necessary. More

11   often than not they're just hoping that they get a visit. They're on the

12   phone all week planning, hey, when can you come up and see me?

13                       MR. OBEDIN: Right. But that's general terms. You

14   don't know, specifically on this date, who was visiting?

15                       LT. SCHNEIDER: No. But if they don't want to visit

16   with you, when they walk in, a lot of times an inmate will walk into a

17   visiting room, see who the visitor is and say, "No, I don't want to

18   waste my visit on this person, I want to wait for another person." And

19   they're escorted out.

20                       MR. OBEDIN: Lieutenant, all I was asking was, when

21   an inmate is called down to visiting and he's told to go to a certain

22   seat number --

23                       LT. SCHNEIDER: Right.

24                       MR. OBEDIN: -- is he also told, go to that seat

25   number, you're being visited by so-and-so? Yes or no.

1          LT. SCHNEIDER: I wouldn't know, I'm not in

2     visiting. I would say probably, sometimes they would ask who's here

3     to visit me. I would say most of the time an inmate will already know

4     whose visiting, they already know. I'm just --

5          MR. OBEDIN: I'm asking you, I guess, what the

6     procedure is in the visiting area. You're here as the person from the

7     Department identifying visiting and talking about visiting. I'm asking

8     you a simple question, let me just --

9          LT. SCHNEIDER: I'm answering --

10          MR. OBEDIN: I'm asking you a yes or no question.

11     The question is, when an inmate comes down to visiting and a

12     member of the Sheriff's department says to that inmate, go to seat

13     number X, whatever the seat is, is the inmate given further

14     information who the visit is from or is he just told to go to a seat?

15     Yes or no?

16          LT. SCHNEIDER: It's not a yes or no answer.

17          MR. OBEDIN: All right.

18          LT. SCHNEIDER: If they want the information, they

19     can ask for it and they'll get the information. If they know who the

20     visitor is, they're not going to ask who their visitor is. And number

21     two, you want me to answer a question about a conversation that I'm

22     not around.

23          MR. OBEDIN: I'm asking what the general policy

24     from the Sheriff's Department regarding --

25          LT. SCHNEIDER: A policy on a conversation?

1    There's no policy on what conversation an officer would have an with
2    an inmate.
3                    PVU CHIEF DEL RIO:  Okay.  Is it your statement
4    that an inmate -- let's say an inmate is told to sit in Seat 10.  He
5    doesn't know who's visiting him and he shows up to Seat 10.  And he
6    sees a person across there that he rather not have a visit with, he could
7    turn around and walk away?
8                    LT. SCHNEIDER:  Yes, he's free to leave, yes.
9                    PVU CHIEF DEL RIO:  So he can reject the visit?
10                   LT. SCHNEIDER:  Yes, he can.
11                   PVU CHIEF DEL RIO:  No matter who it is?
12                   LT. SCHNEIDER:  No matter who it is.
13                   PVU CHIEF DEL RIO:  Under whatever the
14   circumstance is, you don't ask them why they don't want the visit, he
15   just doesn't want it.
16                   LT. SCHNEIDER:  No.
17                   MR. OBEDIN:  What is if that visit is taking place
18   during the count, can that inmate walk away and go back up to his
19   cell?
20                   LT. SCHNEIDER:  No, not during a count.  But if
21   they're done, they'll have you sit in a spot inside the visiting unit.
22   They'll have them sit away from the visitor and we'll tell the visitor he
23   does not want to visit with you, and we'll escort them out.
24                   MR. OBEDIN:  And do you know what time the count
25   is?

1           LT. SCHNEIDER: There's four counts.

2           MR. OBEDIN: Do you know, on October 10th, 2017,

3      whether there was a count at 2:30 in the afternoon?

4           LT. SCHNEIDER: I can guarantee there was a lock-in

5      at 2:30 for the security count, and then there was an official count

6      approximately 15 or 20 minutes later.

7           MR. OBEDIN: Okay. So this -- what we're looking at

8      right now, beginning at 2:33 and zero seconds, there is a lockdown

9      going on, a security lockdown?

10          LT. SCHNEIDER: That's correct.

11          MR. OBEDIN: Okay. Thank you.

12          PVU CHIEF DEL RIO: Is it necessary to look -- can

13     we just, like, have this and see the whole area?

14          LT. SCHNEIDER: You may be able to hit -- hold on,

15     let me see if there's a panel.

16          PVU CHIEF DEL RIO: I think I can just hit this and it

17     will open up.

18          LT. SCHNEIDER: Okay. Try it.

19          PVU CHIEF DEL RIO: Is this the entire visiting area?

20          LT. SCHNEIDER: Except for some hidden spots you

21     have over here.

22          PVU CHIEF DEL RIO: That will show up over here?

23          LT. SCHNEIDER: They will. There's three frames.

24          PVU CHIEF DEL RIO: Now I know what we're

25     doing. These will open whichever ones you want, right? Like, if I

1  want this one, I can click on that and it will open. Come on. Okay! I

2  wish I know how to work this.

3                 LT. SCHNEIDER: That's why I have my IT guy

4  sitting next to my when I have to work it.

5                 PVU CHIEF DEL RIO: Okay. I think we got to go

6  down here. Here we go.

7                 LT. SCHNEIDER: This will tell you how many

8  frames, 1, 9, 16, so if you hit 1 —

9                 PVU CHIEF DEL RIO: Then I'll just get one.

10                LT. SCHNEIDER: Right.

11                PVU CHIEF DEL RIO: Okay. Probably better if I'm

12 actually seeing this prior to today. Let me move this closer. I'm

13 blind.

14                And we don't know where he was sitting on this on this

15 particular day?

16                LT. SCHNEIDER: I wouldn't know.

17                PVU CHIEF DEL RIO: Okay. If the -- so we have to

18 find it. That's moving too fast for me.

19                You have cameras on this side?

20                LT. SCHNEIDER: They would be in the ceiling. So

21 you'll get it at most angles.

22                PVU CHIEF DEL RIO: Bear with me, I'm trying to

23 figure this out as we go along. Can I ask for Ericksen to come in? He

24 did this before so he must know what he's doing.

25                Are you calling Ericksen as a witness?

1              MR. OBEDIN: No.

2              PVU CHIEF DEL RIO: I'm going to ask for the Parole

3    Specialist Ericksen to come in. He did the prelim so he should know.

4              MR. OBEDIN: You're going to ask him to do what, to

5    run the tape?

6              PVU CHIEF DEL RIO: To run it up to the part where

7    he knows.

8              PAROLEE: I object.

9              MR. OBEDIN: I mean, he's not testifying to anything.

10   He's running the computer?

11             PVU CHIEF DEL RIO: Yeah, that's right.

12             PAROLEE: I don't want him in during the

13   proceedings.

14             MR. OBEDIN: Well, if he's a potential witness he

15   shouldn't come in, but you're not calling him.

16             PVU CHIEF DEL RIO: Correct. I'm not calling him.

17             PAROLEE: It was Officer Mencarelli who ran the

18   video..

19             MR. OBEDIN: Yeah, I believe that's correct, actually.

20   I believe it was Officer Mencarelli who ran the disc.

21             ALJ ROSS: Okay. When you find what you're

22   looking for, let me know.

23             MR. OBEDIN: It was Officer Mencarelli who did the

24   video at the prelim, Mr. Ericksen just --

25             ALJ ROSS: Okay.

1             THE COURT REPORTER: I was the reporter on the

2    preliminary hearing and I do remember Officer Mencarelli running

3    the video.

4             MR. OBEDIN: You remember that?

5             THE COURT REPORTER: Yes.

6             PVU CHIEF DEL RIO: Yes, Judge. Let's do it this

7    way, I think it will be easier this way. I'm going to ask for Ericksen to

8    come in. I guess he looked it at it on the day of the preliminary.

9             MR. OBEDIN: We all did. The Judge, myself, and

10    Ericksen, but nobody touched it.

11             PVU CHIEF DEL RIO: I'm going to ask --

12             ALJ ROSS: He's not a witness?

13             MR. OBEDIN: Yeah.

14             PVU CHIEF DEL RIO: We can call him as one.

15             ALJ ROSS: You can certainly do that now.

16             PVU CHIEF DEL RIO: So I'm going to do that.

17             ALJ ROSS: Why don't you find out if he knows how

18    to do this because I don't want to waste another hour while you try

19    and figure this out.

20             PVU CHIEF DEL RIO: Okay. He would be able to

21    identify Akre and Ovalle.

22             MR. OBEDIN: Well, I would object to him coming in.

23    Anyone can identify him.

24             ALJ ROSS: And I don't think Ericksen can do that,

25    right? Ericksen didn't play with the computer?

 1                    (Whereupon, a brief recess was taken.)

 2                    PVU CHIEF DEL RIO:  Well, I have nothing further

 3          for the Lieutenant, he's identified the DVD and the visiting area.

 4                    MR. OBEDIN:  No, I understand.  I have some

 5          questions but I'll wait for Mr. Ovalle.

 6                    ALJ ROSS:  Okay.

 7                    (Whereupon, a brief recess was taken.)

 8                    Did you want to identify what's on there or have

 9          Mr. Obedin question the Lieutenant?

10                    PVU CHIEF DEL RIO:  Well, we were able to key up

11          the visit in the visiting area which was identified by the Lieutenant as

12          being the visiting area at the Suffolk County Jail, in which Mr. Ovalle

13          was at on October 10, 2017.  He's identified the video, he's identified

14          the video as being one that he created in the normal course of

15          business, he's attesting to the truthfulness and the accuracy based on

16          his certification, which we provided to the Court, and his observation

17          of the video.  So I have no further questions at this time.

18                    ALJ ROSS:  Okay.  Thank you.

19                    Mr. Obedin?

20                    MR. OBEDIN:  Thank you, Your Honor.

21                    Lieutenant Schneider, you had indicated that you are

22          the supervisor of the records room; is that correct?

23                    LT. SCHNEIDER:  That's correct.

24                    MR. OBEDIN:  And you indicated that the records

25          room keeps, I think basically your wording was, any legal paperwork

1      that has to do with an inmate --

2                LT. SCHNEIDER: That's correct.

3                MR. OBEDIN: -- while they're in the Suffolk County

4      Correctional Facility?

5                LT. SCHNEIDER: And also after they're discharged,

6      also.

7                MR. OBEDIN: And after their discharged?

8                LT. SCHNEIDER: Yes.

9                MR. OBEDIN: Would that include any parole

10     paperwork if the person is a parole violator, if that's why they're being

11     held?

12                LT. SCHNEIDER: All the parole warrants would be at

13     our office, yes.

14                MR. OBEDIN: All the parole paperwork. Okay.

15                LT. SCHNEIDER: When I say parole paperwork, I

16     mean warrants, the individual warrants, the individual -- what's the

17     word -- the probation warrant, we'll have that in our records.

18                MR. OBEDIN: Okay. So not -- not the individual's

19     conditions --

20                LT. SCHNEIDER: That's correct.

21                MR. OBEDIN: -- of parole release?

22                LT. SCHNEIDER: No, I wouldn't have access to that.

23                MR. OBEDIN: None of that paperwork, okay.

24                Are you aware, at any time during Mr. Ovalle's

25     incarceration, and we're speaking approximately September 23rd of

1     2017 through present day, did anyone from the department of parole

2     ever contact the jail to prohibit or ask the jail to prohibit Mr. Akre

3     from visiting Mr. Ovalle?

4          LT. SCHNEIDER: Not to my knowledge.

5          MR. OBEDIN: Okay. Are you aware -- you've been

6     with the Suffolk County Sheriff's Office for a long time, Lieutenant,

7     working in the jail. Are you aware of any circumstance under which

8     parole has ever asked the jail to prohibit a civilian from visiting an

9     inmate?

10          LT. SCHNEIDER: I'm not aware of it, no.

11          MR. OBEDIN: Okay.

12          LT. SCHNEIDER: Just to be clear, though, I've only

13     been in my present position since November. So before that, as a

14     Duty Lieutenant, that would be information that the department

15     wouldn't make privy to me for any particular reason.

16          MR. OBEDIN: Since you've taken this capacity in

17     November --

18          LT. SCHNEIDER: No.

19          MR. OBEDIN: -- 2017?

20          LT. SCHNEIDER: Not to my knowledge.

21          MR. OBEDIN: Okay. Just one final question. Are

22     you aware, or have you ever been aware, of parole submitting any

23     conditions to the jail, specific conditions, under which an inmate must

24     abide, parole conditions, as opposed to the jail conditions?

25          LT. SCHNEIDER: If it ever happened, I'm not aware

1          of it.

2                              MR. OBEDIN: Okay. Thank you.

3                              All right. I have nothing further for the Lieutenant.

4                              LT. SCHNEIDER: We're good?

5                              ALJ ROSS: Thank you.

6                              LT. SCHNEIDER: Thank you.

7                              PVU CHIEF DEL RIO: Just have a seat here, Officer.

8                              ALJ ROSS: Good afternoon, could you state your

9          name for the record?

10                             SPO HNIS: Senior Parole Officer Scott Hnis.

11                             ALJ ROSS: And your badge number?

12                             SPO HNIS: 397.

13                             ALJ ROSS: And would you raise your right hand to be

14         sworn in.

15                             (Whereupon, Senior Parole Officer Hnis was sworn in

16         by ALJ Ross.)

17                             ALJ ROSS: Thank you.

18                             You may proceed, Mr. Del Rio.

19                             PVU CHIEF DEL RIO: Officer, by whom are you

20         employed?

21                             SPO HNIS: New York State Department of

22         Corrections.

23                             PVU CHIEF DEL RIO: And do you know one Warren

24         Ovalle?

25                             SPO HNIS: I do.

1           PVU CHIEF DEL RIO:  Do you see him in the

2  courtroom?

3           SPO HNIS:  I do.

4           PVU CHIEF DEL RIO:  Could you identify him?

5           SPO HNIS:  He's at the end of the table to your right.

6           PVU CHIEF DEL RIO:  Let the record reflect he's

7  identified Mr. Ovalle.

8           Do you know one Robert Akre?

9           SPO HNIS:  I do.

10           PVU CHIEF DEL RIO:  And how do you know

11  Mr. Akre?

12           SPO HNIS:  PO Samples supervised him for well over

13  a year, year and a half.

14           PVU CHIEF DEL RIO:  And during the time that PO

15  Samples supervised him, Mr. Akre, what was your position?

16           SPO HNIS:  Repeat that?

17           PVU CHIEF DEL RIO:  What was your interaction,

18  with regards to Mr. Akre?

19           SPO HNIS:  I would see him during office reports.  I

20  also did make a home visit. I guess it was maybe three months after

21  his release.

22           PVU CHIEF DEL RIO:  And would you recognize

23  Mr. Akre if he were here in the courtroom?

24           SPO HNIS:  Definitely.

25           PVU CHIEF DEL RIO:  And I'm going to draw your

1          attention to the screen.

2                    Could you identify the parties on the screen?

3                    SPO HNIS: Yes.

4                    PVU CHIEF DEL RIO: And who can you identify?

5                    SPO HNIS: Robert Akre is to the left and Warren

6          Ovalle is to the right.

7                    PVU CHIEF DEL RIO: And as you sit here you're

8          absolutely sure Mr. Akre is to the right?

9                    SPO HNIS: Yes.

10                    PVU CHIEF DEL RIO: I have no further questions.

11                    ALJ ROSS: Mr. Obedin?

12                    MR. OBEDIN: Officer Hnis, did you ever supervise

13         Robert Akre?

14                    SPO HNIS: He was supervised by Parole Officer Judy

15         and Parole Officer Judy was a parole officer that I was supervising.

16                    MR. OBEDIN: Okay. But did you ever supervise --

17         , directly supervise Mr. Akre?

18                    SPO HNIS: No.

19                    MR. OBEDIN: Okay. Nothing further.

20                    PVU CHIEF DEL RIO: I have nothing further, Your

21         Honor.

22                    ALJ ROSS: Nothing? Thank you.

23                    SPO HNIS: Thank you.

24                    PVU CHIEF DEL RIO: The Department rests, Your

25         Honor.

1           ALJ ROSS: Okay.

2           MR. OBEDIN: Your Honor, I'm going to -- Officer

3 Hamlette needs to be here. And the parole office hasn't stated any

4 valid reason for her not being here. There's some vague reference to

5 her being out on medical leave, but it was indicated that she is still a

6 member of the Department of Parole, she was Mr. Ovalle's direct

7 supervisor during this timeframe of these violations, and there's been

8 no explanation as to why she has not responded to a subpoena that

9 was served upon her in this instance.

10          ALJ ROSS: Do you have a response?

11          PVU CHIEF DEL RIO: Your Honor, I'm surprised as

12 well. However, it's my understanding of when an individual is on

13 medical leave or extended medical leave that they are not on duty,

14 they're not considered on duty. And this is the reason why we would

15 have to subpoena that individual. Attempts were made to subpoena

16 her and call her and ask her to be present before this court. She has

17 not responded.

18          We are not aware of whether she's in the hospital right

19 now or maybe she's out of the country or merely just not answering

20 her door. We made a good faith effort to bring her here before the

21 Court. We didn't subpoena her this morning, we subpoenaed her

22 numerous days ago. We made numerous calls to her house, we called

23 her state phone, we called her cell phone, we called her home phone,

24 and she's not responded.

25          At this point, I think the Department should do a

1    wellness visit to see, you know, what her medical condition is.

2    However, as the Court is well aware, when an employee is on

3    extended medical leave or is on a leave of absence, there is no criteria

4    or mandate for that individual to be brought, either before the Court or

5    to -- or to the office against her medical requirements, other than

6    providing a subpoena and asking that individual to come before the

7    Court.

8              Now, we have made a good faith effort -- I mean, we'll

9    continue to do so if the Court wishes to adjourn the case. I believe

10   that she's -- I agree with the defense counsel that she would be a vital

11   witness to the Court to provide any kind of information in regards to

12   whether she modified or gave any different instruction. However, the

13   senior parole officer had indicated to the Court that he was

14   supervising the parole officer during that period and at no time did he

15   authorize, at no time did she request any modification. As a matter of

16   fact, in preparing the parole violation to the Court and against

17   Mr. Ovalle, Ms. Hamlette was the one that drew up the charges

18   charging him with having contact with Mr. Robert Akre against her

19   direction and against her conditions.

20             So I don't think that the parole officer would come in

21   here and contradict anything that she's already put on before the Court

22   with regards -- in reference to a parole violation and the charges. So

23   it's highly unlikely that she would come before the Court and say that,

24   in fact, she gave her permission to have this contact and yet charge

25   him with having the contact.

1    MR. OBEDIN: Well, Your Honor, while Mr. Del Rio

2    might be right that it's in his opinion may not be likely, it's my

3    experience and probably the Court's experience, that many times

4    witnesses will say or do one thing and then contradict themselves

5    when on the record.

6             She is the most vital of all the witnesses here because

7    she was the actual parole officer supervising Mr. Ovalle during the

8    timeframe in question. Officer Evans preceded that time, Supervising

9    Officer Judy had no direct contact with Mr. Ovalle, nor was he

10   present at any of the meetings between Officer Hamlette and

11   Mr. Ovalle. And parole has not given any good reason as to why

12   Officer Hamlette is not here. We don't know that she's out of the

13   country, we don't know that she's unavailable because she's in the

14   hospital. What we do know is that she was subpoenaed, has not

15   responded to multiple attempts to contact her, and is still on the

16   payroll. She's an employee of parole.

17            ALJ ROSS: All right. I believe under the McGee case

18   there has to be good cause shown why a witness who should be here

19   and is vital to the prosecution does not attend the hearing. Because in

20   all cases, the parolee has the right to cross-examine that witness and

21   anything she would have to say. However, the reality is that parole

22   must use due diligence in order to bring a witness in. In this case, the

23   fact that the witness is subpoenaed, that Mr. Juste went to that house

24   to serve a subpoena, that she did not respond at all, that he left several

25   phone messages, I would believe, is due diligence in this case. And

1    the other part is, she's not the only witness here. There were -- Parole

2    Officer Juste came in, he supervised her. They apparently did this

3    violation of parole report together, he was aware of the case.

4                    So at this point, I believe that they have shown good

5    cause why she's not here maybe as an employer, not as much, but I

6    believe that PO Juste did.

7                    MR. OBEDIN: Your Honor, you'll note my objection,

8    please --

9                    ALJ ROSS: Yes.

10                   MR. OBEDIN: -- for the record?

11                   And given that fact and the fact that I'm not going to

12   have the opportunity to cross-examine Officer Hamlette, I'd ask that I

13   be allowed to recall Officer Evans to ask her a few questions which I

14   would have perhaps asked of Officer Hamlette. I don't think there's

15   any harm in it, she's still here.

16                   PVU CHIEF DEL RIO: I have no objection.

17                   ALJ ROSS: Okay. We'll bring her in.

18                   MR. OBEDIN: Thank you.

19                   ALJ ROSS: You're still under oath, Ms. Evans.

20                   PO EVANS: Yes.

21                   ALJ ROSS: Okay.

22                   Go ahead, Mr. Obedin.

23                   MR. OBEDIN: Thank you, Your Honor.

24                   Officer Evans, I just have a few other questions for

25   you.

1          You still supervise parolees even though you don't

2     supervise Mr. Ovalle; is that correct?

3          PO EVANS:  Yes.

4          MR. OBEDIN:  And you supervised or are now

5     supervising parolees who are currently incarcerated for a violation, I

6     assume?

7          PO EVANS:  Yes.

8          MR. OBEDIN:  So in your experience, you have

9     people who are out in community supervision who you supervise, and

10    you also have parolees who have been alleged -- who have violated

11    and so are in custody?

12         PO EVANS:  You're correct.

13         MR. OBEDIN:  Okay.  When -- let's go to Mr. Ovalle,

14    for instance, when you were supervising him he was out of custody,

15    correct?

16         PO EVANS:  Right.

17         MR. OBEDIN:  You had conditions with him where he

18    would have to do office visits; is that fair to say?

19         PO EVANS:  Yes.

20         MR. OBEDIN:  He would have to come see you?

21         PO EVANS:  Yes.

22         MR. OBEDIN:  Do you recall how often that was?

23    Was it weekly, or.

24         PO EVANS:  Mr. Ovalle -- Mr. Ovalle, I believe, came

25    to me --

1        MR. OBEDIN: I'm not going to hold you to this.

2        PO EVANS: Yeah, because --

3        MR. OBEDIN: Do you think it was weekly or once

4    every two weeks, or?

5        PO EVANS: In the beginning I think it was weekly,

6    then it went to once every two weeks.

7        MR. OBEDIN: Okay.

8        PO EVANS: Yeah.

9        MR. OBEDIN: Okay. And when someone you're

10   supervising is in custody for a violation, obviously they're not out in

11   the community, so you're not doing community supervision of them,

12   correct?

13       PO EVANS: Right.

14       MR. OBEDIN: Do you still maintain that visiting

15   schedule? Will you come and visit the parolee who is in custody to

16   do a visit with them?

17       PO EVANS: No, but they're still on my caseload.

18       MR. OBEDIN: I understand they're on your caseload,

19   but you're not following the same provisions that you follow when the

20   person is out of custody, correct?

21       PO EVANS: Right, correct.

22       MR. OBEDIN: When the person is out of custody you

23   tell him, he has to report to you --

24       PO EVANS: Yeah.

25       MR. OBEDIN: -- for an actual face-to-face, like,

1    across a desk, however many times a week or a month that is, correct?

2                    PO EVANS: Correct.

3                    MR. OBEDIN: And again, just to be clear, when that

4    individual is incarcerated, you don't go and visit them just to continue

5    to maintain that meeting?

6                    PO EVANS: No.

7                    MR. OBEDIN: If it's once every two weeks you don't

8    go once every two weeks to meet with the individual?

9                    PO EVANS: No.

10                   MR. OBEDIN: Okay. So you would say that it's fair

11   to say that that's a specific condition related to when someone is out

12   of custody, not under violation?

13                   PO EVANS: That I visit them?

14                   MR. OBEDIN: That they have to visit you.

15                   PO EVANS: Okay. So the question you're asking is

16   that when a person is incarcerated, do they come visit me? No.

17                   MR. OBEDIN: And the other way around, do you go

18   visit them?

19                   PO EVANS: No, but they're still under my

20   supervision.

21                   MR. OBEDIN: So on your caseload?

22                   PO EVANS: And under my supervision.

23                   MR. OBEDIN: Okay. When you say under your

24   supervision, you're not visiting them while they're in the jail?

25                   PO EVANS: No.

1          MR. OBEDIN: Are you receiving any type of weekly

2     report from the facility that they're in, as to whether they are

3     maintaining your conditions of parole release? For an example,

4     curfew, are you receiving a report as to whether or not they're

5     violating their curfew when they're incarcerated?

6          PO EVANS: Well, I would do that, not them. And

7     yes, they still -- I still maintain that they're in until they come out into

8     the community. So yes, I still do -- no, I don't physically go to the

9     jail, they don't physically come to me, but they're still under my

10    supervision.

11         MR. OBEDIN: So based on the fact that they're still

12    under supervision, are they still under the conditions -- all the

13    conditions of parole supervision?

14         PO EVANS: Most definitely. Most definitely.

15         MR. OBEDIN: So they still have to maintain their

16    curfew, correct?

17         PO EVANS: Well they still have to maintain any

18    special conditions that are -- so curfew, no, because obviously he's

19    inside, so he wouldn't maintain curfew --

20         MR. OBEDIN: Okay.

21         PO EVANS: -- however, he would still maintain those

22    special conditions that are implemented.

23         MR. OBEDIN: And is that written anywhere? Do you

24    go over that with him where it's written that it says, even if you're

25    violated and you're incarcerated you still must maintain the special

1          conditions of parole?

2                    PO EVANS: Well, when I first review the conditions

3          with him when we first sit down, I make sure that it's clear that you're

4          under my supervision whether you are incarcerated or not

5          incarcerated until your maximum expiration date. I do explain that.

6                    MR. OBEDIN: Okay.

7                    PO EVANS: These conditions, if you have the

8          conditions sheet, they are until you max out, which is --

9                    MR. OBEDIN: No, I understand that. I understand.

10                    PO EVANS: Oh, okay.

11                    MR. OBEDIN: I want you to listen to my question.

12                    PO EVANS: Okay.

13                    MR. OBEDIN: Because curfew is a condition that's

14          one of his conditions until you change it or he maxes out.

15                    PO EVANS: Right.

16                    MR. OBEDIN: But when he's incarcerated, he's not

17          under that condition of --

18                    PO EVANS: Right.

19                    MR. OBEDIN: -- parole supervision?

20                    PO EVANS: Because he's not out, right.

21                    MR. OBEDIN: So what I'm asking you is, in this

22          instance there's a special condition. The special condition is that he's

23          not to associate with Robert Akre, correct?

24                    PO EVANS: Right.

25                    MR. OBEDIN: By the way, may I ask you what the

1      reason for that special condition was?

2                    PO EVANS:  Because Robert Akro was the

3      co-defendant on this crime that he's on parole for.

4                    MR. OBEDIN:  Okay.  And that's the whole reason for

5      the condition?  Because he's not allowed to -- he's not allowed to meet

6      with or be with the co-defendant of a crime?  Is that the reason for the

7      condition?

8                    PO EVANS:  Correct.

9                    MR. OBEDIN:  Simply because he's a co-defendant?

10                    PO EVANS:  Well because he's on parole supervision,

11     and you're not supposed, you know, you're not supppsed to be

12     consorting with disreputable places or people.

13                    MR. OBEDIN:  Right.

14                    PO EVANS:  So I want to keep him safe and out of

15     trouble.

16                    MR. OBEDIN:  Okay.  So that's the reason for the

17     condition?

18                    PO EVANS:  Yes.

19                    MR. OBEDIN:  Okay.  But when he's incarcerated,

20     he's only with disreputable people who are charged with crimes or

21     have comitted crimes, isn't that correct?

22                    PO EVANS:  Okay, but --

23                    MR. OBEDIN:  Isn't that correct?

24                    PO EVANS:  Not by choice.  He has to be there.

25                    MR. OBEDIN:  That's correct, not by choice.  But he's

1      in. And he's -- so your rationale for having the special condition to

2      make sure that he stays out of trouble and that he's not around

3      disreputable people and he's not around a co-defendant who has

4      committed a crime as well. That's also not relevant while he's

5      incarcerated --

6                     PO EVANS: No, it --

7                     MR. OBEDIN: Because it plays right in with the fact

8      that he's living 24/7 with these people.

9                     PO EVANS: Can I say something? When you're in

10     jail you have no choice if you're around disreputable people.

11                    ALJ ROSS: Stop testifying.

12                    PO EVANS: However, if someone comes to that jail

13     and you know that they are a disreputable person or co-defendant, you

14     have the right to say, no, I don't want to see them, especially if you

15     know that's part of your special conditions. So Mr. Akre was not an

16     inmate in the jail, he came to the jail to visit Mr. Ovalle --

17                    MR. OBEDIN: Right.

18                    PO EVANS: -- which was in direct violation of a

19     special condition that I imposed.

20                    MR. OBEDIN: Okay.

21                    PO EVANS: That's all I'm saying.

22                    MR. OBEDIN: Okay. So based on what you're

23     saying, if Mr. Akre had been arrested for something and was in the

24     jail with Mr. Ovalle and they were speaking, seeing each other in the

25     jail, that would not be a violation of his special conditions; is that

1  correct?

2              PO EVANS: I have no control over what they do

3  when a person is incarcerated. It's when -- Mr. Akre was not

4  incarcerated, he came to the jail.

5              MR. OBEDIN: Okay.

6              PO EVANS: I can only go off of what I see. I can't go

7  off of what if, what if. I don't know that. That's not the case.

8              MR. OBEDIN: Well, this is a simple yes or no

9  question though.

10              If Mr. Akre were incarcerated with Mr. Ovalle at the

11  same time and they were seen together and there was no camera in a

12  jail, that would not be a violation

13              PVU CHIEF DEL RIO: I'll concede to that.

14              PO EVANS: Yeah. I mean, that has nothing to do

15  with --

16              PVU CHIEF DEL RIO: That would not be a violation.

17              PO EVANS: Okay.

18              MR. OBEDIN: Well I was just looking for a simple

19  yes or no answer.

20              PVU CHIEF DEL RIO: I know what he's doing.

21              PO EVANS: Oh, okay.

22              MR. OBEDIN: So with regard to the special

23  conditions, I know you indicated that you went through them very

24  carefully with Mr. Ovalle when he signed them.

25              PO EVANS: Okay.

1              MR. OBEDIN:  Did you explain to him at the time

2       what the basis for that special condition was, that you wanted to be

3       sure that he didn't -- that he wasn't around disreputable people?  That

4       you wanted to make sure while he's under your supervision that he did

5       everything right, didn't get back into trouble, everything like that?

6              PO EVANS:  While Mr. Ovalle was under my

7       supervision, I made sure that every condition was explained to him

8       under my -- my goal was for him to re-integrate back into

9       society --

10             Mr. OBEDIN:  Right.

11             PO EVANS:  -- fully, and be able to complete parole.

12      I was not that type of officer --

13             MR. OBEDIN:  Right.

14             PO EVANS:  -- that tried to get him in trouble.  We

15      had a very good rapport.

16             MR. OBEDIN:  Officer --

17             PO EVANS:  A very good rapport.

18             MR. OBEDIN:  -- I just want to say, I'm not trying to

19      make you out to be anything --

20             PO EVANS:  Right.

21             MR. OBEDIN:  -- and I'm not speaking aggressively.

22      I'm just asking a question.

23             PO EVANS:  Okay.

24             MR. OBEDIN:  So just try to listen to my question --

25             PO EVANS:  Okay.

1    MR. OBEDIN: -- so that we can move on. When -- at

2    the time that the special condition about Mr. Akre was read to him

3    and explained to him and he signed it, did you explain what the

4    reason for that special condition was?

5    PO EVANS: Yes.

6    MR. OBEDIN: And was the explanation what you've

7    told in here already today?

8    PO EVANS: Yes, Because I did not want him

9    consorting with anyone who was in connection with the crime while

10    they were on supervision. I did not want him consorting with anyone

11    that could possibly get him into any type of trouble or, you know --

12    MR. OBEDIN: Right. Okay. Okay.

13    And do you have Mr. Ovalle sign anything, or do you

14    have anything in writing, or did you tell him that if he's violated and

15    he's incarcerated that he is still required to follow all conditions of his

16    parole supervision including the special conditions?

17    PO EVANS: No.

18    MR. OBEDIN: Okay. Thank you.

19    I have nothing further, Judge.

20    PVU CHIEF DEL RIO: I'd like to re-direct.

21    ALJ ROSS: You can go ahead.

22    PVU CHIEF DEL RIO: The special condition related

23    specifically to Mr. Akre, why did you specifically put Mr. Akre?

24    PO EVANS: Because --

25    MR. OBEDIN: Judge, that was asked and answered. I

1    object now.

2            ALJ ROSS: When was that? I don't remember that

3    being asked and answered.

4            MR. OBEDIN: I asked it and the officer answered.

5            PVU CHIEF DEL RIO: What happened was, he

6    answered it but he stood on consorting with every person inside the

7    facility who has a criminal record. In this particular case --

8            MR. OBEDIN: Okay. I'll withdraw my objection.

9            PVU CHIEF DEL RIO: This is different --

10           ALJ ROSS: Okay. You can answer the question.

11           PVU CHIEF DEL RIO: Let me ask you a question --

12           ALJ ROSS: Well, do you want her to answer the first

13    one?

14           PVU CHIEF DEL RIO: She already answered it.

15           PO EVANS: I didn't answer it, because he's a

16    co-defendant.

17           PVU CHIEF DEL RIO: Now, along the same lines as

18    defense counsel, is it possible for a number of inmates -- not inmates,

19    a number of parolees to participate and take place at a group

20    counseling at a drug treatment facility?

21           PO EVANS: Most definitely.

22           PVU CHIEF DEL RIO: Is it possible for a number of

23    individuals under parole supervision to actually take place --

24    participate in a group activity even within the parole building?

25           PO EVANS: Most definitely.

1           PVU CHIEF DEL RIO:  And is it possible for group

2   counseling to exist, say like Fortune Society, where maybe five people

3   under parole supervision are participating?

4           PO EVANS:  Most definitely.

5           PVU CHIEF DEL RIO:  However, those five people

6   who are participating in the Fortune Society group counseling, if they

7   were arrested at 1 o'clock in the morning, would that be okay?

8           PO EVANS:  No.

9           PVU CHIEF DEL RIO:  Let me ask you another

10  question.  If an individual under your supervision, who you've

11  violated, and you've violated a number of people?

12          PO EVANS:  Most definitely.

13          PVU CHIEF DEL RIO:  And you probably have a

14  number of people who are currently in the parole violation process.

15          If any of those individuals are arrested for any criminal

16  activity within the correctional facility, would you receive a hit

17  notice?

18          PO EVANS:  Within the correctional facility?

19          PVU CHIEF DEL RIO:  Yes.

20          PO EVANS:  Yes.

21          PVU CHIEF DEL RIO:  Would you receive

22  notification that they were arrested?

23          PO EVANS:  Yes.

24          PVU CHIEF DEL RIO:  Would you receive

25  notification of the behavior that took place within the facility?

1           PO EVANS:  Yes.

2           PVU CHIEF DEL RIO:  And would you prepare a

3     parole violation as a result of that behavior being reported?

4           PO EVANS:  Yes.

5           PVU CHIEF DEL RIO:  No further questions.

6           MR. OBEDIN:  And Officer Evans, not committing a

7     new crime is clearly a condition of parole, correct?

8           PO EVANS:  Yes, correct.

9           MR. OBEDIN:  And that's a standard condition that

10    comes from upstate with the individual or parolee, right?

11          PO EVANS:  Yes.

12          MR. OBEDIN:  That's never a special condition.  You

13    don't have to write in, and by the way you also can't commit any new

14    crimes.

15          PO EVANS:  Right.

16          MR. OBEDIN:  So when Mr. Del Rio asks if someone

17    within a facility commits a new crime, that, of course, is a violation of

18    their parole supervision and a violation of a standard condition of

19    their parole supervision.

20          PO EVANS:  Yes.

21          MR. OBEDIN:  No parolee is on parole supervision

22    within the state and doesn't have that standard condition of parole that

23    they can't be, you know, can't commit a new crime; correct?

24          PO EVANS:  Right.

25          MR. OBEDIN:  Okay.  And the three examples that

1        Mr. Del Rio stated about parolees being together, whether it's some

2        type of drug rehabilitation or community center or whatever the case

3        may be, those are all -- those three examples all deal with parolees

4        who are out of custody and on community supervision, correct?

5               PO EVANS: They can be inside of the jail or out.

6               MR. OBEDIN: They could be doing drug treatment

7        within the jail?

8               PO EVANS: Some of them do drug treatment within

9        the jail.

10               MR. OBEDIN: But obviously they're always together

11        in the jail, it's not a special situation?

12               PO EVANS: Right.

13               MR. OBEDIN: Okay. I have nothing further.

14               ALJ ROSS: Thank you.

15        Do you have anything further?

16               PVU CHIEF DEL RIO: Yes, just one more question,

17        just for arguments sake.

18               MR. OBEDIN: Well, I'm going to object for

19        arguments sake, what's the reason?

20               PVU CHIEF DEL RIO: Not for arguments sake.

21        Along the lines of defense counsel's question.

22               I just want to show the defense counsel the certificate

23        of release to supervision with Mr. Ovalle's name on it. Would you

24        agree?

25               MR. OBEDIN: No, I would not. I don't see

1    Mr. Ovalle's name -- oh, I see his name typed at the top if that's what

2    you're asking me. Okay.

3            PVU CHIEF DEL RIO: And would you agree that it

4    says Certificate of Release, post-release supervision and all that?

5            MR. OBEDIN: I'm not sure why I'm answering

6    questions.

7            ALJ ROSS: Right. What's your point? He should

8    have received a copy of that when Mr. Ovalle violated.

9            PVU CHIEF DEL RIO: He did get a copy. I'm going

10   to show you this document. Are you familiar with that document?

11           PO EVANS: Mm-hm.

12           PVU CHIEF DEL RIO: Could you identify that?

13           PO EVANS: Yes.

14           PVU CHIEF DEL RIO: What is it?

15           PO EVANS: Certificate of release to post-release

16   supervision.

17           PVU CHIEF DEL RIO: And I'd like to draw your

18   attention to Rule No. 7 of the conditions of release.

19           PO EVANS: Would you like me to read it?

20           PVU CHIEF DEL RIO: Yes, if you don't mind.

21           MR. OBEDIN: I'd like to see it first?

22           I object to the relevance of this, Judge. I don't know

23   where Mr. Del Rio is going.

24           PVU CHIEF DEL RIO: It's along the lines of defense

25   counsel question. He questioned the parole officer regarding special

1    conditions of release, one of which is Rule No. 8 and that is to not

2    commit a new crime.

3         ALJ ROSS:  Correct.

4         PVU CHIEF DEL RIO:  Secondly, Number 7 is not to

5    fraternize with anyone he knows to have a criminal record.  Now, we

6    understand that the parole officer of the Department cannot control

7    the number of inmates incarcerated in the jail.

8         ALJ ROSS:  Save that for your summation.

9         PVU CHIEF DEL RIO:  However, fraternizing and

10   accepting visits with someone who has an option not to, is a violation

11   of Rule No. 7, is a direct violation of Rule No. 7.  So a special

12   condition may not be imposed, however, this parole officer imposed a

13   special condition, specifically to his co-defendant.

14        ALJ ROSS:  Okay.

15        PVU CHIEF DEL RIO:  If there's no objection, I'd like

16   the Court to take a copy of the Certificate of Release.

17        ALJ ROSS:  It's already in evidence, came in in the

18   beginning.

19        PVU CHIEF DEL RIO:  I have nothing further.

20        MR. OBEDIN:  Nothing further.

21        ALJ ROSS:  Thank you again.

22        You rested, Mr. Del Rio?

23        PVU CHIEF DEL RIO:  I rested a long time ago.  It

24   was defense counsel who called Ms. Evans.

25        ALJ ROSS:  Are you putting on anything else?

1      MR. OBEDIN:  No, no witness.

2      Mr. Ovalle is asking if he can read a statement into the

3   record.

4      ALJ ROSS:  In regard to what?

5      PAROLEE:  To my parole.

6      ALJ ROSS:  No.  If you want something read in, it's up

7   to Mr. Obedin to do that, Mr. Ovalle.

8      MR. OBEDIN:  May I have a moment, Judge?

9      ALJ ROSS:  Yes.

10      (Whereupon, a brief recess was taken.)

11      MR. OBEDIN:  All right.

12      No, we're not calling any witnesses, Judge.

13      ALJ ROSS:  Any motions or anything?

14      MR. OBEDIN:  Your Honor, I'm just going to renew

15   again my objection to proceeding without Officer Hamlette.  I think

16   that in this instance, while, yes, she is one of a number of witnesses,

17   she is the truly essential witness.  She's the officer who purportedly

18   wrote up the violations.  She is the officer who was supervising

19   Mr. Ovalle during this period of violation and she's the only one who

20   hasn't testified here.  And Supervising Officer Judy's testimony --

21   Juste's, excuse me -- Juste's testimony, does not rise to the level that

22   would be necessary in a situation where we're dealing with an

23   individual's liberty.  He was not -- and he indicated quite specifically

24   that he was not present for any of the meetings between Mr. Ovalle

25   and Officer Hamlette at the time she took over as his parole officer.

1          And again, I would just state that I think that it's

2     essential that we either have Officer Hamlette or we have a real

3     reason, a valid reason why she's not present.

4          ALJ ROSS:  Well, I've already ruled on that.  And I'll

5     say the valid reason is basically that parole could not find her.

6          MR. OBEDIN:  But she's still an employee of parole;

7     is that correct?  She's still on the payroll?

8          PVU CHIEF DEL RIO:  Yes, she's on the payroll;

9     however, she's on extended leave, on sick leave.  And we can't compel

10    people to come in, other than by subpoena.

11          ALJ ROSS:  Which was tried.

12          PVU CHIEF DEL RIO:  And we did make numerous

13    efforts to get her here.

14          MR. OBEDIN:  And I'll just state, just finally, that we

15    haven't received anything from parole, neither a letter, nothing

16    indicating what the -- why she's on leave.  We didn't know anything,

17    other than an employee of parole that is essential to this case is

18    refusing to respond to a subpoena and we don't know why.

19          ALJ ROSS:  Have you ever heard of HIPAA?

20          MR. OBEDIN:  Yes, of course I've heard of HIPAA.

21          ALJ ROSS:  That's your answer.

22          PVU CHIEF DEL RIO:  It's not the practice of the

23    Department to question anybody's medical issues with regard to --

24          MR. OBEDIN:  I'm not asking for her medical

25    condition.

1      ALJ ROSS:  Did you want to make a summation,

2  Mr. Obedin?

3      MR. OBEDIN:  Well, we would go in whatever order

4  the Judge asked us to go in.  Yes, I would.

5      Your Honor, what we have seen here is an allegation

6  of a violation of a special condition of supervised release.  We have a

7  video of a jail visit between Mr. Ovalle, who was incarcerated, and

8  Mr. Akre, a co-defendant no longer on parole supervision who came

9  to visit him.

10      Officer Evans stated quite clearly for the record what

11  her reason for having that special condition imposed upon Mr. Ovalle

12  was, and she stated quite clearly that it was to make sure that while he

13  was released to the community, he didn't have any speed bumps or be

14  with anybody who could potentially derail him from adequately

15  integrating, re-integrating, back into society, which is, quite clearly,

16  her job.  I mean, that's exactly what she should be doing, trying to get

17  people on parole re-integrated positively into society.  But what

18  happened here, what occurred here was not out in the community, it

19  was in -- while Mr. Ovalle was incarcerated.  And we know that

20  Mr. Ovalle doesn't set up visits while he's incarcerated.  Mr. Ovalle

21  doesn't have control of that circumstance, people on the outside set up

22  those visits.  As far as we're aware, no one from parole, even though

23  it's quite clear that they knew that these visits were taking place, no

24  one from parole contacted the jail, attempted to stop these visits,

25  which I suppose they could have done.

1     So what we see on October --

2     ALJ ROSS: 14th?

3     PVU CHIEF DEL RIO: October 10th? The video?

4     MR. OBEDIN: October 10th, yes, it was October

5     10th, is a visit that Mr. Ovalle is called down to attend. Again, there's

6     no testimony that he knows who he's going to be seeing. He goes, he

7     sits down, and what we did hear from Lieutenant Schneider, this is

8     during a security lockdown and he can't just get up and leave and go

9     back up to his jail cell, much in the same manner that he can't control

10    fraternizing with other felons while he's in a facility; much in the

11    same way that he can't control curfew while he is within the facility,

12    he can't control visits while he's in the facility, and he certainly can't

13    control his own movement in the facility if he's told that it's a

14    lockdown and he has to stay put.

15    Even if the Court were to find that this is a violation, I

16    would argue that it was not a violation that rises to the level making it

17    serious enough to warrant an incarceratory period. Mr. Ovalle has

18    been in custody since September 23rd. I don't think that it is

19    coincidental that parole waited until a writ was entered by a supreme

20    court justice dismissing a prior warrant and a prior violation against

21    Mr. Ovalle before then turning around and filing this new violation

22    which post-dates back to late September when Mr. Ovalle had been

23    sitting for two-and-a-half months already. They could have

24    supplemented that violation at any time. And now, here we are, six

25    months later, Mr. Ovalle has be sitting incarcerated all this time, and

1    the violation that comes before Your Honor is a jail visit, something

2    that is beyond his control.

3              I argued at the preliminary hearing, and I'll argue,

4    again, I'm the one who raised it.  Clearly, if this had been a new arrest,

5    if he had been charged with committing a new crime while

6    incarcerated, an assault or whatever, there would be no argument here

7    because that's a standard condition of parole and that is within

8    Mr. Ovalle's control.  He can't commit new crimes.  This is not a new

9    crime.  This is having a visit, and a controlled visit within a facility

10   where no contraband can be passed.  Nothing -- we saw two men

11   sitting, no papers, nothing could be written down, no paperwork could

12   be passed.  None of the safeguards that a parole officer might be

13   concerned with while an individual is out on community release, in

14   terms of fraternizing or not fraternizing with an individual are in play

15   in a controlled setting such as this.

16             So I would ask, Your Honor, first of all, to find that

17   there is no violation.  And if Your Honor finds there is any violation,

18   that it doesn't rise to the seriousness that would be necessary.

19   Additionally, and again, we don't have Officer Hamlette here, but I

20   believe that there is a directive from State of New York Department

21   of Corrections and Community Supervision saying that any time a

22   parole -- a parolee transfers parole officers, the receiving officer will

23   also review all special conditions currently in place with the releasee.

24   We don't know that that took place.  We know that Officer Evans, by

25   her testimony, reviewed the conditions and had Mr. Ovalle sign them

1 and acknowledge them. We have no idea whether Officer Hamlette

2 did that. We certainly have nothing signed from Officer Hamlette as

3 far as special conditions with Mr. Ovalle. And again, unfortunately,

4 we don't have Officer Hamlette here, but that should not enure to the

5 disadvantage to Mr. Ovalle. That's not Mr. Ovalle's fault that Officer

6 Hamlette is not available. And certainly Supervising Officer Juste

7 didn't provide any paperwork of that kind, nor would I expect that he

8 would have that. But we don't know, without Officer Hamlette,

9 whether that directive was followed.

10      So for all of those reasons, Judge, I would ask to find

11 in favor of Mr. Ovalle.

12      ALJ ROSS: Okay.

13      MR. OBEDIN: Yes. And I'm sorry, one final thing,

14 that's correct. And Officer Evans testified, I asked her point-blank

15 whether she actually reviewed the fact with Mr. Ovalle that he still

16 had to follow all his conditions of parole release while incarcerated,

17 and she specifically reviewed that fact with him, and she said no. So

18 for that reason as well.

19      ALJ ROSS: Mr. Del Rio?

20      PVU CHIEF DEL RIO: Your Honor, I believe that the

21 Department has substantiated the charges before the Court that on the

22 day specifically stated on the parole violation that Mr. Ovalle did have

23 contact with his co-defendant, Mr. Robert Akre.

24      Mr. Ovalle knows that Mr. Akre was his co-defendant.

25 Parole Officer Evans gave him a special condition specific to Robert

1       Akre. There's no need to give special conditions to not fraternize with

2       other individuals known to have a criminal record because that's, as

3       the defense counsel stated, standard conditions of parole. So

4       Mr. Akre was Mr. Ovalle's co-defendant and an individual who has a

5       criminal record who Mr. Ovalle knew has a criminal record, because

6       the convictions were both of them together committing a crime and

7       they were both under parole supervision.

8               Fraternizing is a standard condition of release and

9       fraternizing is against the rules and regulation. Defense counsel

10      would have the Court believe that the entire parole violation is the

11      subject of a special condition; however, the Court, after reviewing the

12      charges, will also note that there are also numerous Rule 7 parole

13      violations, which is fraternizing, which does not need a special

14      condition, with individuals that are -- who have criminal records and

15      that the parolee has a knowledge of that. Now, I submit to the Court

16      that this parolee had knowledge that Mr. Akre had a criminal record.

17              With regards to Mr. Ovalle's responsibilities to avoid

18      Mr. Akre, the Lieutenant had indicated to the Court that Mr. Ovalle

19      had every right to refuse the visit and that even if there was a count

20      going on and there was no movement, that if Mr. Ovalle refused the

21      visit he would be isolated and placed in a separate cell, a holding area,

22      so that he doesn't have to participate in that visit. That other people

23      who are other inmates also come down and don't want to lose a visit

24      by visiting with someone who they were not intending to be visited

25      by, refuse it in order not to lose a visit.

1      Now, I submit to the Court that Mr. Ovalle has a

2      responsibility to say no when Mr. Akre visits him because he knows

3      he should not be engaged in visits with Mr. Akre in any way, shape,

4      or form.

5      And I'll submit to the Court as well, Mr. Akre's license,

6      which was submitted into evidence, which was identified and further

7      taken, has also Mr. Ovalle's address on it, in which, Mr. Akre was a

8      resident in his own home and they even lived in the same residence.

9      MR. OBEDIN: Well, that I object to that. That was

10     not part of this violation. And just the fact that --

11     ALJ ROSS: That objection is sustained.

12     PVU CHIEF DEL RIO: This is not an accidental

13     occurrence that they ran into each other. That they ran info each other

14     at the drug treatment, or that they saw each other accidentally in the

15     lobby of the parole building. We don't violate individuals for having

16     contact with other parolees in our offices or having contact with other

17     parolees in other drug treatment programs. However, outside of --

18     outside in the community, where it is not a controlled environment, as

19     defense counsel said, we expect that the parolees act in a way not to

20     engage in contact with individuals that they know have criminal

21     records.

22     In this particular environment, in the correctional

23     facility, it is controlled environment; however, Mr. Ovalle has some

24     measure of responsibility controlling who comes to visit him. And

25     one of them is Mr. Akre, whose visit he have should have been

1    refusing simply because he was his co-defendant. Sure, that Mr.

2    Ovalle can't control his curfew while he's incarcerated, he can't

3    control that he's around other inmates, but he can control who visits

4    him when they visit him, and if they visit him. And Mr. Ovalle

5    accepted numerous contacts and visits from his co-defendant,

6    Mr. Akre.

7         So I submit to the Court that this is a violation in an

8    important respect. It's continued behavior on the part of Mr. Ovalle to

9    continue to have contact with Mr. Robert Akre, despite being told not

10   to have contact, specifically with Mr. Akre. And I submit to the Court

11   that the charges should be sustained and Mr. Ovalle held.

12        ALJ ROSS: Okay. I am going to --

13        PVU CHIEF DEL RIO: And our recommendation is

14   that Mr. Ovalle be held to his maximum expiration. He takes

15   absolutely no responsibility for his behaviors, nor his actions.

16        ALJ ROSS: Okay. I'm going to reserve decision.

17   You'll get it in the mail.

18        Thank you all very much.

19        PVU CHIEF DEL RIO: Thank you.

20        MR. OBEDIN: Thank you, Judge.

21        (Whereupon, this proceeding was concluded.)

22

23

24

25

1

2              C E R T I F I C A T E

3

4         I, Sara Galante, Court Reporter and Notary Public, in and for

5    the State of New York, do hereby certify that I attended the foregoing

6    proceedings, took stenographic notes of the same, and that the

7    foregoing, consisting of 110 pages, is a true and accurate copy of

8    same and whole thereof.

9

10    Dated: March 1, 2018

11

12                                    *Sara Galante*

13                                    Sara Galante

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 11

CMSCHRON* * *  NEW YORK STATE - DOCCS   DATE: 12/03/2018
       COMMUNITY SUPERVISION    PAGE: 6
       PAROLEE CHRONO REPORT
    FROM 01/01/1999 THRU 12/03/2018

NAME: OVALLE,WARREN A       AREA:
NYSID: 09347560J        SPO NAME:
DIN: 10R0095         PO NAME:

DATE  TIME  TYPE       ACTIVITY   LOCATION

ENTERED BY: JUSTE,GARRY
AREA: SUFFOLK  SPO NAME: SPO,UNK SHAW  PO NAME: ERICKSEN,JOHN
12/07/2017 04:15PM OTHER VISIT W/PAROLEE  LAW ENFORCEMENT
WRITER SERVED MR. OVALLE WITH A COPY OF THE AMENDED VOP CHARGES AND THE NOTICE
THAT HIS PRELIMINARY HEARING SCHEDULED FOR 12/11/17 AT 9:30AM HAS BEEN CHANGED
TO 12/13/17 AT 9:30AM AT SCJ. SUBJECT REFUSED TO SIGN BUT ACCEPTED THE
DOCUMENTS. SGT. MARK SMITH WITNESSED THE SERVICE.
SPO REVIEW: 12/11/2017

ENTERED BY: HAMLETTE,SABRINA
AREA: SUFFOLK  SPO NAME: SPO,UNK SHAW  PO NAME: ERICKSEN,JOHN
REPORT TAKEN BY: HAMLETTE,SABRINA
12/07/2017 12:29PM OTHER WORK
AMENDED VOP RESUBMITTED
SPO REVIEW: 03/01/2018

ENTERED BY: HAMLETTE,SABRINA
AREA: SUFFOLK  SPO NAME: SPO,UNK SHAW  PO NAME: ERICKSEN,JOHN
REPORT TAKEN BY: HAMLETTE,SABRINA
12/06/2017 10:00AM CASE CONFERENCE
PO CASE CONFERENCED WITH SPO JUSTE AND BC JENKINS THAT PO HAD RECEIVED A
CALL FROM A LEGISLATURE/ MR. TROTTA  REGARDING P. PO WAS DIRECTED NOT TO
CALL MR. TROTTA BACK AND DIRECTED TO PROVIDE HIM WITH THE ASSISTANT
COMMISSIONER  CHARLES KELLY CONTACT #
SPO REVIEW: 12/08/2017

ENTERED BY:



ENTERED BY: THOMAS,KIRSTEN M
AREA: SUFFOLK  SPO NAME: SPO,UNK SHAW  PO NAME: ERICKSEN,JOHN
REPORT TAKEN BY: THOMAS,KIRSTEN
12/04/2017 04:10PM LETTER TO OTHER
PO PRESENTED 2 SUBPOENAS FOR DEPUTY WARDEN AND ALL RECORDS TO APPEAR AT PRELIM
SCHEDULED FOR 12/11/17 TO RECORD ROOM AT SUFFOLK COUNTY JAIL/RIVERHEAD. GIVEN T
O SGT BRADY.
SPO REVIEW: 03/01/2018

ENTERED BY: THOMAS,KIRSTEN M
AREA: SUFFOLK  SPO NAME: SPO,UNK SHAW  PO NAME: ERICKSEN,JOHN
REPORT TAKEN BY: THOMAS,KIRSTEN
12/04/2017 03:30PM TELEPHONE TO OTHER
PO CONTACTED DEPUTY WARDEN HENNESSEY. HE TOLD PO THAT HE WAS EXPECTING SUBPOENA
S. HE ASKED THAT PO BRING THEM TO THE RECORD ROOM.
SPO REVIEW: 02/28/2018

# EXHIBIT 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SULLIVAN
----------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,              **WRIT OF HABEAS CORPUS**
ex rel., WARREN A. OVALLE,
                                                  **ORDER**
                          Petitioner,
                                                  INDEX #1833-2019
          -against-

LYNN LILLEY, SUPERINTENDENT of Woodbourne
Correctional Facility,

                          Respondent.
----------------------------------------------------------X

*A Writ of Habeus Corpus*

1. ~~The legality of the revocation of parole resulting from Parole Warrant #762686 having been argued before this Court on October 2, 2019; and~~ *Violation of Parole*

2. This Court having found that the charges against Warren Ovalle ~~have not been established by a preponderance of the evidence,~~ *were brought in bad faith and were an abuse of discretion,* now.

It is hereby ORDERED, that charges set forth in Parole Warrant #762686 are dismissed; that the revocation of parole be lifted, and that Warren Ovalle be ~~immediately~~ released and restored to Community Supervision *within 10 days.*

Dated: October 2, 2019
       Monticello, New York

                                        The Hon. Stephan G. Schick, J.S.C.

RECEIVED
OFFICE OF COURT CLERK
2019 OCT -2 PM 81:28

**EXHIBIT 13**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SULLIVAN

THE PEOPLE OF THE STATE OF NEW YORK, ex rel.,
WARREN A. OVALLE,

                    Petitioner,

     -against-                    Index No. 1813-2019

LYNN LILLEY, SUPERINTENDENT of Woodbourne
Correctional Facility,

                    Respondent.

ORDER TO SHOW CAUSE

                         Lawrence H. Cooke
                         Sullivan County Courthouse
                         Monticello, New York 12701
                         October 2, 2019

B E F O R E:

                         HONORABLE STEPHAN G. SCHICK,
                         Justice of the Supreme Court.

APPEARANCES:

                         LAW OFFICE OF DANIELLE COYSH, P.L.L.C.
                         Attorney for Petitioner
                         320 Carleton Avenue, Suite 2000
                         Central Islip, New York 11722
                         BY:  DANIELLE COYSH, ESQ.

                         LETITIA JAMES, ATTORNEY GENERAL
                         OFFICE OF THE ATTORNEY GENERAL
                         Attorneys for Respondent
                         One Civic Center Plaza, Suite 401
                         Poughkeepsie, New York 12601-3157
                         BY:  VINITA KAMATH, ESQ.

                         WARREN A. OVALLE, in Person.

                              Georgette H. Sayers, RMR,
                              Senior Court Reporter.

1    THE COURT: This is the People of the State

2    of New York, ex rel., Warren A. Ovalle -- is that

3    pronounced correctly?

4    MR. OVALLE: Yes, sir.

5    THE COURT: -- against Lynn Lilley, the

6    Superintendent of Woodbourne Correctional Facility, and

7    are there other defendants that I'm -- is it just

8    against Mr. Lilley?

9    MS. COYSH: It's against Lynn Lilley, Judge,

10   because he is presently --

11   THE COURT: All right. So can the attorneys

12   put their appearance on the record, please.

13   MS. COYSH: Judge, my appearance for the

14   record on behalf of Mr. Ovalle is Danielle Coysh, 320

15   Carleton Avenue, Suite 2000, in Central Islip.

16   THE COURT: New York.

17   MS. COYSH: New York.

18   MS. KAMATH: Vinita Kamath, Assistant

19   Attorney General for the State of New York, on behalf

20   of Lynn Lilley, Superintendent of the Woodbourne

21   Correctional Facility.

22   THE COURT: All right. And the record should

23   reflect that Mr. Ovalle is here in court.

24   And -- all right. So Miss Coysh, you brought

25   this writ seeking the immediate release of Mr. Ovalle

because, under your view, Parole has wrongfully
incarcerated him on a violation of parole, is that
correct?

MS. COYSH:  That is correct.  It's our
position that he's being unlawfully detained based upon
his parole revocation.

THE COURT:  And Miss Kamath, it appears to me
the parole revocation is based solely on the allegation
that while he was incarcerated in the Suffolk County
Jail, a prior co-defendant from ten years earlier from
the originating case ten years earlier visited him at
the jail and that that was a violation of a special
condition of parole not to associate with that
co-defendant?

MS. KAMATH:  Your Honor, there were other
charges that were brought against Mr. Ovalle, but --

THE COURT:  Those charges, the other charges
were dismissed by a supreme court justice in Suffolk
County, that's my understanding, the other charges.

MS. KAMATH:  Under the new warrant there were
116 charges and approximately 40 were upheld by the
hearing officer at the final hearing in March of 2018.

MS. COYSH:  All visits, Judge -- what's
before the judge is simply visits in the Suffolk County
Jail.  Any other allegation of anything had been

1    dismissed by Judge Santorelli in a writ of habeas

2    corpus.

3              THE COURT:  What's disturbing to this Court

4    is that it appears from the records that were presented

5    here, it appears there was a proceeding brought before

6    the Suffolk County Supreme Court Judge Genarelli.

7              MS. COYSH:  Judge Santorelli, Judge, a writ

8    of habeas corpus.

9              THE COURT:  And after due consideration, he

10   dismissed the case.  He dismissed the violation of

11   parole and before the paperwork could be done to

12   release Mr. Ovalle --

13             MR. OVALLE:  Ovalle, sir.

14             THE COURT:  Ovalle, I'm sorry, Ovalle.   --

15   they presented these new petitions for these jailhouse

16   visits, and it appears to be in an effort to -- to

17   overrule Justice Santorelli.  Certainly looks that way

18   on the face of it.  And it appears from the record that

19   is before me that this co-defendant had been visiting

20   Mr. Ovalle at the Suffolk County Jail on a regular

21   basis and that -- is there an issue as to whether they

22   advised Mr. Ovalle that that couldn't occur?

23             MS. KAMATH:  Your Honor, they did advise

24   Mr. Ovalle through the supplementary --

25             THE COURT:  Yeah, but they never visited him

1    at the jail.  They just charged him.  They never -- the
2    position of the State seems to be that even though he
3    was incarcerated in the Suffolk County Jail, he was
4    still on parole supervision, but they never visited
5    him.  They never visited him, they never visited his
6    home, they didn't do anything, and then only after
7    Judge Santorelli had -- had dismissed the violations of
8    parole and ordered him to be released, then they
9    brought these charges saying that he'd been visiting --
10   he'd been visiting this co-defendant when he was called
11   down to the visiting room when the co-defendant went to
12   the jail to visit him.

13            And isn't it true, Miss Kamath, that had he
14   been incarcerated in state prison at Woodbourne
15   Correctional Facility where he's currently serving,
16   there would be no problem with him receiving visits
17   from the co-defendant there?

18            MS. KAMATH:  That's actually not accurate,
19   Your Honor.  I've checked with the department, and
20   they've clarified that.  A felon cannot visit an inmate
21   at Woodbourne Correctional Facility.

22            THE COURT:  Do we know if the co-defendant is
23   a felon?

24            MS. KAMATH:  Based on the assault, I believe
25   so.

1    THE COURT: I don't know, was he convicted of

2    that also? He's a co-defendant, but apparently he's

3    not on parole or not in prison.

4    MS. KAMATH: But I believe he was also

5    convicted in this assault, and I can clarify that with

6    the department, if you'd like.

7    THE COURT: Well, every time somebody visits

8    somebody at Woodbourne Correctional Facility, do they

9    run a check to see if --

10    MS. KAMATH: Yes. Yes, that's my

11    understanding, yes. And, Your Honor, just to clarify

12    the time, so there was this supplementary release

13    report, violation release report that predated the

14    decision of Judge Santorelli. So in other words,

15    petitioner was on notice of the conditions being

16    violated through these visits prior to Judge

17    Santorelli's decision.

18    THE COURT: Is that true, Miss Coysh?

19    MS. COYSH: No, Judge. Let me -- if I can

20    explain. In fact, I was involved with Mr. Ovalle's

21    case at that time as well. I had no notice of this

22    whatsoever. We learned later through a FOIL request

23    that there are journal entries, I'll call them,

24    indicating that there was visits with Mr. Akre and

25    Mr. Ovalle. Judge, nobody from Parole, nobody from

anywhere ever told Mr. Ovalle you can't have these
visits even after they learned of them.  In fact,
there's testimony from a lieutenant at the jail that
the jail wasn't even notified of any -- that there's
not supposed to be a visit.  And --

THE COURT:  Miss Kamath, isn't that standard
policy?  You can call -- you can contact the Suffolk
County Jail and say you've got an inmate there,
Mr. Ovalle, he's not allowed to see -- is it Mr. Arke?
What is the name?

MS. COYSH:  Akre.

THE COURT:  Akre?  And then they would stop
the visitation.

MS. KAMATH:  I can't speak --

THE COURT:  So if it was so important, if it
was so incredibly important that he not be able to see
Mr. Akre, why didn't they do that, number one?  And
number two, there doesn't seem to be any evidence of
any kind anywhere, any conversation with this
co-defendant had any criminal -- criminality to it.
They are apparently, from what I understand from the
conference downstairs in chambers, they are close
friends, almost like brothers, and have a multitude of
things in common to talk about that have nothing to do
with the ten-year-old assault case or any other alleged

1  criminal behavior and there's no evidence that they

2  were doing anything wrong.

3        MS. KAMATH:  But it's the department's

4  position that they need to monitor, you know,

5  whether --

6        THE COURT:  Well, couldn't they have

7  monitored whether he saw Mr. Akre by telling the jail

8  not to allow him to see him?

9        MS. KAMATH:  I can't speak to whether they

10  could or couldn't do that, but the reality is that he

11  had continuous visits with him despite the fact that

12  this was a special condition on his parole supervision

13  which persists through his local custody at the Suffolk

14  County Jail.  Under Executive Law 259-i, he's still

15  under parole release supervision.  The conditions still

16  apply.

17        THE COURT:  What if he received telephone

18  calls, would that be a violation?

19        MS. KAMATH:  It may be, based on the contact

20  provision.

21        THE COURT:  Would he not be allowed to

22  receive telephone calls in prison?

23        All right.  I interrupted you, Miss Coysh.

24  You're saying that the -- that the charges were only

25  brought after Judge -- Justice Santorelli dismissed the

previous petition.

MS. COYSH: 100 percent, Judge. It's clear as to what happened. We were waiting for Mr. Ovalle literally to walk out of jail and when that didn't happen, I believe it took us a day or two to find out that they had launched another -- another hold on him merely based upon the visits. No evidence that Mr. --

THE COURT: They launched another hold on him without telling him or his attorney?

MS. COYSH: Well, he was served -- if I may, Judge, may I walk over to Mr. Ovalle? Just to clarify when exactly he was served? We didn't find out --

(Counsel conferred with Mr. Ovalle.)

THE COURT: Back on the record.

MS. COYSH: Judge, Judge Santorelli had issued his decision on the 29th day of November and Mr. --

THE COURT: 2015?

MS. COYSH: 2017.

THE COURT: '17.

MS. COYSH: And signed the release order on November 30th, and Mr. Ovalle tells me he received the paperwork on that detainer on the new parole warrant on December 4th. It was a time where we couldn't figure out what was even happening.

1    THE COURT:  So he should have been released

2    at least for four days.

3    MS. COYSH:  Hundred percent, Judge, should

4    have been released.  Should have been released when

5    Judge Santorelli ordered him released.

6    MS. KAMATH:  And, Your Honor, I'm just taking

7    a moment to look for that second warrant, the warrant

8    that we're here on today, which is part of Exhibit E.

9    The date of the warrant is November 30th, 2017, and

10   that's Exhibit E in the petition.

11   THE COURT:  That's the same date that Judge

12   Santorelli -- well, actually Justice Santorelli made

13   his decision in November but he didn't actually sign

14   the proposed order until the 30th, which was the same

15   day they lodged their warrant.

16   MS. COYSH:  Judge, that's correct.  The

17   argument was on November 29th, 2017, and the official

18   order was signed.

19   THE COURT:  And what concerns me, too, is

20   that going forward from that date, then some new

21   supreme court judge heard the second one and basically

22   on similar facts came to a different decision than

23   Justice Santorelli.  So it concerns this Court that

24   there's some judge shopping going on that if the

25   Division of Parole rules -- loses a case, they'll just

file a new warrant on the same or similar charges, hope

to get a different judge off the wheel or however they

randomly choose judges in Suffolk County.  So they got

a different judge, they have a second bite at the same

apple with a different judge with a different ruling.

So --

MS. KAMATH:  Judge, if I may, the warrant

that was vacated by Judge Santorelli was on different

charges distinct from the warrant -- the charges

contained -- some were overlapping charges --

THE COURT:  Some.

MS. KAMATH:  -- but there were new charges --

THE COURT:  Including this charge was an

overlapping charge.

MS. KAMATH:  The visit charges were not

included in the original warrant, because the original

warrant led to his custody in Suffolk County Jail.  And

it was only when he was in custody in Suffolk County

Jail that the --

THE COURT:  Well, did Justice Santorelli or

did he not dismiss parole charges based upon the

visitation by co-defendant in the Suffolk County Jail

visiting room?

MS. KAMATH:  I believe he did not.  I think

those were part of the new warrant that is the

underlying basis for today's proceeding.

MS. COYSH:  Judge, the issue that was heard at the preliminary hearing was whether or not Mr. Ovalle and Mr. Akre had contact outside of the jail.

THE COURT:  Right.

MS. COYSH:  That was the --

THE COURT:  So Justice Santorelli dismissed that and it was even outside the jail.

MS. COYSH:  Correct.

THE COURT:  So upon the Division of Parole learning that, they provide -- they provide new charges that it was violation for him to visit him inside the jail.  Does that sound like -- it sounds like a less serious charge than the ones that Justice Santorelli, Santorini, whatever his name is, dismissed.

MS. KAMATH:  But Your Honor, it was still a repeated violation of the condition.

THE COURT:  Well --

MS. KAMATH:  And if I may, this argument is included in my papers, but the writ of habeas corpus is not the appropriate remedy here.  Petitioner's challenging the decision, the merits of the decision, the final decision here, and that needs to be argued within an Article 78 proceeding.

And furthermore, if -- even if these
challenges are meritorious, the proper remedy is
remand, the Court to remand this case for a new
hearing.  It's not to allow Mr. Ovalle to be released
from custody.

THE COURT:  Well, if the Court were to remand
it for a new hearing, how long would that take?

MS. KAMATH:  The Court could designate a
specific time frame for the hearing to occur.

THE COURT:  I've done that in the past and
the Division of Parole has always asked for more time.
And what concerns me is he's now been incarcerated for
almost the entire two years of his sentence on the
violation of parole.  So by doing what you suggest, by
remanding it, he might be in there longer than if he
hadn't brought this proceeding and been successful.
Doesn't make any sense.

MS. KAMATH:  But Your Honor, under the
technical terms of the statute, which is Executive Law
259-i, he was still under parole release supervision
while he was in custody and he clearly violated that
condition.

THE COURT:  Well, all right.  This Court
finds that -- finds for the petitioner, Mr. Ovalle,
finds that the bringing of the instant violation of

1   probation charges a matter of days after —a Justice

2   Santorini?

3          MS. COYSH:  Santorelli.

4          THE COURT:  —a Santorelli had dismissed

5   similar charges that were more serious than these, it

6   appears, was brought in bad faith and also appears to

7   have been brought as part of that bad faith to forum

8   shop for a new judge to bring a new proceeding for the

9   sole purpose of keeping Mr. Ovalle incarcerated over

10  a -- what amounts to a super technical violation of

11  parole.

12         The Division of Parole, like any law

13  enforcement agency, is given -- is given by the

14  legislature and the laws of this state a lot of power,

15  a lot of power, and within the giving by the

16  legislature that power is invested an incredible amount

17  of what I would call discretion, to use that power with

18  discretion and not with bad intent.  And the facts and

19  the records that are put before me lead me to believe

20  that this -- these violations of parole, based upon the

21  technical violation allowing in the Sullivan -- in the

22  Suffolk County Jail, he went to the visiting room under

23  the supervision of the law enforcement personnel at the

24  jail and spoke to someone he's known his entire life

25  who happened to be ten years earlier a co-defendant in

1    an assault crime is a super technical violation of

2    parole. And based upon the sequence of events where

3    Justice Santorelli had -- had dismissed the parole

4    violations, to bring that on these super technical

5    violations without any evidence, not one scintilla of

6    evidence that any discussions with the co-defendant had

7    anything to do with any illegal activity, just -- just

8    seems an abuse of discretion.

9         It also seems an abuse that, to bring these

10   charges when -- when -- if they were so serious -- they

11   claim he was still under supervision, parole

12   supervision, while he was incarcerated. Technically

13   that may be true, but they can't have it both ways.

14   They can't say he's still under supervision but we

15   won't visit him, we won't visit his family, we won't

16   supervise him in any way, but if under other law

17   enforcement supervision he goes down to the visiting

18   room and has a visit with someone, that's a violation

19   of our supervisory conditions of parole, seems to be

20   counterintuitive to me and counterproductive.

21        So I -- the worse thing about this case is

22   that Mr. Ovalle has now served the two years he got

23   from the administrative parole judge for violating

24   parole on these, I think, excessive use of discretion

25   charges. And so I don't know how long the paperwork

1    will take, but he's probably going to do the full two

2    years anyway.

3             How fast can you get an order to this Court?

4             MS. COYSH:  I have one with me, Judge.

5             THE COURT:  All right.

6             MS. KAMATH:  Your Honor, just -- the

7    department has informed me that there's a parole

8    release process that he has to go through which can

9    take approximately a week.

10            THE COURT:  Take two years.

11            MS. COYSH:  Our client can be released from

12   jail based upon this writ, Judge?  This is what

13   happened last time, and this is something Mr. Ovalle --

14            THE COURT:  File another --

15            MS. COYSH:  That's exactly.  He's terrified.

16            MS. KAMATH:  I've been informed by counsel at

17   the department that there is a parole release process.

18            MS. COYSH:  Judge, may I approach Mr. Ovalle?

19            THE COURT:  Sure.

20            MS. COYSH:  Judge, the writ of habeas corpus

21   is something for immediate release.  It's an unjust

22   detention.  When I represented Mr. Ovalle at his

23   preliminary hearing back in 2016 where there was no

24   probable cause found, what the administrative judge did

25   was order him released immediately from the jail, and

he was to report to parole by, I think it was 8:30 or
9:30, within 24 hours, the next day.

THE COURT:  The problem with that is that
that was from a jail and not a prison system.  Prison
system has a bureaucracy all of its own, so --

MS. COYSH:  Judge, if the Court would be
inclined to maybe issue language of forthwith or, you
know, immediate or something to make sure that this --
my client's terrified of what's going to happen, that
he's not going to go home because something else is
going to come up.

My client's telling me that you granting this
writ restores him back to where he was, and I would
just ask that the Court, whatever, however the Court
could do it to make sure it's expedited.  If not,
Judge, I'll have to bring another writ and we'll be
back here.

I'd ask that if anything that could be done
for today, Judge, his family's here also that could
transport him.

THE COURT:  What is Mr. Ovalle's maximum
expiration date on the original sentence?

MS. COYSH:  Judge, he tells me March 16th,
2020.

THE COURT:  Miss Kamath, you have an

alternative order?

MS. KAMATH: No, Your Honor, I don't have an alternative order but if I may be given an opportunity to review the order before you.

THE COURT: Yeah, I -- I'm not sure that the wording is completely correct. You want to --

(The document was handed to Counsel.)

MS. KAMATH: Your Honor, I --

THE COURT: How much time do you need?

MS. KAMATH: I've been told by DOCCS, the department's counsel, that it could be at least a week -- approximately a week.

THE COURT: All right. I'll give them ten days. Is that sufficient?

MS. KAMATH: I think so. But, Your Honor, are you signing this -- are you going to sign this order because I agree that this --

THE COURT: I'm going to change it.

MS. KAMATH: Okay. This legality of the revocation of parole --

THE COURT: Yeah, that --

MS. COYSH: Judge, my client is very concerned that what Parole may try to do to him next is deny his residence. He's lived at the same residence with his mom at 15 -- 15 Locust in Central Islip, 15

1    East Locust in Central Islip, New York, that they will

2    then say that he can't go back to that residence with

3    his mom.

4                THE COURT:  Why is Parole so --

5                MS. KAMATH:  I can't speak to whether Parole

6    has a proven address, Your Honor.

7                THE COURT:  Yeah.

8                MS. KAMATH:  I don't have enough information.

9                MS. COYSH:  I guess if that happens, Judge,

10   we'll certainly bring it to the Court's attention or

11   whatever.  At this point, at this point in time it's

12   here, it's on the record and we'll facilitate your

13   release.

14               THE COURT:  All right.  Show this to Miss

15   Kamath and see if that --

16               (The document was handed to counsel.)

17               THE COURT:  Show that to Miss Coysh also.

18   Show that proposed order to Miss Coysh.

19               MS. COYSH:  Thank you.  Judge, we have no

20   objection to that order.  Thank you.

21               THE COURT:  Now Miss Kamath, I know you

22   object to the finding of the Court, but as far as the

23   language, does that give your agencies under -- that

24   you work under sufficient time to process whatever

25   paperwork has to be processed?

1        MS. KAMATH:  They've informed me that it take

2    approximately one week, so hopefully the ten days will

3    allow them the time.

4        MS. COYSH:  Judge, can I inquire that's ten

5    regular days or just business days?  I'm not familiar.

6        THE COURT:  No, ten days are ten days.

7        MS. COYSH:  Ten days calendar days.

8        THE COURT:  Today is the 2nd, so we're

9    talking about August (sic) 12th.

10        MS. COYSH:  Okay.

11        THE COURT:  Now Mr. Ovalle, you know, that

12    means that you're going to be back on parole at least

13    until I guess next -- what did you say, May or

14    something?

15        MR. OVALLE:  March.

16        THE COURT:  March.  I can understand some of

17    your feelings here, but try not to get too paranoid

18    because I think that the Division of Parole will not

19    attempt to drop another papers, I mean you've been in

20    custody of corrections for what, almost two years, so I

21    don't think you've been charged with any crimes, so I

22    don't know of any more violations they could bring

23    against you.  Certainly anything from prior to these

24    charges are so distant, I don't think they could bring

25    them any more.  So try not to be too paranoid about

this.  It's only going to be what, about six months or

so and you're going to be completely without any

supervision, which goes without saying, but you're not

getting any younger, maybe you want to just cool it and

not get involved in any of these scrapes.

     You had -- I read your history.  You had some

issues, so stop.  Getting too old for this, all right?

     All right, I'm going to sign the order.

Maybe -- I'm not going to hand write all these changes,

so maybe we can get a bunch of copies and certify them

or something?

     THE CLERK:  It's got to be clocked in

downstairs first.

     THE COURT:  All right.

     THE CLERK:  It should be taken first to your

chambers so Priscilla can copy it.

     THE COURT:  Yeah.

     THE CLERK:  And then it's got to be -- it

should be clocked in in our office and then go to the

county clerk.

     THE COURT:  All right.  So why don't the

attorneys stay until we get a copy or certified copy of

the order.

     MS. COYSH:  Judge, on behalf of Mr. Ovalle,

I'd like to thank you for the Court's time.

1            THE COURT:  And Mr. Ovalle, you don't have to

2    thank me.  I'm just trying to do my job.  Just make

3    sure that this is the last time you're ever arrested,

4    okay?

5            MR. OVALLE:  Yes, sir.

6            THE COURT:  All right.

7            MS. KAMATH:  Thank you.

8        *       *       *       *       *       *       *

9            C E R T I F I C A T I O N

10       Certified to be a true and correct

11    transcript of the proceedings held above.

12            *Georgette H. Sayers*

13            Georgette H. Sayers, RMR,

14            Senior Court Reporter.

15

16

17

18

19

20

21

22

23

24

25